# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 30, 2013          Decided July 14, 2014

No. 11-1324

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
PETITIONER

v.

UNITED STATES OF AMERICA,
RESPONDENT

———

On Petition for Rehearing En Banc

———

*Michel Paradis*, Counsel, Office of the Chief Defense Counsel, argued the cause for the petitioner. *Mary R. McCormick* and *Todd E. Pierce*, Counsel, were on brief.

*David S. Weissbrodt* and *William J. Aceves* were on brief for *amicus curiae* International Law Scholars in support of the petitioner.

*Agnieszka Fryszman* was on brief for *amicus curiae* National Institute of Military Justice in support of the petitioner.

*McKenzie A. Livingston* was on brief for *amici curiae* Robert D. Steele and other Former Members of the Intelligence Community in support of the petitioner.

*John S. Summers* and *Michael J. Newman* were on brief for *amici curiae* Professors David Glazier and Gary Solis in support of the petitioner.

*Sarah H. Paoletti* was on brief for *amici curiae* Historians, Political Scientists and Constitutional Law Scholars in support of the petitioner.

*Jeffrey T. Renz* was on brief for *amici curiae* First Amendment Scholars and Historians and the Montana Pardon Project in support of the petitioner.

*Elizabeth B. Wydra* was on brief for *amicus curiae* Constitutional Accountability Center in support of the petitioner.

*Ian H. Gershengorn*, Attorney, U.S. Department of Justice, argued the cause for the respondent. *Steven M. Dunne*, Chief Attorney, and *John F. De Pue*, Attorney, were on brief. *Jeffrey M. Smith*, Trial Attorney, U.S. Department of Justice, and *Francis A. Gilligan* and *Edward S. White*, Attorneys, Office of Military Commissions, entered appearances.

*James A. Schoettler Jr.* was on brief for *amici curiae* Former Government Officials, Former Military Lawyers and Scholars of National Security Law in support of respondent.

*Cory L. Andrews* and *Richard A. Samp* were on brief for *amici curiae* Washington Legal Foundation et al. in support of the respondent.

Before: GARLAND, *Chief Judge*, and HENDERSON, ROGERS, TATEL, BROWN, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Opinion concurring in the judgment in part and dissenting filed by *Circuit Judge* ROGERS.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* BROWN.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* KAVANAUGH.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Ali Hamza Ahmad Suliman al Bahlul (Bahlul) served as a personal assistant to Osama bin Laden, produced propaganda videos for al Qaeda and assisted with preparations for the attacks of September 11, 2001 that killed thousands of Americans. Three months after 9/11, Bahlul was captured in Pakistan and transferred to the United States Naval Base at Guantanamo Bay, Cuba. Military prosecutors charged him with three crimes: conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes. A military commission convicted him of all three crimes and sentenced him to life imprisonment. The United States Court of Military Commission Review (CMCR) affirmed his conviction and sentence. Bahlul appeals. For the reasons that follow, we reject Bahlul's *ex post facto* challenge to his conspiracy conviction and remand that conviction to the original panel of this Court for it to dispose of several remaining issues. In addition, we vacate his material support and solicitation convictions.

## I. Background

Bahlul is a native of Yemen. In the late 1990s, he traveled to Afghanistan to join al Qaeda. He completed military-like training while staying at an al Qaeda guesthouse and eventually met and pledged an oath of loyalty ("bayat") to bin Laden. Bin Laden assigned Bahlul to work in al Qaeda's media office.

On October 12, 2000, al Qaeda suicide bombers attacked the *U.S.S. Cole*, killing 17 American servicemen and wounding 39 others. Bin Laden later instructed Bahlul to create a video celebrating the attack for use as a recruiting tool. The video Bahlul produced (and bin Laden edited) includes footage of the attack, calls for jihad against the United States and propaganda blaming "Western infidels" and complicit Middle Eastern regimes for Muslim suffering. Bahlul considered it one of the best propaganda videos al Qaeda had produced and it has been translated into several languages and widely distributed.

Bin Laden then appointed Bahlul as his personal assistant and secretary for public relations. Bahlul arranged the loyalty oaths of two of the 9/11 hijackers, Mohamed Atta and Ziad al Jarrah, and prepared their "martyr wills"—propaganda declarations documenting al Qaeda's role in the attacks. Bahlul claims he sought to participate in the 9/11 attacks himself but bin Laden refused because he considered his media man too important to lose. In the days preceding 9/11, Bahlul assembled al Qaeda's media equipment and evacuated al Qaeda's Kandahar headquarters with bin Laden and other senior al Qaeda leaders. They traveled to a remote region of Afghanistan where, on September 11, 2001, they heard reports of the day's attacks via a radio operated by Bahlul.

Bin Laden subsequently asked Bahlul to research the economic effects of the attacks and report his findings.

In the following weeks, Bahlul fled to Pakistan. He was captured there in December 2001 and turned over to U.S. forces. In 2002, he was transferred to the U.S. Naval Base at Guantanamo Bay, Cuba, where he has since been detained as an enemy combatant pursuant to the 2001 Authorization for Use of Military Force (AUMF). *See* Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224; *Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 521 (2004) (plurality). Two months after 9/11, President Bush invoked the AUMF and Article 21 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 821 (hereinafter "section 821"), to establish military commissions to try "member[s] of . . . al Qaida" and others who "engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor." *See* Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001). In 2003, the President designated Bahlul eligible for trial by military commission and in 2004 military prosecutors charged him with conspiracy to commit war crimes.

Bahlul's prosecution was stayed pending the outcome of another detainee's challenge to the lawfulness of his trial by military commission. In *Hamdan v. Rumsfeld*, the United States Supreme Court held that the military commission procedures then in place contravened certain constraints imposed by the UCMJ and the four Geneva Conventions signed in 1949. 548 U.S. 557, 613–35 (2006). In response to the *Hamdan* decision, the Congress enacted the Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-336, 120 Stat. 2600, which amended the statutory procedures governing military commissions to cure the flaws identified in *Hamdan*. The 2006 MCA specifically enumerated 30 war

crimes triable by military commission, *see* 10 U.S.C. §§ 950t–950v (2006),[1] and conferred jurisdiction on military commissions to try "any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001," *id.* § 948d(a).

The Supreme Court has long recognized that unlawful enemy combatants may be prosecuted by military commission for their war crimes. *See Hamdan*, 548 U.S. at 592–93; *Hamdi*, 542 U.S. at 518; *In re Yamashita*, 327 U.S. 1, 7–8, 11 (1946); *Ex parte Quirin*, 317 U.S. 1, 28, 31 (1942). There are three traditional bases for military commission jurisdiction: military government, martial law and the law of war. *See Hamdan*, 548 U.S. at 595–98 (plurality opinion); *see also id.* at 683 (Thomas, J., dissenting). First, military commissions may try ordinary crimes—*e.g.*, manslaughter or robbery—and violations of military orders committed by both soldiers and civilians in territories under U.S. military government. *Id.* at 595–96. Second, military commissions may try ordinary crimes and violations of military orders committed by soldiers and civilians in territory under martial law—as much of our country was during the Civil War. *See id.* at 595; WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 832–34 (rev. 2d ed. 1920). Third, and "utterly different" from the first two categories, military commissions may try offenses against the law of war. *Hamdan*, 548 U.S. at 596 (plurality opinion) (citation omitted). It is undisputed that the commission that tried Bahlul is of the third type: a law-of-war military

---

[1] The Military Commissions Act of 2009 rewrote the 2006 MCA but left it substantively unaltered as relevant here. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, §§ 1801–07, 123 Stat. 2190, 2574–2614 (codified at 10 U.S.C. §§ 948a–950t (Supp. III 2010)). Unless otherwise noted, we refer to the 2006 MCA.

commission. A military commission convened pursuant to the 2006 MCA must be composed of at least five "members," who are qualified active duty officers of the armed forces and play a role similar to a petit jury. 10 U.S.C. §§ 948i, 948m. A military judge presides over the trial. *Id.* § 948j.

In 2008, military prosecutors amended the charges against Bahlul to allege three of the offenses enumerated in the 2006 MCA based on the conduct summarized above—conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes. *See id.* §§ 950u, 950v(b)(25), 950v(b)(28) (2006). The conspiracy and solicitation charges alleged seven object crimes proscribed by the 2006 MCA: murder of protected persons, attacking civilians, attacking civilian objects, murder in violation of the law of war, destruction of property in violation of the law of war, terrorism and providing material support for terrorism. *See id.* § 950v(b)(1)–(3), (15)–(16), (24)–(25). Bahlul admitted all of the factual allegations against him, with the exception of the allegation that he had armed himself with a suicide belt to protect bin Laden. He nevertheless pleaded not guilty to the charged offenses because he denied the legitimacy of the military commission and sought to absent himself from the proceedings as a boycott. He objected to representation by appointed defense counsel and expressed a desire to proceed *pro se*, although his attempts to absent himself from the proceedings at times complicated matters and forced defense counsel to stand in for Bahlul and carry out his instructions not to present a defense. Bahlul waived all pretrial motions, asked no questions during voir dire, made no objections to prosecution evidence, presented no defense and declined to make opening and closing arguments.

The military commission convicted Bahlul of all three offenses. Using a detailed findings worksheet, it found that Bahlul conspired to commit and solicited each of the seven alleged object offenses and that Bahlul committed ten of the eleven alleged overt acts. *See* Petitioner's Appendix (App.) 132–33.[2] The commission sentenced him to life imprisonment and the convening authority, Susan J.

---

[2] The military commission specifically found that Bahlul committed the following overt acts: (1) traveled to Afghanistan with the purpose and intent of joining al Qaeda; (2) met with Saif al Adl, the head of the al Qaeda Security Committee, as a step toward joining al Qaeda; (3) underwent military-type training at an al Qaeda sponsored training camp located in Afghanistan; (4) pledged fealty or "bayat" to the leader of al Qaeda, Osama bin Laden, joined al Qaeda and provided personal services in support of al Qaeda; (5) prepared and assisted in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer U.S.S. Cole," to solicit material support for al Qaeda, to recruit to and indoctrinate personnel about the organization and objectives of al Qaeda and to solicit, incite and advise persons to commit terrorism; (6) acted as personal secretary and media secretary of bin Laden in support of al Qaeda; (7) arranged for Muhammed Atta and Ziad al Jarrah to pledge fealty or "bayat" to bin Laden; (8) prepared the propaganda declarations styled as martyr wills of Atta and al Jarrah in preparation for the acts of terrorism perpetrated by Atta, al Jarrah and others at various locations in the United States on September 11, 2001; (9) at the direction of bin Laden, researched the economic effect of the 9/11 attacks on the United States and provided the results of that research to bin Laden; and (10) operated and maintained data processing equipment and media communications equipment for the benefit of bin Laden and other members of the al Qaeda leadership. App. 132–33; *see also id.* at 122–23 (charging document).

Crawford,[3] approved the findings and sentence. The CMCR affirmed Bahlul's conviction and sentence in a 112-page opinion. *See United States v. Bahlul*, 820 F. Supp. 2d 1141 (2011). Bahlul then appealed to this Court.

While Bahlul's appeal was pending, this Court held that the 2006 MCA "does not authorize *retroactive* prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission." *Hamdan v. United States (Hamdan II)*, 696 F.3d 1238, 1248 (D.C. Cir. 2012) (emphasis in original). The Court declared that providing material support for terrorism—the only charge at issue in that appeal—was not a pre-existing war crime triable by military commission; it therefore vacated Hamdan's conviction on that offense. *Id.* at 1248–53. The Government subsequently conceded that *Hamdan II*'s reasoning required vacatur of all three of Bahlul's convictions. Based on that concession, a panel of this Court vacated the convictions. Order, *Bahlul v. United States*, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013). We subsequently granted the Government's petition for rehearing *en banc*.

---

[3] Under the 2006 MCA, a military commission "may be convened by the Secretary of Defense or by any officer or official of the United States designated by the Secretary for that purpose." 10 U.S.C. § 948h. Crawford, a former judge of the United States Court of Appeals for the Armed Forces, was so designated by the Defense Secretary. The convening authority refers the charges against the accused for trial by military commission, details the members of the commission and approves or disapproves the findings and sentence of the commission. *Id.* §§ 948i(b), 950b; *cf. Hamdan*, 548 U.S. at 647–49 (Kennedy, J., concurring) (explaining role of convening authority under UCMJ).

## II. Standard of Review

Bahlul argues that the 2006 MCA must be construed to make triable by military commission only those crimes that were recognized under the international law of war when committed. He further contends that, if the 2006 MCA authorizes retroactive prosecution of new law-of-war offenses by military commission, his convictions violate the *Ex Post Facto* Clause. Bahlul made neither of these arguments before the military commission.

" 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *United States v. Olano*, 507 U.S. 725, 731 (1993) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). This fundamental principle of appellate review generally bars a party who failed to preserve an argument in a lower tribunal from raising it on appeal absent plain error or exceptional circumstances. *See United States v. Atkinson*, 297 U.S. 157, 159 (1936); *Salazar ex rel. Salazar v. Dist. of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010).

To preserve error for appellate review, an appellant must interpose a "timely" objection, *United States v. Simpson*, 430 F.3d 1177, 1183 (D.C. Cir. 2005), and "state the specific ground for [the] objection," *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995). Although he need not "cite the particular case that supports his position," *United States v. Rashad*, 396 F.3d 398, 401 (D.C. Cir. 2005), he must state the ground for his objection "with sufficient precision to indicate distinctly [his] thesis," *Miller v. Avirom*, 384 F.2d 319, 322 (D.C. Cir. 1967). Thus, "[a]n objection is not properly raised

if it is couched in terms too general to have alerted the trial court to the substance of the petitioner's point." *United States v. Breedlove*, 204 F.3d 267, 270 (D.C. Cir. 2000); *see also Noonan v. Caledonia Gold Min. Co.*, 121 U.S. 393, 400 (1887) ("The rule is universal, that where an objection is so general as not to indicate the specific grounds upon which it is made, it is unavailing on appeal, unless it be of such a character that it could not have been obviated at the trial.").

The contemporaneous-objection rule is not mere "obeisance to ritual." *Miller*, 384 F.2d at 322. It serves two purposes. First, the rule promotes judicial efficiency by giving the trial tribunal the opportunity to quickly and efficiently resolve errors that would otherwise require burdensome and unnecessary appellate review and remand. *See Puckett v. United States*, 556 U.S. 129, 134 (2009). Second, the rule discourages the intentional withholding of an objection by a party to be raised on appeal only if he loses at trial. *See id.*; *see also Wainwright v. Sykes*, 433 U.S. 72, 89 (1977); *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–39 (1940) (citing *Crumpton v. United States*, 138 U.S. 361, 364 (1891)).

To mitigate the sometimes harsh results of the forfeiture rule in criminal cases, the Congress authorizes the court of appeals to exercise its discretion to notice and correct a certain type of forfeited error: "plain error." FED. R. CRIM. P. 52(b); *see United States v. Young*, 470 U.S. 1, 15 (1985); *see also* 10 U.S.C. § 950a(a) (Supp. III 2010) (Military Commissions Act of 2009 review provision specifying that only errors that "materially prejudice[] the substantial rights

of the accused" may be corrected).[4] A plain error is "[1] an 'error' [2] that is 'plain' and [3] that 'affect[s] substantial rights.' " *Olano*, 507 U.S. at 732 (quoting FED. R. CRIM P. 52(b)) (final alteration in original). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quotation marks and brackets omitted). Plain-error review, however, is "highly circumscribed." *United States v. Brinson-Scott*, 714 F.3d 616, 625 (D.C. Cir. 2013); *see also Puckett*, 556 U.S. at 134 ("Meeting all four prongs is difficult, as it should be." (quotation marks omitted)); *Young*, 470 U.S. at 15 ("[T]he plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." (quotation marks omitted)). "There is good reason for this; anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal" to the policies furthered by the contemporaneous-objection rule. *Puckett*, 556 U.S. at 134 (quotation marks omitted). We therefore must guard against "unwarranted extension of this exacting definition of plain error." *Young*, 470 U.S. at 15.[5]

---

[4] We need not decide whether Rule 52(b) applies directly to this proceeding because plain-error review is appropriate whether or not Rule 52(b) directly governs. *See Salazar*, 602 F.3d at 437.

[5] The Government argued for plain-error review before the CMCR, in its original brief to a panel of this Court and in its brief to the *en banc* court. *See Bahlul*, 820 F. Supp. 2d at 1256–58; Br. of the United States 65, *Bahlul v. United States*, No. 11-1324 (D.C. Cir. May 16, 2012) (Panel Br.); Br. of the United States 63, *Bahlul*

Applying these principles here, we conclude that Bahlul forfeited the arguments he now raises. He flatly refused to participate in the military commission proceedings and instructed his trial counsel not to present a substantive defense. Although he objected to the commission's authority to try him, his objection was couched entirely in political and religious terms. He disclaimed guilt and contended that "what [he] did was not a crime." Trial Tr. 175. But context makes clear that Bahlul argued that his acts were not criminal because they were inspired by religious fervor. *See id.* at 175–76. After claiming that the United States had "put on the side[] the meaningless American laws" and "legislated new laws" for "the planet Earth," he explained that he "believe[s] that no one has the right in the land to set laws for the people, the right of legislating laws[] is absolutely to Allah, the All Mighty." *Id.* at 23–24. Bahlul did ask a "legal question" about whether the "law here by you stems from the action, before action, or post action," *id.* at 104, but the military judge could not ascertain what Bahlul was asking and Bahlul did not elaborate. Bahlul's objection to the commission's authority was unquestionably "too general to have alerted the trial court to the substance of [his] point." *United States v. Bolla*, 346 F.3d 1148, 1152 (D.C. Cir. 2003) (Roberts, J.)

---

*v. United States*, No. 11-1324 (D.C. Cir. July 10, 2013) (E.B. Br.). We reject Bahlul's contention that the Government abandoned its forfeiture argument by conceding in its supplemental brief to the panel after *Hamdan II* that Bahlul's convictions should be vacated. That brief was directed to a panel of this Court, which was bound by *Hamdan II*'s avoidance of the *ex post facto* issue. *See Hamdan II*, 696 F.3d at 1248 n.7. Only at the *en banc* stage was it possible for the Government to attack *Hamdan II*'s statutory construction and therefore put the *Ex Post Facto* Clause—and the applicable standard of review—back in play.

(quotation marks omitted); *Breedlove*, 204 F.3d at 270. Accordingly, we review his convictions for plain error.[6]

---

[6] Three of our colleagues cite Rules 905 and 907 of the Rules of Military Commissions for the notion that Bahlul's *ex post facto* argument is "not forfeitable." Opinion of Judge Kavanaugh (Kavanaugh Op.) 31; *accord* Opinion of Judge Rogers (Rogers Op.) 26–27; Opinion of Judge Brown (Brown Op.) 2. Bahlul's briefs do not mention these rules or suggest this argument. Moreover, Rules 905 and 907 both explicitly refer to *waiver*, *see* MANUAL FOR MILITARY COMMISSIONS, pt. II, at 83–84, 87 (2007), whereas we conclude instead that Bahlul *forfeited* his argument. "Although jurists often use the words interchangeably," *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004), waiver and forfeiture are not the same, *see Olano*, 507 U.S. at 733; *see also United States v. Weathers*, 186 F.3d 948, 955 (D.C. Cir. 1999) (explaining difference while interpreting similar provision in Federal Rules of Criminal Procedure regarding waiver of pretrial motions). Nor is Bahlul's *ex post facto* argument "jurisdictional." *See* Rogers Op. 26; Brown Op. 2; Kavanaugh Op. 31. As discussed *infra* pp. 16–17, the 2006 MCA explicitly confers jurisdiction on military commissions to try the charged offenses. The question whether that Act is unconstitutional does not involve " 'the courts' statutory or constitutional *power* to adjudicate the case.' " *United States v. Cotton*, 535 U.S. 625, 630 (2002) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)); *United States v. Williams*, 341 U.S. 58, 66 (1951) ("Even the unconstitutionality of the statute under which the proceeding is brought does not oust a court of jurisdiction."); *Lamar v. United States*, 240 U.S. 60, 65 (1916) ("The objection that the indictment does not charge a crime against the United States goes only to the merits of the case."); *see also United States v. Delgado-Garcia*, 374 F.3d 1337, 1342–43 (D.C. Cir. 2004) (explaining limits of so-called "*Blackledge/Menna*" exception relied on by Bahlul). Nor are we persuaded that Bahlul's *ex post facto* argument is non-forfeitable because it amounts to an argument that the indictment fails to "allege an offense." Rogers Op. 27; Kavanaugh Op. 32. Failure to state an offense is simply another way of saying there is a defect in the indictment—as

Two of our colleagues contend that, by applying only plain-error review, we have provided insufficient clarity in this case.  They argue that the Executive Branch's need for guidance in this area warrants *de novo* review.  Brown Op. 1, 24; Kavanaugh Op. 34.  But the Government itself has asked that we apply plain-error review.  E.B. Br. of the United States 63.  Indeed, at oral argument, it insisted that we do so, notwithstanding the potential lack of "clarity" that such review might entail.  Oral Arg. Tr. 45.

### III.  Statutory Analysis

As noted, *Hamdan II* held that the 2006 MCA "does not authorize *retroactive* prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission."   696 F.3d at 1248.   Because we conclude, for the reasons that follow, that the 2006 MCA is unambiguous in its intent to authorize retroactive prosecution for the crimes enumerated in the statute—regardless of their pre-existing law-of-war status—we now overrule *Hamdan II*'s statutory holding.  *See United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc); *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc);

---

evidenced by Rule 907's cross-reference to Rule 307(c), which sets forth the criteria for charges and specifications. *See* MANUAL FOR MILITARY COMMISSIONS, pt. II, at 15–16; *see also Delgado-Garcia*, 374 F.3d at 1341–42 ("[T]he question of an indictment's failure to state an offense is an issue that goes to the merits of a case . . . .").  As *Cotton* makes clear, such a claim can be forfeited. 535 U.S. at 630–31.

*Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1524 (D.C. Cir. 1988) (en banc).[7]

## A.  The 2006 MCA is Unambiguous

The 2006 MCA confers jurisdiction on military commissions to try "*any* offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant *before, on, or after September 11, 2001*."  10 U.S.C. § 948d(a) (2006) (emphases added). "Any," in this context, means "all."  *See* OXFORD ENGLISH DICTIONARY 539 (2d ed. 1989) ("indifference as to the particular one or ones that may be selected"); *see also Dep't of Housing & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002); *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  The "offense[s] made punishable by this chapter" include the charges of which Bahlul was convicted: conspiracy to commit war crimes, providing material support for terrorism and solicitation of others to commit war crimes.  10 U.S.C. §§ 950u, 950v(b)(25), 950v(b)(28) (2006).  There could hardly be a clearer statement of the Congress's intent to confer jurisdiction on military commissions to try the enumerated crimes regardless whether they occurred "before, on, or after September 11, 2001."  And the provisions of the statute enumerating the crimes triable thereunder expressly "do not preclude trial for crimes that occurred before the date of the enactment of this chapter."  10 U.S.C. § 950p(b) (2006).  For good reason:  If it were otherwise, section 948d's conferral of jurisdiction to prosecute the enumerated crimes occurring on or before September 11, 2001 would be

---

[7] Although perhaps uncommon, overruling our precedent on plain-error review is within the authority of the *en banc* court. *See, e.g.*, *United States v. Padilla*, 415 F.3d 211, 217–18 (1st Cir. 2005) (en banc) (recognizing power of *en banc* court to overrule circuit precedent under plain-error review but declining to do so).

inoperative. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotation marks, brackets and ellipsis omitted)). Although we presume that statutes apply only prospectively "absent clear congressional intent" to the contrary, that presumption is overcome by the clear language of the 2006 MCA. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also Johnson v. United States*, 529 U.S. 694, 701 (2000) (clear statement of intent overcomes presumption against retroactivity); *Martin v. Hadix*, 527 U.S. 343, 353–54 (1999) (" 'unambiguous directive' or 'express command' " overcomes presumption against retroactivity); *Reynolds v. M'Arthur*, 27 U.S. (2 Pet.) 417, 434 (1829) (Marshall, C.J.) ("[L]aws by which human action is to be regulated . . . are never to be construed retrospectively unless the language of the act shall render such construction indispensable.").

Review of the inter-branch dialogue which brought about the 2006 MCA confirms the Congress's intent to apply all of the statute's enumerated crimes retroactively. *See Boumediene v. Bush*, 553 U.S. 723, 738 (2008) ("acknowledg[ing] . . . the litigation history that prompted Congress to enact the MCA"). In *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), the Supreme Court considered the President's order that a military commission try Hamdan, a Guantanamo detainee, for one of the very crimes of which Bahlul was convicted: conspiracy to commit war crimes. Hamdan challenged the President's authority to convene the military commission by petitioning for habeas corpus relief and the Supreme Court's resulting decision initiated two games of interpretive ping-pong between the judiciary and the legislature. One involves the issue presented here: whether conspiracy is triable by a law-of-war military commission. In

*Hamdan*, four justices concluded that it was not triable under the extant statute (section 821) and three concluded that it was. *Compare Hamdan*, 548 U.S. at 603–13 (plurality opinion of Stevens, J.), *with id.* at 697–704 (Thomas, J., dissenting). Four justices also "specifically invited Congress to clarify the scope of the President's statutory authority to use military commissions to try unlawful alien enemy combatants for war crimes." *Hamdan II*, 696 F.3d at 1243; *see Hamdan*, 548 U.S. at 636 (Breyer, J., concurring) ("Nothing prevents the President from returning to Congress to seek the authority he believes necessary."); *id.* at 637 (Kennedy, J., concurring) ("If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so.").

The Congress answered the Court's invitation with the 2006 MCA, which provides the President the very power he sought to exercise in *Hamdan*—the power to try the 9/11 perpetrators for conspiracy—by including conspiracy as an offense triable by military commission, 10 U.S.C. § 950v(b)(28) (2006), and by conferring jurisdiction on military commissions to try alien unlawful enemy combatants for conspiracy based on conduct that occurred "before, on, or after September 11, 2001," *id.* § 948d(a). We must heed this inter-branch dialogue, as *Boumediene* instructs. 553 U.S. at 738.

If this sounds familiar, it does so because it mirrors a second game of interpretive ping-pong begun in *Hamdan*. There, the Court also addressed the Government's contention that section 1005(e)(1) of the Detainee Treatment Act of 2005 (DTA), Pub. L. 109-148, 119 Stat. 2739, 2741–42—enacted after the Court's grant of certiorari in *Hamdan*—ousted it of jurisdiction to entertain Hamdan's habeas petition. *Hamdan*,

548 U.S. at 572. After a lengthy statutory analysis, the Court construed the DTA to apply only to petitions filed after the DTA's enactment and, because Hamdan's petition was filed before, the statute did not apply. *Id.* at 576–84. In construing the DTA as it did, the Court avoided addressing "grave questions about Congress' authority to impinge upon this Court's appellate jurisdiction, particularly in habeas cases" and whether the Congress had unconstitutionally suspended the writ of habeas corpus. *Id.* at 575. Although the Court relied on "[o]rdinary principles of statutory construction" to reach its result, *id.*, its practical message to the Congress was clear: Stripping the courts of jurisdiction over detainees' pending habeas petitions must be done unambiguously. Three justices dissented, arguing that the DTA was already unambiguous in its intent to repeal the Court's jurisdiction. *Id.* at 656–69 (Scalia, J., dissenting).

The Congress returned serve in the 2006 MCA. Section 7(b) clarified that the bar to habeas jurisdiction applied to "all cases, without exception, pending on or after the date" of the statute's enactment. 2006 MCA, § 7(b), 120 Stat. at 2636. Two years later, a detainee whose habeas petition was pending at the time of the 2006 MCA's enactment argued that the statute did not apply to his case because section 7(b) was not a "sufficiently clear statement of congressional intent to strip the federal courts of jurisdiction in pending cases." *Boumediene*, 553 U.S. at 737. This time, the Court rejected the argument. It explained:

> If the Court invokes a clear statement rule to advise that certain statutory interpretations are favored in order to avoid constitutional difficulties, Congress can make an informed legislative choice either to amend the statute or to retain its existing text. *If Congress amends, its intent must be respected even if*

> *a difficult constitutional question is presented.* The usual presumption is that Members of Congress, in accord with their oath of office, considered the constitutional issue and determined the amended statute to be a lawful one; and the Judiciary, in light of that determination, proceeds to its own independent judgment on the constitutional question when required to do so in a proper case.
>
> If this ongoing dialogue between and among the branches of Government is to be respected, *we cannot ignore that the MCA was a direct response to* Hamdan*'s holding that the DTA's jurisdiction-stripping provision had no application to pending cases*.

*Id.* at 738 (emphases added).  Having avoided the Suspension Clause issue in *Hamdan* by virtue of its construction of the statute and having been answered by the Congress's reenactment of its retroactive intent, the Court had no choice but to resolve the difficult constitutional question presented (whether the MCA violated the Suspension Clause).

The same thing happened here.  In enacting the military commission provisions of the 2006 MCA, the Congress plainly intended to give the President the power which *Hamdan* held it had not previously supplied—just as the 2006 MCA clarified that in fact the Congress *did* intend section 7(b)'s ouster of habeas jurisdiction to apply to pending cases. The legislative history confirms this view. *See Boumediene*, 553 U.S. at 739 ("The Court of Appeals was correct to take note of the legislative history when construing the statute . . . ."). Supporters and opponents of the legislation alike agreed that the 2006 MCA's purpose was to authorize the trial by

military commission of the 9/11 conspirators.[8]  And because the 9/11 conspiracy took place long before 2006, the statute could accomplish its explicit purpose only if it applied to pre-enactment conduct.  As the Court itself made clear, "we cannot ignore that the [2006] MCA was a direct response to *Hamdan*'s holding." *Boumediene*, 553 U.S. at 739.

Reading the MCA in this context and given the unequivocal nature of its jurisdictional grant, we conclude the

---

[8]  The legislative history is overwhelmingly in favor of retroactive application of the MCA's provisions as a response to *Hamdan*.  *See, e.g.*, 152 CONG. REC. H7533 (daily ed. Sept. 27, 2006) (statement of Rep. Hunter) ("I can't think of a better way to honor the fifth anniversary of September 11 than by establishing a system to prosecute the terrorists who on that day murdered thousands of innocent civilians . . . ."); *id.* ("Without [the 2006 MCA], the United States has no effective means to try and punish the perpetrators of September 11, the attack on the USS *Cole* and the embassy bombings."); *id.* at H7536 (statement of Rep. Saxton) ("We have carefully narrowed and crafted the provisions of this bill to enable the United States to prosecute the perpetrators of the 1998 bombings of the American embassies in Kenya and Tanzania, the 2000 attack on the USS *Cole*, and other crimes that have been committed."); *id.* ("Importantly, this bill allows, as all Americans believe it should, the criminal prosecutions of those who purposefully and materially supported [the 9/11 conspiracy]."); *id.* at H7545 (statement of Rep. Sensenbrenner) ("[The 2006 MCA] is about prosecuting the most dangerous terrorists America has ever confronted . . . like Khalid Sheik Mohammed, the mastermind of the 9/11 attacks, or Ahbd al-Nashiri, who planned the attack on the USS *Cole*."); *id.* at H7552 (statement of Rep. Boehner); *id.* at S10243 (statement of Sen. Frist) ("Until Congress passes [the 2006 MCA], terrorists such as Khalid Shaikh Mohammed cannot be tried for war crimes . . . ."); *cf. id.* at H7536 (statement of Rep. Skelton) (opposing 2006 MCA because it "creates" "ex post facto laws").

2006 MCA unambiguously authorizes Bahlul's prosecution for the charged offenses based on pre-2006 conduct.

### B. The Avoidance Canon is Inapplicable

*Hamdan II*'s contrary conclusion turned on the following provision of the 2006 MCA:

> (a) PURPOSE.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

> (b) EFFECT.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

10 U.S.C. § 950p (2006). In *Hamdan II*, the Court read this provision to reflect the Congress's "belie[f] that the Act codified no new crimes and thus posed no ex post facto problem." 696 F.3d at 1247. Because the Congress was wrong in its textually stated premise—*i.e.*, the Act *did* codify new war crimes—the Court found "at least something of an ambiguity" in the statute. *Id.* at 1248. It then turned to the avoidance canon to resolve the ambiguity, concluding that the Congress intended to authorize retroactive prosecution only if "the conduct was already prohibited under existing U.S. law as a war crime triable by military commission." *Id.*

The "avoidance canon" reflects a fundamental principle of judicial restraint. *See Ashwander v. TVA*, 297 U.S. 288, 341–48 (1936) (Brandeis, J., concurring). But "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as *a means* of *choosing between them*." *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis in original); *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 239 (2010). If, after applying ordinary principles of textual analysis, the statute is not genuinely open to two constructions, the "canon of constitutional avoidance does not apply." *Gonzales v. Carhart*, 550 U.S. 124, 154 (2007). Because the 2006 MCA unqualifiedly confers jurisdiction on military commissions to try "*any* offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant *before, on, or after September 11, 2001*," 10 U.S.C. § 948d(a) (2006) (emphases added), it is not "fairly possible" to read the statute to apply only prospectively. *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) (Holmes, J.).

*Hamdan II* perceived a "tight causal link between (i) Congress's belief that the statute codified only crimes under pre-existing law and (ii) Congress's statement that the new statute could therefore apply to conduct before enactment." 696 F.3d at 1247–48. We think that link plainly *affirms* the Congress's intent to apply the statute retroactively. "The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States." *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981). We assume that, in meeting that oath, it "legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575

(1988); *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924); *United States v. Harris*, 106 U.S. 629, 635 (1883); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring). As section 950p makes abundantly clear, the Congress made precisely that assessment and, whether right or wrong, concluded that the statute fell within the constitutional limits of its legislative authority. *See City of Boerne v. Flores*, 521 U.S. 507, 535 (1997) ("When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution."); *United States v. Nixon*, 418 U.S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others."). Indeed, the legislative history reveals the breadth of the Congress's debate on the statute's constitutionality. *See, e.g.*, H.R. Rep. No. 109-664, at 25 ("For the reasons stated in Justice Thomas's opinion [in *Hamdan*], the Committee [on Armed Services] views conspiracy as a separate offense punishable by military commissions.").

The "ambiguity" *Hamdan II* identified was the Congress's failure to address what it "would . . . have wanted" if it "had known that the Act was codifying some new crimes." 696 F.3d at 1247. In other words, *Hamdan II* found the statute ambiguous because the Congress did not include in the text of the statute alternative language in case it was wrong in its reading of the law on which it premised its legislation. But the Congress always legislates on the basis of some set of facts or premises it believes to be true. It holds hearings and investigates precisely for the purpose of acquiring facts and then legislates on the basis of those facts. Because it believes to be true the facts on which it bases its

legislation, the Congress seldom (if ever) includes instructions on what to do if those facts are proven incorrect. Here, the Congress authorized prosecution for "any offense made punishable by" the 2006 MCA, including offenses based on pre-enactment conduct, precisely because it believed that all of the offenses were already triable by military commission. The Congress's plainly expressed belief about pre-enactment law should govern our understanding of the Congress's intent expressed in the text of the statute. If judicial inquiry reveals that the Congress was mistaken, it is not our task to rewrite the statute to conform with the actual state of the law but rather to strike it down insofar as the Congress's mistake renders the statute unconstitutional. *See Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 n.7 (D.C. Cir. 2013) ("The constitutional avoidance canon is an interpretive aid, not an invitation to rewrite statutes to satisfy constitutional strictures."), *cert. granted* (June 23, 2014).

Moreover, the avoidance canon ordinarily requires no speculation into the Congress's hypothetical intent: If the statute's text is ambiguous, we choose a constitutional construction over an unconstitutional one. Here, however, the "ambiguity" lies not in the text itself but in the text when read in light of *Hamdan II*'s subsequent finding that the premise on which the text is based is wrong. That is, the "ambiguity" lies in the existence of matters unknown to the Congress. But "[w]e cannot replace the actual text with speculation as to Congress' intent," *Magwood v. Patterson*, 130 S. Ct. 2788, 2798 (2010), nor can we "divin[e] what Congress would have wanted if it had thought of the situation before the court," *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2881 (2010); *see also United States v. Public Utilities Comm'n of Cal.*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring) ("Never having been a Congressman, I am handicapped in that weird endeavor. That process seems to me not

interpretation of a statute but creation of a statute.").  For that reason, "our inquiry focuses on an analysis of the textual product of Congress' efforts, not on speculation as to the internal thought processes of its Members."  *Carter v. United States*, 530 U.S. 255, 272 (2000); *see also Gardner v. Collins*, 27 U.S. (2 Pet.) 58, 93 (1829) ("What the legislative intention was, can be derived only from the words they have used; and we cannot speculate beyond the reasonable import of these words.").

Even if it may raise difficult constitutional questions, the statutory text remains the gravamen of our interpretive inquiry.  *See United States v. Raynor*, 302 U.S. 540, 552 (1938).  "Although [we] will often strain to construe legislation so as to save it against constitutional attack," *Aptheker v. Sec'y of State*, 378 U.S. 500, 515 (1964) (quotation marks omitted), a court cannot "rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain," *United States v. Stevens*, 559 U.S. 460, 481 (2010) (quotation marks, ellipsis and citations omitted).  "Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power.  The problem must be faced and answered."  *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933) (Cardozo, J.).

## IV.  Bahlul's *Ex Post Facto* Challenge

Because the Congress's intent to authorize retroactive prosecution of the charged offenses is clear, we must address Bahlul's *ex post facto* argument.  *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.) ("Questions may occur which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.").  As noted, we may

overturn Bahlul's convictions only if they constitute plain constitutional error.

The Constitution prohibits the Congress from enacting any "*ex post facto* Law." U.S. CONST. art. I, § 9, cl. 3. "The phrase *ex post facto* law was a term of art with an established meaning at the time of the framing." *Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013) (quoting *Collins v. Youngblood*, 497 U.S. 37, 41 (1990)) (quotation marks omitted). In *Calder v. Bull*, Justice Chase set forth his understanding of that meaning:

> 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.); *see Peugh*, 133 S. Ct. at 2081 (reciting Justice Chase's formulation); *Carmell v. Texas*, 529 U.S. 513, 525 (2000) (Supreme Court has "repeatedly endorsed" Justice Chase's formulation); *see also id.* at 537–39 (noting that *Collins* did not eliminate Justice Chase's fourth category).

In our order granting *en banc* review, we asked the parties to brief whether the *Ex Post Facto* Clause applies in cases involving aliens detained at Guantanamo. The Government has taken the position that it does. Although we

are not obligated to accept the Government's concession, *see Young v. United States*, 315 U.S. 257, 258–59 (1942); *United States v. Baldwin*, 563 F.3d 490, 491 (D.C. Cir. 2009), we will assume without deciding that the *Ex Post Facto* Clause applies at Guantanamo. In so doing, we are "not to be understood as remotely intimating in any degree an opinion on the question." *Petite v. United States*, 361 U.S. 529, 531 (1960) (per curiam); *see also Casey v. United States*, 343 U.S. 808, 808 (1952) (per curiam) ("To accept in this case [the Solicitor General's] confession of error would not involve the establishment of any precedent."); *United States v. Bell*, 991 F.2d 1445, 1447–48 (8th Cir. 1993).[9]

## A. Conspiracy

We reject Bahlul's *ex post facto* challenge to his conspiracy conviction for two independent and alternative reasons. First, the conduct for which he was convicted was already criminalized under 18 U.S.C. § 2332(b) (section 2332(b)) when Bahlul engaged in it. It is not "plain" that it violates the *Ex Post Facto* Clause to try a pre-existing federal criminal offense in a military commission and any difference between the elements of that offense and the conspiracy charge in the 2006 MCA does not seriously affect the fairness, integrity or public reputation of judicial proceedings. Second, it is not "plain" that conspiracy was not already

---

[9] Were we to decide this issue *de novo*, Judge Henderson would conclude that the *Ex Post Facto* Clause does not apply in cases involving aliens detained at Guantanamo, for the reasons stated in her separate concurring opinion. Chief Judge Garland and Judges Tatel and Griffith would conclude that the Clause does apply in such cases, for the reasons stated in the first two paragraphs of Part II.B of Judge Rogers's opinion and in Note 3 of Judge Kavanaugh's opinion.

triable by law-of-war military commission under 10 U.S.C. § 821 when Bahlul's conduct occurred.

### 1. Section 2332(b)

Bahlul was convicted of conspiracy to commit seven war crimes enumerated in the 2006 MCA, including the murder of protected persons.[10]   Although the 2006 MCA post-dates Bahlul's conduct, section 2332(b) has long been on the books, making it a crime to, "outside the United States," "engage[] in a conspiracy to kill[] a national of the United States."  18 U.S.C. § 2332(b); *see* Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. No. 99-399, § 1202(a), 100 Stat. 853, 896.  Section 2332(b) is not an offense triable by military commission but, the Government argues, "[t]he fact that the MCA provides a different forum for adjudicating such conduct does not implicate ex post facto concerns."  E.B. Br. of United States 67.  We agree.  *See infra* p. 53 (remanding to panel to determine Bahlul's other constitutional challenges).

The right to be tried in a particular forum is not the sort of right the *Ex Post Facto* Clause protects.  *See Collins*, 497 U.S. at 51.  In *Collins*, the Supreme Court sifted through its *Ex Post Facto* Clause precedent, noting that some cases had

---

[10] Specifically, the 2006 MCA provides:  "Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished . . . ."  10 U.S.C. § 950v(b)(28).  The murder of protected persons is the "intentional[]" killing of one or more "protected persons."  *Id.* § 950v(b)(1).  A protected person is "any person entitled to protection under one or more of the Geneva Conventions, including . . . civilians not taking an active part in hostilities."  *Id.* § 950v(a)(2)(A).

said that a "procedural" change—*i.e.*, a "change[] in the procedures by which a criminal case is adjudicated"—may violate the *Ex Post Facto* Clause if the change "affects matters of substance" by "depriving a defendant of substantial protections with which the existing law surrounds the person accused of crime or arbitrarily infringing upon substantial personal rights." *Id.* at 45 (citations, brackets and quotation marks omitted). The Court observed that such language had "imported confusion" into its doctrine and it attempted to reconcile that language so as to not enlarge the *Ex Post Facto* Clause's application beyond laws that "make innocent acts criminal, alter the nature of the offense, or increase the punishment." *Id.* at 46. One case that could not be reconciled was *Thompson v. Utah*, in which the Court had found that a change in Utah law reducing the size of criminal juries from 12 to 8 persons violated the *Ex Post Facto* Clause by depriving the defendant of "a substantial right involved in his liberty." 170 U.S. 343, 352–53 (1898). The Court overruled *Thompson* in *Collins*, explaining that the reduced size of the jury was not in fact an *ex post facto* violation because "[t]he right to jury trial provided by the Sixth Amendment is obviously a 'substantial' one, but it is not a right that has anything to do with the definition of crimes, defenses, or punishments, which is the concern of the *Ex Post Facto* Clause." *Collins*, 497 U.S. at 51.

Similarly, in *Cook v. United States*, the Court held that an act vesting jurisdiction over a crime in a newly formed judicial district does not violate the *Ex Post Facto* Clause because "[i]t only . . . subjects the accused to trial in th[e new] district rather than in the court of some other judicial district established by the government against whose laws the offense was committed. This does not alter the situation of the defendants in respect to their offense or its consequences." 138 U.S. 157, 183 (1891); *accord Gut v. Minnesota*, 76 U.S.

35, 38 (1869) ("An *ex post facto* law does not involve, in any of its definitions, a change of the place of trial of an alleged offence after its commission."); *see also Duncan v. Missouri*, 152 U.S. 377, 382–83 (1894) (suggesting no *ex post facto* violation where defendant's appeal was heard by smaller appellate panel than provided for at time of his offense).

It is therefore not a plain *ex post facto* violation to transfer jurisdiction over a crime from an Article III court to a military commission because such a transfer does not have anything to do with the definition of the crime, the defenses or the punishment. That is so regardless of the different evidentiary rules that apply under the 2006 MCA. *See Carmell*, 529 U.S. at 533 n.23 (change in "[o]rdinary rules of evidence . . . do[es] not violate the [*Ex Post Facto*] Clause"); *id.* at 542–47; *Collins*, 497 U.S. at 43 n.3; *Beazell v. Ohio*, 269 U.S. 167, 171 (1925); *Thompson v. Missouri*, 171 U.S. 380, 386–88 (1898); *Hopt v. Utah*, 110 U.S. 574, 589–90 (1884). Nor is this a case like *Carmell*, where a law retroactively reduced the "quantum of evidence necessary to sustain a conviction," 529 U.S. at 530; the 2006 MCA requires the Government to prove guilt beyond a reasonable doubt, *see* 10 U.S.C. § 949*l*(c); *see also* Trial Tr. 233, 878 (military judge's instructions to commission).[11]

---

[11] Likewise, the greater maximum sentence provided in the 2006 MCA—the death penalty, as opposed to a maximum of life imprisonment under section 2332(b)—does not present an *ex post facto* problem. The Government did not seek the death penalty, *see* Trial Tr. 958, and the military judge's instructions to the commission before sentencing specifically declared that "[t]he maximum punishment that may be adjudged in this case is confinement for life," *id.* at 949. Further, the 2006 MCA requires a 12-member military commission if the death penalty is sought, *see* 10 U.S.C. § 949m(c), and Bahlul's commission had only nine members, *see* Trial Tr. 285. There was therefore no risk that the

Our inquiry is not ended, however, because the 2006 MCA conspiracy-to-murder-protected-persons charge and section 2332(b) do not have identical elements. The difference is a potential problem because the *Ex Post Facto* Clause prohibits "retrospectively eliminating an element of the offense" and thus "subvert[ing] the presumption of innocence by reducing the number of elements [the government] must prove to overcome that presumption." *Carmell*, 529 U.S. at 532. Both statutes require the existence of a conspiracy and an overt act in furtherance thereof. *See* 18 U.S.C. § 2332(b)(2); 10 U.S.C. § 950v(b)(28) (2006); *see also* Trial Tr. 846, 849–50 (military judge's instructions to commission). The 2006 MCA conspiracy charge is in one sense more difficult to prove than section 2332(b) because it applies only to alien unlawful enemy combatants engaged in hostilities against the United States. *See* 10 U.S.C. §§ 948b(a), 948c, 948d; *see also* Trial Tr. 843–45 (instructions). But the 2006 MCA charge is in two ways easier to prove than a section 2332(b) charge. It does not require that the conspiracy occur "outside the United States" or that the conspiracy be to kill a "national of the United States," as section 2332(b) does. It simply requires a conspiracy to murder "one or more protected persons." Trial Tr. 850–51 (instructions); *see supra* n.10 (providing MCA's definition of "protected person"). Although the two statutes are quite similar, then, the 2006 MCA conspiracy charge

---

greater sentence included in the 2006 MCA affected Bahlul's sentence. *See Peugh*, 133 S. Ct. at 2082 ("The touchstone of this Court's inquiry is whether a given change in law presents a sufficient risk of increasing the measure of punishment attached to the covered crimes." (quotation marks omitted)).

eliminates two elements required to convict a defendant under section 2332(b).[12]

Nevertheless, Bahlul cannot bear his burden of establishing that the elimination of the two elements "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (quotation marks omitted); *see United States v. Vonn*, 535 U.S. 55, 62–63 (2002) (defendant bears burden of proving *Olano*'s fourth prong); *see also United States v. Johnson*, 331 F.3d 962, 967 (D.C. Cir. 2003) (proceeding directly to fourth prong if it can resolve appeal). He cannot satisfy the fourth prong because the charges against him and the commission's findings necessarily included those elements and the evidence supporting them was undisputed. To explain why requires that we first discuss the most on-point Supreme Court precedent.

In *Johnson v. United States*, the Supreme Court reviewed a defendant's conviction for perjury where the district court had decided the issue of materiality itself rather than submit that issue to the jury, as the Court's precedent requires. 520 U.S. 461, 463 (1997). The defendant did not object, however, so the Court reviewed his conviction for plain error. Because the evidence of the missing materiality element was

---

[12] To be clear, Bahlul was convicted of conspiracy as a stand-alone offense that does not depend upon the completion of an object offense. *See* Trial Tr. 848. He was *not* charged with conspiracy as a theory of liability for a completed crime. *See* Trial Tr. 109–12 (Government amended charge by striking allegation that Bahlul joined "an enterprise of persons who share the common criminal purpose that involved . . . the commission . . . of one or more substantive offenses"); *see also United States v. Ali*, 718 F.3d 929, 941 (D.C. Cir. 2013) (noting difference between conspiracy as stand-alone offense and conspiracy as theory of liability).

"overwhelming" and "essentially uncontroverted at trial," the Court concluded that the error, although plain, did not seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id.* at 470; *cf. Neder v. United States*, 527 U.S. 1, 19 (1999) (failure to submit element to jury was harmless error "where [the] defendant did not, and apparently could not, bring forth facts contesting the omitted element"). Similarly, in *United States v. Cotton*, the indictment failed to charge the drug quantity involved in the offense, as the Court's precedent requires for any fact that enhances the otherwise applicable statutory maximum sentence. 535 U.S. 625, 627–28 (2002). After the jury found the defendants guilty of a narcotics conspiracy, the district court made drug quantity findings that enhanced the defendants' statutory maximums. *Id.* at 628. This was "error" and it was "plain" but the Court nevertheless upheld the convictions under *Olano*'s fourth prong. Because the evidence of the requisite drug quantity was "overwhelming" and "essentially uncontroverted," the Court concluded that "[t]he real threat . . . to the fairness, integrity, and public reputation of judicial proceedings would be if [the defendants] . . . were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." *Id.* at 633–34 (quotation marks omitted); *accord Johnson*, 331 F.3d at 966–70; *United States v. Webb*, 255 F.3d 890, 899–902 (D.C. Cir. 2001).

Here, the evidence of the two missing elements was not simply "overwhelming" and "essentially uncontroverted"—it was *entirely* uncontroverted. Bahlul was charged with committing numerous overt acts "in Afghanistan, Pakistan and elsewhere" that furthered the conspiracy's unlawful objects; those objects included the murder of protected persons. App. 122–25. He did not dispute that his conduct occurred outside the United States nor did he dispute that the

purpose of the conspiracy was to murder United States nationals. *See* Trial Tr. 167 (Bahlul: "And what I did . . . is to kill Americans . . . ."); *id.* at 511–12 ("[Bahlul] does not consider anybody protected person[s] or civilians. . . . [A]s long as you're a[n] American, you are a target."). Indeed, several witnesses testified that Bahlul considered *all* Americans to be targets. *Id.* at 503, 512, 596, 653. The commission was instructed on the overt acts allegedly undertaken by Bahlul in furtherance of the conspiracy, *see id.* at 846–47, and was instructed that one of the conspiracy's object offenses was the murder of protected persons, *id.* at 850. The commission specifically found that Bahlul committed ten overt acts, all of which took place outside the United States and several of which directly relate to the 9/11 attacks that killed thousands of United States nationals. App. 132–33. And it found that all seven of the alleged object offenses, including murder of protected persons, were objects of the conspiracy. App. 131. There is no scenario in which the commission could have found that Bahlul committed these overt acts yet rationally found that the conspiracy did not take place outside the United States and did not have as an object the murder of United States nationals. *Accord Webb*, 255 F.3d at 901. Although the commission was not specifically instructed that it had to find these two elements, the overt acts it *did* find Bahlul had committed necessarily included the two elements and Bahlul did not, and does not, dispute either. Therefore, although the 2006 MCA conspiracy offense, as charged here, does "eliminat[e] an element of the offense," *Carmell*, 529 U.S. at 532, the omission did not seriously affect the fairness, integrity, or public reputation of the proceedings.

## 2. Section 821

When Bahlul committed the crimes of which he was convicted, section 821 granted—and still grants—military commissions jurisdiction "with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821. Section 821 and its predecessor statute have been on the books for nearly a century. *See* Pub. L. No. 64-242, 39 Stat. 619, 653 (1916); Pub. L. No. 66-242, 41 Stat. 759, 790 (1920); Pub. L. No. 81-506, 64 Stat. 107, 115 (1950); *Madsen v. Kinsella*, 343 U.S. 341, 350–51 & n.17 (1952). We must therefore ascertain whether conspiracy to commit war crimes was a "law of war" offense triable by military commission under section 821 when Bahlul's conduct occurred because, if so, Bahlul's *ex post facto* argument fails.

In answering this question, we do not write on a clean slate. In *Hamdan*, seven justices of the Supreme Court debated the question at length. Four justices concluded that conspiracy is not triable by military commission under section 821. 548 U.S. at 603–13 (plurality opinion of Stevens, J.). Three justices opined that it is. *Id.* at 697–704 (Thomas, J., dissenting). Both opinions scoured relevant international and domestic authorities but neither position garnered a majority. The case was resolved on other grounds and the eighth vote— one justice was recused—left the conspiracy question for another day, noting that the Congress may "provide further guidance in this area." *See id.* at 655 (Kennedy, J., concurring). In light of the uncertainty left by the split, it was not "plain" error to try Bahlul for conspiracy by military commission pursuant to section 821. *See United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012) (plain error met only if "its erroneous character" is established by "a clear precedent in the Supreme Court or this circuit").

The reason for the uncertainty is not only the divided result in *Hamdan* but also the High Court's failure to clearly resolve a subsidiary question: What body of law is encompassed by section 821's reference to the "law of war"? That dispute takes center stage here. Bahlul contends that "law of war" means the *international* law of war, full stop. The Government contends that we must look not only to international precedent but also "the common law of war developed in U.S. military tribunals." E.B. Br. of United States 28; *see also* Oral Arg. Tr. 15 ("[W]e believe the law of war is the international law of war as supplemented by the experience and practice of our wars and our wartime tribunals."). The answer is critical because the Government asserts that conspiracy is *not* an international law-of-war offense. *See* E.B. Br. of United States 34; Oral Arg. Tr. 15.

In *Hamdan II*, the Court said that "law of war" as used in section 821 is a term of art that refers to the international law of war. 696 F.3d at 1248; *see also id.* at 1252 (noting that "U.S. precedents may inform the content of international law"); *cf.* Kavanaugh Op. 11 n.5 (stating that *Hamdan II*'s interpretation of section 821 "was not necessary to the result"). Language in several Supreme Court opinions supports that proposition. *See, e.g.*, *Quirin*, 317 U.S. at 27–28 ("[T]his Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."); *id.* at 29 (describing law of war as "branch of international law"); *see also Hamdan*, 548 U.S. at 603 (plurality) (citing *Quirin* and describing offense alleged therein as being "recognized as an offense against the law of war" both "in this country and internationally"); *id.* at 610–11 (analyzing international law sources); *id.* at 641 (Kennedy, J., concurring) ("[T]he law of

war . . . is the body of international law governing armed conflict." (citing *Quirin*, 317 U.S. at 28)); *Madsen*, 343 U.S. at 354–55 ("The 'law of war' . . . includes at least that part of the law of nations which defines the powers and duties of belligerent powers occupying enemy territory pending the establishment of civil government."); *Yamashita*, 327 U.S. at 12–16 (analyzing international precedent in determining whether offense was violation of law of war); Rogers Op. 6–7 (concluding on *de novo* review that section 821 refers to international law of war). Several Executive Branch interpretations and scholarly articles also support that reading. *See Hamdan II*, 696 F.3d at 1248–49 & n.9 (collecting citations).

On the other hand, section 821 might not be so limited (as two of our colleagues would hold on *de novo* review). *See* Brown Op. 3; Kavanaugh Op. 7–11; *see also Hamdan*, 548 U.S. at 689 (Thomas, J., dissenting) ("[W]hether an offense is a violation of the law of war cognizable before a military commission must be determined pursuant to the system of common law applied by military tribunals . . . [which] is derived from the experience of our wars and our wartime tribunals and the laws and usages of war as understood and practiced by the civilized nations of the world." (citations and quotation marks omitted)). Significantly, both the *Hamdan* plurality and dissent relied primarily on *domestic* precedent to ascertain whether conspiracy could be tried under section 821. *See Hamdan*, 548 U.S. at 603–09 (plurality); *id.* at 689–704 (Thomas, J., dissenting).[13] There is also language in *Yamashita* and *Quirin* that domestic precedent is an important

---

[13] The *Hamdan* plurality did not expressly decide whether section 821's reference to the "law of war" is limited to the international law of war. *See Hamdan*, 548 U.S. at 604–13 (plurality).

part of our inquiry. *See Yamashita*, 327 U.S. at 8 ("[The Congress] adopted the system of military common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts, and as further defined and supplemented by the Hague Convention . . . ."); *Quirin*, 317 U.S. at 31–35, 42 n.14 (evaluating domestic precedent to determine whether offense charged was law-of-war offense); *see also Madsen*, 343 U.S. at 347–48. Moreover, as the Supreme Court has explained, when the Congress enacted section 821 and its predecessors, it intended to preserve, not limit, the pre-existing jurisdiction of military commissions. *See Madsen*, 343 U.S. at 352–53; *Yamashita*, 327 U.S. at 19–20; *see also Hamdan*, 548 U.S. at 593 (majority) ("[T]he *Quirin* Court recognized that Congress had simply preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions—with the express condition that the President and those under his command comply with the law of war."). It is therefore arguable that the Congress also intended to incorporate military commission precedents predating section 821's enactment. *See Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947))); *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

Ultimately, we need not resolve *de novo* whether section 821 is limited to the international law of war. It is sufficient for our purpose to say that, at the time of this appeal, the

answer to that question is not "obvious." *Olano*, 507 U.S. at 734; *see Henderson v. United States*, 133 S. Ct. 1121, 1130–31 (2013) (plainness of error determined at time of appeal). As seven justices did in *Hamdan*, we look to domestic wartime precedent to determine whether conspiracy has been traditionally triable by military commission. That precedent provides sufficient historical pedigree to sustain Bahlul's conviction on plain-error review.

Most notably, the individuals responsible for the assassination of President Abraham Lincoln were charged with a single offense—"combining, confederating, and conspiring . . . to kill and murder . . . Abraham Lincoln"—and were convicted of that offense by military commission. General Court-Martial Order No. 356, War Dep't (July 5, 1865), *reprinted in* H.R. Doc. No. 55-314, at 696 (1899).[14] The specification of the offense includes several paragraphs, each of which sets forth a separate overt act done "in further prosecution of the unlawful and traitorous conspiracy." *Id.* at 697–98; *see also* The Assassination of President Lincoln and the Trial of the Conspirators 18–21 (New York, Moore, Wilstach & Baldwin 1865). A federal district court later denied three of the conspirators' habeas petitions raising jurisdictional objections to the commission. *Ex Parte Mudd*, 17 F. Cas. 954 (S.D. Fla. 1868).

President Andrew Johnson personally approved the convictions. In doing so, he considered the jurisdictional limits of military commissions: He asked Attorney General James Speed whether the accused could be tried for

---

[14] The *Hamdan* plurality interpreted this precedent as convicting the conspirators only of the completed offense of assassination, not inchoate conspiracy. *Hamdan*, 548 U.S. at 604 n.35 (plurality). *But see id.* at 699 n.12 (Thomas, J., dissenting) (finding it clear that inchoate conspiracy was tried).

conspiracy in a military commission. In a lengthy opinion, Attorney General Speed said they could. *See* Military Commissions, 11 Op. Att'y Gen. 297 (1865). We think this highest-level Executive Branch deliberation is worthy of respect in construing the law of war. *Cf. Sosa v. Alvarez-Machain*, 542 U.S. 692, 733–34 (2004) (looking "albeit cautiously" to sources like "controlling executive . . . act[s]" to ascertain current state of international law (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 780 n.6 (D.C. Cir. 1984) (Edwards, J., concurring) (Attorney General opinions not binding but "entitled to some deference, especially where judicial decisions construing a statute are lacking"). Granted, the Attorney General's framing of the question presented— "whether the persons charged with the offence of having assassinated the President can be tried before a military tribunal"—casts some doubt on whether he was addressing inchoate conspiracy or the offense of assassination. 11 Op. Att'y Gen. at 297; *see Hamdan*, 548 U.S. at 604 n.35 (plurality). But the Attorney General's opinion was written *after* the commission had been convened and the convictions had been approved; he would therefore have been aware that the sole offense alleged was conspiracy.[15] On the other hand,

---

[15] Some doubt about the precise nature of the charge also appears in the transcript of the conspirators' trial. Thomas Ewing, counsel for several of the defendants, objected to the ambiguity of the charge, stating that "[t]here is but one charge, *in form*, against the accused; but, *in fact*, there seem to be four charges, each alleging the commission of a separate and distinct offense." THE ASSASSINATION OF PRESIDENT LINCOLN AND THE TRIAL OF THE CONSPIRATORS, *supra*, at 244. He listed what he perceived to be the four offenses charged: conspiracy, traitorously murdering President Lincoln, traitorously assaulting with intent to kill Secretary of State William Seward and lying in wait with intent to traitorously murder then-Vice President Johnson. *Id.* at 244–45.

that the Attorney General's opinion was written after the convictions were approved may undermine its persuasive value, as it could be viewed as a *post hoc* rationalization for a decision already made.

Either way, the Lincoln conspirators' trial was a matter of paramount national importance and attracted intense public scrutiny.  Thus, when the Congress enacted section 821's predecessor—and "preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions," *Hamdan*, 548 U.S. at 593 (majority)—it was no doubt familiar with at least one high-profile example of a conspiracy charge tried by a military commission.  Because of the national prominence of the case and the highest-level Executive Branch involvement, we view the Lincoln conspirators' trial as a particularly significant precedent.[16]

---

The Judge Advocate responded that "[t]he general allegation is a conspiracy" and that "[t]he pleadings proceed, after averring this conspiracy, . . . to set forth clearly and specifically the part which it is believed and alleged each one of them took in the execution of that conspiracy."  *Id.* at 245; *see also id.* at 246–47 (further discussion of the charge).

[16] William Winthrop—the Blackstone of military law—also concluded that conspiracy is an offense that is "both a crime against society and a violation of the laws of war."  WINTHROP, MILITARY LAW AND PRECEDENTS, *supra*, at 842; *accord* WILLIAM WINTHROP, A DIGEST OF OPINIONS OF THE JUDGE ADVOCATE GENERAL OF THE ARMY 328–29 (1880) ("[c]onspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy" is an "offence[] against the laws and usages of war").  That said, although Winthrop based that conclusion in part on the Lincoln conspirators' case, he also relied on Civil War-era field orders.  WINTHROP, MILITARY LAW AND PRECEDENTS, *supra*, at 839 & n.5 (explaining different bases of military jurisdiction and

Also noteworthy is the World War II-era military commission trial of several Nazi saboteurs who entered the United States intending to destroy industrial facilities; they were convicted of, *inter alia*, conspiracy to commit violations of the law of war. *See Quirin*, 317 U.S. at 21–23. Although the Supreme Court resolved the case on other grounds and therefore did not review the validity of the conspiracy conviction, the case remains another prominent example of a conspiracy charge tried in a law-of-war military commission. President Franklin D. Roosevelt, like President Johnson before him, approved the charges. *See* 7 Fed. Reg. 5103-02 (July 7, 1942). Moreover, *Quirin* is not the sole example from that era. *See Colepaugh v. Looney*, 235 F.2d 429, 431–32 (10th Cir. 1956) (upholding conviction by military commission of Nazi saboteur of conspiracy to commit offense against law of war); General Order (G.O.) No. 52, War Dep't (July 7, 1945) (President Truman approves convictions of *Colepaugh* conspirators), *reprinted in* Supp. Auth. 149–50; Memo. of Law from Tom C. Clark, Assistant Att'y Gen., to Major General Myron C. Kramer, Judge Advocate Gen., at 6 (Mar. 12, 1945), *reprinted in* Supp. Auth. 139 (opining, with regard to *Colepaugh* case, that "it may be said to be well established that a conspiracy to commit an offense against the laws of war is itself an offense cognizable by a commission administering military justice"). Finally, during the Korean War, General Douglas MacArthur ordered that persons accused of "conspiracies and agreements to commit . . . violations of the laws and customs of war of general

citing cases of Henry Wirz, William Murphy, G. St. Leger Grenfel and others as examples of criminal conspiracies tried by military commission on combination of jurisdictional bases). The field orders lack the high-level Executive Branch consultation of the Lincoln conspirators' case, however, and give us pause for additional reasons discussed *infra* p. 46.

application" be tried by military commission. *See* Letter Order, Gen. HQ, United Nations Command, Tokyo, Japan, *Trial of Accused War Criminals* (Oct. 28, 1950) (Rules of Criminal Procedure for Military Commissions, Rule 4).

We do not hold that these precedents conclusively establish conspiracy as an offense triable by military commission under section 821. After all, four justices examined the same precedents and found them insufficiently clear. *Hamdan*, 548 U.S. at 603–09 (plurality);[17] *cf. Marks v. United States*, 430 U.S. 188, 193 (1977). But there are two differences between *Hamdan* and this case. First, the elements of the conspiracy charge were not defined by statute in *Hamdan* and therefore the plurality sought precedent that was "plain and unambiguous." 548 U.S. at 602. Here, the Congress has positively identified conspiracy as a war crime. We need not decide the effect of the Congress's action, however, because we rely on the second difference: The *Hamdan* plurality's review was *de novo*; our review is for plain error. We think the historical practice of our wartime tribunals is sufficient to make it not "obvious" that conspiracy was not traditionally triable by law-of-war military commission under section 821. *Olano*, 507 U.S. at 734. We therefore conclude that any *Ex Post Facto* Clause error in trying Bahlul on conspiracy to commit war crimes is not plain. *See United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000) (assuming error to decide it was not plain).

---

[17] The *Hamdan* plurality thought *Quirin* suggested "that conspiracy is not a violation of the law of war" because the Court's "analysis . . . placed special emphasis on the *completion* of [another charged] offense; it took seriously the saboteurs' argument that there can be no violation of a law of war—at least not one triable by military commission—without the actual commission of . . . a 'hostile and warlike act.' " 548 U.S. at 606–07 (plurality).

## B. Material Support

A different result obtains, however, regarding Bahlul's conviction of providing material support for terrorism.[18] The Government concedes that material support is not an international law-of-war offense, *see* Oral Arg. Tr. 15; Panel Br. of United States 50, 57, and we so held in *Hamdan II*, 696 F.3d at 1249–53. But, in contrast to conspiracy, the Government offers little domestic precedent to support the notion that material support or a sufficiently analogous offense has historically been triable by military commission. Although Bahlul carries the burden to establish plain error, *see United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007), we presume that in the unique context of the "domestic common law of war"—wherein the Executive Branch shapes the relevant precedent and individuals in its employ serve as prosecutor, judge and jury—the Government can be expected to direct us to the strongest historical precedents. What the Government puts forth is inadequate.

---

[18] The 2006 MCA provides: "Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism . . . , or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism . . . , shall be punished . . . ." 10 U.S.C. § 950v(b)(25). The provision cross-references the Act's prohibition of "terrorism," which is defined as an act that "kills or inflicts great bodily harm on one or more protected persons, or . . . that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct." *Id.* § 950v(b)(24).

The Government relies solely on a number of Civil War-era field orders approving military commission convictions of various offenses that, the Government contends, are analogous to material support. Before delving into the specifics of the orders, we note our skepticism that such informal field precedent can serve as the sole basis for concluding that a particular offense is triable by a law-of-war military commission. Unlike the Lincoln conspirators' and Nazi saboteurs' cases, which attracted national attention and reflected the deliberations of highest-level Executive Branch officials, the field precedents are terse recordings of drumhead justice executed on or near the battlefield. Indeed, several precedents cited by the Government for trying material support and solicitation under the "law of war" were issued by the same 1862 military commission that tried one Henry Willing for the offense of "[b]eing a bad and dangerous man." G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 THE WAR OF THE REBELLION, OFFICIAL RECORDS OF THE UNION AND CONFEDERATE ARMIES (OR) ser. II, at 480–81. In addition, the military commissions these orders memorialize were not always models of due process.[19] And, as the *Hamdan* plurality explained, the Civil War commissions "operated as both martial law or military government tribunals and law-of-war commissions," obliging us to treat the precedents "with caution" because of their unclear jurisdictional basis. 548 U.S. at 596 n.27 (plurality); *see also id.* at 608.[20]

---

[19] *See* Frank J. Williams & Nicole J. Benjamin, *Military Trials of Terrorists: From the Lincoln Conspirators to the Guantanamo Inmates*, 39 N. KY. L. REV. 609, 625 (2012); David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 VA. J. INT'L L. 5, 39–40 (2005).

[20] *See also Hamdan*, 548 U.S. at 602 n.34 (plurality) (explaining that because of "vagueness" concerns, "caution . . .

In any event, even if the law of war can be derived from field precedents alone, none of the cited orders charges the precise offense alleged here—providing material support for terrorism. The Government nonetheless contends that the material support charge "prohibits the same conduct, under a modern label, as the traditional offense of joining with or providing aid to guerrillas and other unlawful belligerents." E.B. Br. of United States 48. But we do not think the cited field orders establish that such conduct was tried by law-of-war military commissions during the Civil War.[21]

First, every precedent cited by the Government involves offenses committed in Missouri, a border state; none is from a state that seceded. *See Dow v. Johnson*, 100 U.S. 158, 164–65 (1879) (observing that, during the Civil War, "[t]he people of the loyal States . . . and the people of the Confederate States . . . became enemies to each other, and . . . [c]ommercial intercourse and correspondence between them were prohibited . . . by the accepted doctrines of public law"); *McKinzie v. Hill*, 51 Mo. 303, 307 (1873) ("[T]he principles [regarding the duty of "total non-intercourse between the belligerents"] have no application to the present case. Missouri was not one of the States that joined in the rebellion."). The difference between a border state—whose citizens owed a duty of loyalty to the United States—and a state that seceded—whose citizens did not—is significant. The crime of "aiding the enemy," which includes as an element the breach of a duty of loyalty owed to the United States, had long been triable by military commission. *See*

---

must be exercised in the incremental development of common-law crimes"); *Hamdan II*, 696 F.3d at 1250 n.10 (similar).

[21] In reviewing this Civil War precedent, we hold only that it does not sanction trying material support by military commission.

*Hamdan II*, 696 F.3d at 1245 n.4 (citing *Hamdan*, 548 U.S. at 600–01 n.32 (plurality)); WINTHROP, MILITARY LAW AND PRECEDENTS, *supra*, at 839–40 ("offences in violation of the laws and usages of war" subject to trial by law-of-war military commission include "breaches of the law of non-intercourse with the enemy, such as . . . furnishing them with money, arms, provisions, medicines, &c"); *see also* 10 U.S.C. § 950v(b)(26) (2006) (codifying offense of aiding enemy to include element of "breach of an allegiance or duty to the United States"). The orders cited by the Government frequently refer to the treasonous nature of the conduct, implying a breach of loyalty. *See, e.g.*, G.O. No. 9, HQ, Dep't of the Mississippi (Mar. 25, 1862), 1 OR ser. II, at 465–66 (case of John Montgomery); *id.* at 467 (case of Joseph Bollinger); G.O. No. 1, HQ, Dep't of the Missouri (Jan. 1, 1862), 1 OR ser. II, at 248 ("[C]ertain acts of a treasonable character such as conveying information to the enemy, acting as spies, &c., are military offenses triable by military tribunals and punishable by military authority."); *see also Young v. United States*, 97 U.S. 39, 62 (1877) ("[T]reason is a breach of allegiance, and can be committed by him only who owes allegiance . . . ." (quotation marks omitted)). The material support offense charged here, which lacks a breach of loyalty requirement, is plainly distinguishable from the "aiding the enemy" precedent.

Second, several of the cited field orders appear to involve offenses more akin to aiding and abetting a law-of-war violation. *See, e.g.*, G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 478 (Matthew Thompson convicted of "joining with, aiding and assisting [a] band [of desperadoes] in the commission of acts of plunder, robbery and abuse of the citizens of the State of Missouri"). Aiding and abetting is a theory of criminal liability, not a stand-alone offense like material support. *See Ali*, 718 F.3d at

936. As the Court said in *Hamdan II*, "aiding and abetting terrorism prohibits different conduct, imposes different mens rea requirements, and entails different causation standards than material support for terrorism." 696 F.3d at 1252. Thus, "[i]f the Government wanted to charge [Bahlul] with aiding and abetting terrorism . . . it should have done so." *Id.*; *see* 10 U.S.C. § 950q(1) (2006) (one who "aids [or] abets" offense proscribed by 2006 MCA is punishable as principal).

Third, other orders appear to involve the offense of unlawful belligerency—that is, directly waging guerrilla warfare. *See, e.g.*, G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 472–476 (approving convictions of several men who each, not "being a soldier belonging to any lawfully authorized and organized military forces at war with the United States," "t[ook] up arms as an insurgent and commit[ted] acts of hostility against" United States military forces); G.O. No. 9, HQ, Dep't of the Mississippi (Mar. 25, 1862), 1 OR ser. II, at 464–65 (William Kirk convicted of "belong[ing] to a marauding or guerrilla band" that "did unlawfully plunder and take away a certain yoke of oxen, wagon and other property"); *see also* Instructions for the Government of Armies of the United States in the Field, G.O. No. 100, art. 82 (Apr. 24, 1863); WINTHROP, MILITARY LAW AND PRECEDENTS, *supra*, at 840.

The upshot is that the Civil War field precedent is too distinguishable and imprecise to provide the sole basis for concluding that providing material support for terrorism was triable by law-of-war military commission at the time of Bahlul's conduct.[22] We therefore think it was a plain *ex post*

---

[22] Even the Government is dubious of its argument: Executive Branch officials previously acknowledged in prepared congressional testimony that "there are serious questions as to

*facto* violation—again, assuming without deciding that the protection of the *Ex Post Facto* Clause extends to Bahlul, *see supra* pp. 26–27—to try Bahlul by military commission for that new offense. *See Collins*, 497 U.S. at 42–43. The error is prejudicial and we exercise our discretion to correct it by vacating Bahlul's material support conviction. *Olano*, 507 U.S. at 734–36; *see also Casey*, 343 U.S. at 808 (vacating conviction based on Government's confession of error); *United States v. Law*, 528 F.3d 888, 909 (D.C. Cir. 2008) (same); *cf. Petite*, 361 U.S. at 531 (vacating conviction based on Government's motion).[23]

---

whether material support for terrorism or terrorist groups is a traditional violation of the law of war." *Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law of War: Hearing Before the S. Comm. on Armed Services*, 111th Cong. 12 (2009) (statement of David Kris, Assistant Attorney General, National Security Division, Department of Justice); *see also id.* at 9 (statement of Jeh Johnson, General Counsel, Department of Defense) ("After careful study, the administration has concluded that appellate courts may find that 'material support for terrorism'—an offense that is also found in Title 18—is not a traditional violation of the law of war.").

[23] Unlike with conspiracy, the Government has not identified a pre-existing federal criminal statute that might cure any *ex post facto* aspect of Bahlul's material support conviction. The Government cites 18 U.S.C. § 2339A, which criminalizes providing material support or resources knowing they are to be used in a violation of section 2332, but that offense was not made extraterritorial until October 26, 2001. *See* Pub. L. No. 107-56, § 805(a)(1)(A), 115 Stat. 272, 377. Although Bahlul was not captured until December 2001, nearly all of the conduct of which he was convicted took place before September 11, 2001. The only overt act that necessarily occurred after September 11 was Bahlul's research on the economic effects of the attack. The record does not reflect, however, whether Bahlul committed that or any other act of

## C. Solicitation

We also conclude that solicitation of others to commit war crimes is plainly not an offense traditionally triable by military commission.[24] The Government concedes it is not an international law-of-war offense. *See* Oral Arg. Tr. 15; Panel Br. of United States 50, 57. The Government contends that solicitation "possesses a venerable lineage as an offense triable by military commission," E.B. Br. of United States 50, but it cites only two Civil War-era field orders involving three defendants in support thereof. It mischaracterizes one of the orders, asserting that "a military commission convicted Francis Skinner of 'counsel[ing]' and 'invit[ing]' others to destroy a railroad in violation of the law of war," *id.*, when in fact Skinner was *acquitted* of that offense. *See* G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 476–77. And although the other two defendants in the cited cases were convicted on charges that resemble the 2006 MCA solicitation offense, they were also convicted of personal involvement in the crimes they solicited. *See id.* at 478 (James Barnes convicted of both "attack[ing] the dwelling-house of one Thomas H. Keene . . . and with guns and pistols attempt[ing] to murder the occupants of said house" and "incit[ing] certain persons unknown to make" that attack); G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1

---

material support constituting a violation of section 2339A after October 26, 2001. This charge, then, is unlike the conspiracy charge, where Bahlul expressly conceded and the jury necessarily found the two omitted elements.

[24] The 2006 MCA provides: "Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall . . . be punished . . . ." 10 U.S.C. § 950u.

OR ser. II, at 475 (Edward Wingfield convicted of both "assist[ing] and abet[ting] the said persons in the destruction of the track, bridges and buildings of the [North Missouri Railroad]" and "incit[ing], induc[ing] and procur[ing] the said persons to take up arms and to commit acts of hostility against the property of the United States"); *cf. Hamdan*, 548 U.S. at 609 (plurality).

As noted, we are skeptical that field orders can be the sole basis for military commission jurisdiction over a particular offense. *See supra* p. 46. Moreover, the two field orders discussed fall far short of meeting any showing we would require. Because solicitation to commit war crimes was not an offense triable by law-of-war military commission when Bahlul's conduct occurred, it is a plain *ex post facto* violation—again, assuming without deciding that the protection of the *Ex Post Facto* Clause extends to Bahlul, *see supra* pp. 26–27—to try him by military commission for that new offense. *See Collins*, 497 U.S. at 42–43. The error is prejudicial and we exercise our discretion to correct it by vacating Bahlul's solicitation conviction. *Olano*, 507 U.S. at 734–736; *see also Casey*, 343 U.S. at 808; *Law*, 528 F.3d at 909; *cf. Petite*, 361 U.S. at 531.[25]

---

[25] As with material support, we cannot conclude that a pre-existing federal statute might cure any *ex post facto* aspect of Bahlul's solicitation conviction. The Government notes that, when Bahlul's conduct occurred, 18 U.S.C. § 373 criminalized solicitation of another person to "engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another." The Government's brief does not identify an offense that Bahlul solicited, however, which it must do for us to compare the elements of a pre-existing criminal offense with the elements of the charge under the MCA.

## V. Remaining Issues

In his brief to the panel, Bahlul raised four challenges to his convictions that we have not addressed here. He argued that (1) the Congress exceeded its Article I, § 8 authority by defining crimes triable by military commission that are not offenses under the international law of war, *see* Br. for Bahlul 38, *Bahlul v. United States*, No. 11-1324 (D.C. Cir. Mar. 9, 2012); (2) the Congress violated Article III by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war, *see id.* at 39–40; (3) his convictions violate the First Amendment, *see id.* at 43; and (4) the 2006 MCA discriminates against aliens in violation of the equal protection component of the Due Process Clause, *see id.* at 54. We intended neither the *en banc* briefing nor argument to address these four issues. *See* Order, *Bahlul v. United States*, No. 11-1324 (D.C. Cir. May 2, 2013) (notifying parties that Equal Protection and First Amendment issues are not "within the scope of the rehearing en banc"). And with the exception of a few passages regarding the first two, we received none from the parties. We therefore remand the case to the original panel of this Court to dispose of Bahlul's remaining challenges to his conspiracy conviction. *See United States v. McCoy*, 313 F.3d 561, 562 (D.C. Cir. 2002) (en banc) (remanding outstanding issue to panel).

For the foregoing reasons, we reject Bahlul's *ex post facto* challenge to his conspiracy conviction and remand that conviction to the panel to consider his alternative challenges thereto. In addition, we vacate Bahlul's convictions of providing material support for terrorism and solicitation of others to commit war crimes, and, after panel consideration, remand to the CMCR to determine the effect, if any, of the two vacaturs on sentencing.

*So ordered*.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: I write separately to emphasize, for me, the critical nature of the Government's concession that the *Ex Post Facto* Clause protects Bahlul. Had the Government not conceded the point and the Court not decided to act on the concession, *cf. Young v. United States*, 315 U.S. 257, 258–59 (1942), I would have reached a different conclusion. I briefly explain why.

### I. It Is Not "Plain" That the *Ex Post Facto* Clause Protects Bahlul

" 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.' " *United States v. Olano*, 507 U.S. 725, 734 (1993). Put another way, "the error must be 'so plain the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it.' " *United States v. Saro*, 24 F.3d 283, 286 (D.C. Cir. 1994) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)). An error meets this high standard only if "its erroneous character" is established by "a clear precedent in the Supreme Court or this circuit." *United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012). Indeed, "[r]arely do we find an error to be plain where 'this court has not ruled on the question.' " *United States v. Laureys*, 653 F.3d 27, 32–33 (D.C. Cir. 2011) (per curiam) (quoting *United States v. Thomas*, 896 F.2d 589, 591 (D.C. Cir. 1990)); *see also United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993) (error may be plain even in absence of controlling precedent if trial court failed to follow "legal norm[ that is] absolutely clear (for example, because of the clarity of a statutory provision or court rule)"). To be "plain," the error must be clear or obvious at the time of appeal. *Henderson v. United States*, 133 S. Ct. 1121, 1130–31 (2013); *United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013).

Bahlul contends that his convictions are unconstitutional because the 2006 MCA, as applied to him, is an *ex post facto*

law. Even assuming that Bahlul is correct, the error is not plain because there is no holding by *any* court that an unlawful alien enemy combatant detained abroad is entitled to the protections of the *Ex Post Facto* Clause. Before *Boumediene*, *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), "were thought to be the controlling Supreme Court cases on the Constitution's application to aliens abroad." *Rasul v. Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009) (per curiam). In *Eisentrager*, the Supreme Court held that the Fifth Amendment did not apply to aliens with neither property nor presence in the United States. 339 U.S. at 784. *Verdugo-Urquidez*, relying on *Eisentrager*, held that the Fourth Amendment did not apply to such aliens. 494 U.S. at 269, 273–75. Other Supreme Court opinions similarly suggested that the Constitution did not apply outside the sovereign United States. *Zadyvas v. Davis*, 533 U.S. 678, 693 (2001); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 597 n.5 (1953); *United States v. Belmont*, 301 U.S. 324, 332 (1937); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936). We have followed those precedents consistently, recognizing that the Fifth Amendment did not extend beyond the boundaries of the United States. *See, e.g.*, *Jifry v. FAA*, 370 F.3d 1174, 1182–83 (D.C. Cir. 2004); *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *Harbury v. Deutch*, 233 F.3d 596, 603–04 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999).

In *Boumediene*, the Supreme Court for the first time in our history extended a constitutional protection to an alien located outside the sovereign territory of the United States. 553 U.S. at 770. But the Supreme Court "explicitly confined its constitutional holding 'only' to the extraterritorial reach of

the Suspension Clause" and "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." *Rasul*, 563 F.3d at 529 (quoting *Boumediene*, 553 U.S. at 795). Indeed, it remains the law of this circuit that, after *Boumediene*, aliens detained at Guantanamo may not invoke the protections of the Due Process Clause of the Fifth Amendment. *See Kiyemba v. Obama*, 555 F.3d 1022, 1026 & n.9 (D.C. Cir. 2009) ("due process clause does not apply to aliens without property or presence in the sovereign territory of the United States" and Guantanamo "is not part of the sovereign territory of the United States"), *vacated and remanded*, 559 U.S. 131 (2010), *reinstated in relevant part*, 605 F.3d 1046 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1631 (2011); *see also Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011); *Kiyemba v. Obama*, 561 F.3d 509, 518 n.4 (D.C. Cir. 2009) (Kavanaugh, J., concurring); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1428 (11th Cir. 1995) (Fifth Amendment does not apply to Cubans and Haitians temporarily housed at Guantanamo). Whether *Boumediene* in fact portends a sea change in the extraterritorial application of the Constitution writ large, we are bound to take the Supreme Court at its word when it limits its holding to the Suspension Clause. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 480–81 (1989). Thus, the extraterritorial inapplicability of the *Ex Post Facto* Clause remains as it was before *Boumediene*.

Bahlul points to no case from the Supreme Court or any court of appeals, nor to any other "absolutely clear" legal norm, opining that the *Ex Post Facto* Clause applies beyond the sovereign territory of the United States. Finding such a precedent would be a remarkable feat inasmuch as *Boumediene* expressly recognized that it was the first case to apply *any* constitutional provision to aliens located beyond

our sovereign territory: "It is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." 553 U.S. at 770. Because there is no clear precedent establishing that the *Ex Post Facto* Clause applies to aliens held at Guantanamo, prosecuting Bahlul under the 2006 MCA cannot constitute plain constitutional error.

## II. The *Ex Post Facto* Clause Does Not Protect Bahlul

Even if our review were *de novo*, I would conclude that the *Ex Post Facto* Clause does not apply to aliens detained at Guantanamo. As discussed above, only one constitutional protection applies to Guantanamo even after *Boumediene*. 553 U.S. at 795 ("Our decision today holds only that petitioners before us are entitled to seek the writ."); *see Rasul*, 563 F.3d at 529. *Boumediene* is the law and therefore it must be followed. But before 2008, the Constitution did not apply to aliens without property or presence in the United States. After 2008, the Suspension Clause—and only the Suspension Clause—protects only those aliens detained on the southeastern tip of an island outside the sovereign United States. We have previously said that, "[a]s a novel constitutional development, we are loath to expand *Boumediene*'s reach without specific guidance from the Supreme Court, particularly where expansion would carry us further into the realm of war and foreign policy." *Maqaleh v. Hagel*, 738 F.3d 312, 336 n.16 (D.C. Cir. 2013). I see no reason to abandon that caution.

Finally, we must remember the who, what and where of this case. Bahlul is an alien unlawful enemy combatant who—like Hitler's Goebbels—led Osama bin Laden's propaganda operation and freely admitted his role in the 9/11

atrocities. He was tried outside the sovereign United States for war crimes. During the post-World War II Nuremberg trials several defendants raised *ex post facto* objections but they were rejected as "sheer absurdity" under international law. 3 *Trials of War Criminals Before the Nuremberg Military Tribunals: "The Justice Case"* 975 (1951). I cannot agree that Bahlul is entitled to domestic constitutional protections—to which he would not be entitled under international law—simply because his war crimes trial was held at an American naval base located in Cuba.

Accordingly, were it not for the Government's concession that the *Ex Post Facto* Clause protects Bahlul, I would reach the issue and conclude that it does not.[1]

---

[1] Responding briefly to Judge Kavanaugh's concurrence, and with respect, I believe he is a solo source of confusion. He persists in reading the majority opinion to resuscitate *Hamdan II*. *Cf.* Kavanaugh Op. 1. He is wrong. I leave it to the careful reader to discern, not surprisingly, that the majority *expressly overrules Hamdan II*'s statutory holding. *See* Majority Op. 15. Judge Kavanaugh then pivots, calling the majority's decision to " 'overrule[]' " *Hamdan II*'s "statement" "a meaningless exercise." Kavanaugh Op. 27. Despite his best efforts at revisionism, the fact of the matter is that *Hamdan II* was wrongly decided and today the majority so holds.

ROGERS, *Circuit Judge*, concurring in the judgment in part and dissenting. Ali Hamza Ahmad Suliman al Bahlul, a self-avowed member of al Qaeda who has been held in the Naval Base at Guantanamo Bay, Cuba since 2002, was convicted and sentenced to life imprisonment by a military commission for three offenses under the Military Commissions Act of 2006. The question before the *en banc* court is whether these charges support the jurisdiction of the military commission. *See* Order, Apr. 23, 2013. Because Bahlul's conduct occurred prior to the enactment of the 2006 Act, and the military commission lacked jurisdiction to try these non-law-of-war offenses, Bahlul's convictions must be vacated. The court is vacating Bahlul's convictions for material support and solicitation. For the following reasons, I would also vacate Bahlul's conviction for inchoate conspiracy.

## I.

In *Hamdan v. Rumsfeld*, 548 U.S. 557, 590 (2006), the Supreme Court observed that "[t]he military commission, a tribunal neither mentioned in the Constitution nor created by statute, was born of military necessity." Historically, such commissions have been used in three situations. *Id.* at 595 (plurality op.); *id.* at 683 (Thomas, J., dissenting). First, they have substituted for civilian courts where martial law has been declared. Second, they have tried civilians in occupied enemy territory or territory regained from an enemy where civilian government cannot function. Third, military commissions have been convened to try "enemies who in their attempt to thwart or impede our military effort have violated the law of war." *Ex Parte Quirin*, 317 U.S. 1, 28–29 (1942). This third type of military commission is designed "to determine, typically on the battlefield itself, whether the defendant has violated the law of war." *Hamdan*, 548 U.S. at 596–97 (plurality op.); *cf. id.* at 641 (Kennedy, J., concurring in part). Its jurisdiction is thus limited

to "offenses cognizable during time of war." *Id.* at 596 (plurality op.); *see id.* at 641 (Kennedy, J., concurring in part).

"Trial by military commission raises separation-of-powers concerns of the highest order." *Id.* at 638 (Kennedy, J., concurring in part). "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality op.); *see id*. at 41 (Frankfurter, J., concurring in result); *see also* THE FEDERALIST NO. 47, at 324 (James Madison) (J. Cooke ed., 1961) (warning against the "tyranny" created through the "accumulation of all powers legislative, executive and judiciary in the same hands"). A statute conferring judicial power outside the Article III courts "may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture.'" *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (2011) (quoting *Reid*, 354 U.S. at 39 (plurality op.)). Even when confronted with the exigencies of war, "[the Court] cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system." *Id.*

The question presented by Bahlul's appeal is the effect of the 2006 Act on these settled principles. Given "the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty," *Quirin*, 317 U.S. at 19, this court must assure itself that the military commission had jurisdiction over the charged offenses of which Bahlul was convicted. *See Hamdan*, 548 U.S. at 611–12 (plurality op.); *id.* at 683 (Thomas, J., dissenting); *Application of Yamashita*, 327 U.S. 1, 17–18 (1946); *Quirin*, 317 U.S. at 25; 10 U.S.C. § 950g(d). The court properly considers a challenge to the jurisdiction of a military

commission at any time it is raised. *See* R.M.C. 907(b)(1), THE MANUAL FOR MILITARY COMMISSIONS, at II-87 (2007) ("A charge or specification shall be dismissed at any stage of the proceedings if: (A) The military commission lacks jurisdiction to try the accused for the offense"); *cf.* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction, *see* FED. R. CIV. P. 12(b)(1), may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").

## A.

Congress enacted the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, to authorize the establishment of law-of-war military commissions and to establish procedures governing their use. The 2006 Act specifies the "[c]rimes triable by military commissions," 10 U.S.C. § 950v, including offenses such as attacking civilians, *id.* § 950v(b)(2), taking hostages, *id.* § 950v(b)(7), and torture*, id.* § 950(b)(11). Congress included an unequivocal statement of the purpose and effect of its enactment:

> (a) PURPOSE. — The provisions of this subchapter codify offenses that have ***traditionally*** *been triable* by military commissions. This chapter *does not establish new crimes* that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

> (b) EFFECT. — Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are *declarative of existing law*, they do not preclude trial for crimes

that occurred before the date of the enactment of this chapter.

*Id.* § 950p (emphases added). The court must "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). The words used by Congress are to be understood in their ordinary, normal meaning, absent a contrary indication. *See Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2042 (2012).

The reference in Congress's plain and unequivocal statement of purpose to "offenses that have *traditionally* been triable by military commissions," 10 U.S.C. § 950p(a) (emphasis added), clearly indicates its intent to confine military commissions to their traditional role and jurisdiction, not to overturn settled principles. "Traditionally" is the adverbial form of the word "traditional," which means "long-established" or "habitually done, used, or found." THE NEW OXFORD AMERICAN DICTIONARY 1785 (2d ed. 2005). A "tradition[]" is readily identified and found in established practices; it is not based on a "few scattered . . . anomalies." *NLRB v. Noel Canning*, No. 12-1281, slip op. at 21 (U.S. June 26, 2014). To quote Henry James: "[I]t takes an endless amount of history to make even a little tradition." THE AMERICAN SCENE 164 (1907). Thus sang Tevye in "Fiddler on the Roof" of "Tradition" that has lasted for generations. Jerry Bock & Sheldon Harnick, *Prologue – Tradition*, *on* FIDDLER ON THE ROOF (RCA Victor 1964).

Congress's unusual "effect" statement, that the 2006 Act's provisions are "declarative of existing law," 10 U.S.C. § 950p(b), amplifies its instruction in the statement of purpose to look to offenses traditionally triable by military commissions. Here, Congress expresses sensitivity to the implicit

constitutional concerns arising from authorizing military commissions to try persons for conduct predating the 2006 Act. Its statement that the 2006 Act permits retroactive application only for offenses previously triable by military commission accords with the established "presumption against statutory retroactivity," and is the very antithesis of a contrary "unambiguous directive" or "express command" requiring retroactivity. *Landgraf v. USI Film Products*, 511 U.S. 244, 263, 270, 280 (1994); *see also Calder v. Bull*, 3 Dall. 386, 390 (1798) (opinion of Chase, J.); *Martin v. Hadix*, 527 U.S. 343, 354 (1999); *Lindh v. Murphy*, 521 U.S. 320, 325 (1997). This presumption is "deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265.

Ambiguity, if any, would arise, therefore, only in identifying the offenses that "have traditionally been triable by military commissions," 10 U.S.C. § 950p(a), and the Supreme Court has provided clear guidance on the resolution of this question. Congress's statement that the offenses it has listed are "declarative of existing law," *id*. § 950p(b), is a legal conclusion that is subject to a judicial declaration of what the law is. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803); *see also Noel Canning*, No. 12-1281, slip op. at 7. "[A] mistaken opinion of the legislature concerning the law[] does not make law." *Postmaster-General v. Early*, 25 U.S. 136, 148 (1827); *see also United States v. Stafoff*, 260 U.S. 477, 480 (1923) (Holmes, J). Determining what offenses were "traditionally" tried by military commissions according to "existing law" at the time of the conduct underlying Bahlul's convictions carries out Congress's expressly stated purpose, and is not an attempt to rewrite the 2006 Act's listing of offenses because Congress was mistaken, *see* Op. at 25.

At the time of Bahlul's charged conduct, the relevant statute

was Article 21 of the Uniform Code of Military Justice, 10 U.S.C. § 821 (2000). *See Hamdan*, 548 U.S. at 592–93; *see also Yamashita*, 327 U.S. at 7; *Quirin*, 317 U.S. at 28. It confers jurisdiction on military commissions over "offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821 (2000). The only offenses then listed by statute were spying and aiding the enemy, 10 U.S.C. §§ 904, 906 (2000). Because Bahlul was not charged with either of these offenses, the military commission trying him had jurisdiction only over violations triable by military commission under "the law of war." *See Hamdan*, 548 U.S. at 613; *Yamashita*, 327 U.S. at 17; *Quirin*, 317 U.S. at 29.

For more than seventy years, the Supreme Court has interpreted the "law of war" to mean the international law of war. In *Quirin*, examining the predecessor statute to 10 U.S.C. § 821 — Article 15 of the Articles of War, which similarly referenced "offenders or offenses that by statute or by the law of war may be triable by such military commissions" — the Court stated that in Article 15 Congress had "sanction[ed], within constitutional limitations, the jurisdiction of military commissions to try persons and offenses which, according to the rules and precepts of *the law of nations*, and more particularly the law of war, are cognizable by such tribunals." 317 U.S. at 27–28 (emphasis added). The Court reaffirmed its understanding that the law of war is a "branch of international law," *id.* at 29, four years later in *Yamashita.* Discussing the jurisdiction of the military commission, the Court looked to the violations of the law of war "recognized in international law" and consulted the Hague Conventions and the Geneva Conventions. *Yamashita*, 327 U.S. at 14–16. "[W]hen a new legal regime develops out of an identifiable predecessor, it is reasonable to look to the precursor in fathoming the new law." *Johnson v. United States*, 529 U.S. 694, 710 (2000); *see also Hamilton v. Rathbone*, 175 U.S. 414, 421 (1899). More

recently, in addressing Section 821 in *Hamdan*, the Court adhered to *Quirin* and *Yamashita* by looking to the body of international law governing armed conflict. *See Hamdan*, 548 U.S. at 602–03 (plurality op.); *id.* at 641 (Kennedy, J., concurring in part); *see also* Memorandum from the Office of Legal Counsel to the Attorney General 28, 30 (July 16, 2010), *printed in New York Times v. United States*, No. 13-422-cv, slip op. app. A (2d Cir. June 23, 2014) (describing the law of war as international law).

**B.**

To demonstrate that the offenses of which Bahlul was convicted are violations of the international law of war and within the jurisdiction of his military commission, Supreme Court precedent indicates that the "Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war." *Hamdan*, 548 U.S. at 603 (plurality op.). For instance, in *Quirin*, the Court concluded that a military commission had jurisdiction to try "unlawful combatants" who surreptitiously entered the United States, discarding their uniforms on arrival, for the purpose of committing hostile acts involving destruction of life or property. 317 U.S. at 35–36. This charge, the Court explained, "has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as a rule or principle of the law of war." *Id.* Similarly, in *Yamashita*, the Supreme Court held that a military commission had jurisdiction to try an invading Commanding General of the Imperial Japanese Army for breach of his duty to control the members of his command, by permitting them to commit atrocities against civilian populations and prisoners of war, because the charge "plainly" alleged a violation of the law of war, the purpose of which is "to protect civilian populations and prisoners of war from brutality."

327 U.S. at 13–18.

The government has repeatedly conceded that the three offenses of which Bahlul was convicted are not, and were not at the time of Bahlul's conduct, law-of-war offenses under international law. *See* Resp't's Br. 34 (regarding conspiracy only); Resp't's Pet. for Reh'g *En Banc* 1–2 ("the charges are not sustainable under *Hamdan II* because they have not attained recognition at this time as offenses under customary international law"); Resp't's pre-*Hamdan II* Panel Br. 57 ("the offenses of conspiracy, solicitation, and providing material support to terrorism have not attained international recognition at this time as offenses under customary international law"); Oral Argument Tr. 15 (Sept. 30, 2013) ("we have conceded that [all three offenses] are not violations of the international law of war"). This should end the matter given Congress's stated purpose and effect in the 2006 Act, 10 U.S.C. § 950p. Instead, departing from the instruction of more than half a century of Supreme Court precedent, the government contends that the *en banc* court can affirm Bahlul's convictions on the basis of a U.S. common (or U.S. domestic) law of war. Because the court is vacating Bahlul's convictions for material support for terrorism and solicitation but not for inchoate conspiracy, *see* Op. at 3, I need address only Bahlul's jurisdictional challenges to his conviction for inchoate conspiracy. It bears noting, however, that the court's analysis of the infirmities of the government's U.S. common law theory, based on Civil War military commissions and field orders, in vacating two of Bahlul's convictions applies no less to his conviction for inchoate conspiracy. *See* Op. at 46, 49, 52.

**1.** The trial record of the law-of-war military commission makes clear Bahlul was charged and convicted of inchoate conspiracy; his stand-alone conspiracy conviction did not depend upon proof of the completion of any object offense (such as

murder) or proof that the overt acts in furtherance of the conspiratorial agreement of which he was convicted (such as preparing a propaganda video) were law-of-war offenses.

First, the government elected not to charge Bahlul under the *Pinkerton* doctrine under which he could have been found vicariously liable for reasonably foreseeable substantive crimes committed by his co-conspirators in furtherance of the conspiracy. *See* Resp't's Br. 47; *Pinkerton v. United States*, 328 U.S. 640 (1946). The government also did not pursue the theory that Bahlul had joined a joint criminal enterprise. At the beginning of Bahlul's trial, the prosecutor moved to strike the charge that Bahlul had "join[ed] al Qaeda, an enterprise of persons who share the common criminal purpose that involved, at least in part, the commission or intended commission of one or more substantive offenses triable by military commission." Trial Tr. 110.

Second, the trial evidence allowed for conviction of no more than inchoate conspiracy. The government's evidence consisted of Bahlul's agreement with Usama bin Laden and other members of al Qaeda to commit law-of-war offenses and his commission of non-law-of-war, non-criminal overt acts in furtherance of the agreement. (The government's focus at trial was on Bahlul's role as an al Qaeda propagandist, in particular, his preparation of a recruitment video entitled "The Destruction of the American Destroyer U.S.S. Cole.") None of the overt acts committed in furtherance of the charged conspiracy — including traveling to Afghanistan with the intent to join al Qaeda, undergoing military-type training at a training camp sponsored by al Qaeda, pledging fealty (or "bayat") to Usama bin Laden, or transcribing the martyr wills of two of the September 11th hijackers — is a law-of-war offense. Even assuming being armed would have sufficed, the military commission found Bahlul not guilty of the overt act that he had "armed himself with an explosive belt, rifle,

and grenades to protect and prevent the capture of Usama bin Laden."

Third, the presiding military judge instructed the members of the military commission that to find Bahlul guilty of conspiracy, they must find beyond a reasonable doubt that he knowingly entered into an agreement to commit one or more substantive offenses triable by military commission and that he knowingly committed at least one overt act in furtherance of that agreement. Trial Tr. 845–46. The judge further instructed that proof the object of the conspiratorial agreement, the substantive law-of-war offense, "actually occurred is not required" and "[t]he overt act required for this offense does not have to be a criminal act." *Id.* at 848–49. The presiding judge also confirmed that Bahlul was not being tried on the basis of a joint criminal enterprise; when he discovered that his written instructions included the word "enterprise," the judge instructed the military commission members to strike the words "or enterprise," explaining "that's not before you," *id.* at 881.

**2.** The international law of war does not recognize inchoate conspiracy as a law-of-war offense. Although there are two exceptions — conspiracy to commit genocide and conspiracy to wage aggressive war (also known as the commission of crimes against peace), *see Hamdan*, 548 U.S. at 610 (plurality op.); 22 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL: NUREMBERG, 14 NOVEMBER 1945 – 1 OCTOBER 1946, at 469 (1948) ("TRIAL OF MAJOR WAR CRIMINALS AT NUREMBERG"); Antonio Cassese, International Criminal Law 191 (2003); *see also* Br. of *Amici Curiae* Int'l Law Scholars 12–14 — the government does not argue that either applies to Bahlul.

Treaty law and international courts and tribunals have refused to recognize inchoate conspiracy as a war crime because

of its potential for conflict with the international law-of-war principle "that criminal guilt is personal, and that mass punishments should be avoided." TRIAL OF MAJOR WAR CRIMINALS AT NUREMBERG at 500. Morever, the Anglo-American concept of conspiracy is not known to some European legal systems. *See* Telford Taylor, THE ANATOMY OF THE NUREMBERG TRIALS: A PERSONAL MEMOIR 36 (1992) ("Taylor"). Neither the Hague Conventions nor the Geneva Conventions, which are the "major treaties on the law of war," includes inchoate conspiracy as an international law-of-war offense. *Hamdan*, 548 U.S. at 603–04 (plurality op.); *see* Convention with Respect to the Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1803, 1 Bevans 247; Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631; Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3; Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609.

The International Military Tribunal convened at Nuremberg "pointedly refused to recognize as a violation of the law of war conspiracy to commit war crimes," *Hamdan*, 548 U.S. at 610 (plurality op.), concluding that its charter "does not define as a

separate crime any conspiracy except the one to commit acts of aggressive war." TRIAL OF MAJOR WAR CRIMINALS AT NUREMBERG at 469; *see also* Charter of the International Military Tribunal, in Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 280; Taylor at 550–53. The Charter addressed the personal responsibility of the major war criminals of the European Axis. *See* Charter arts. 1, 6–8. The Tribunal was concerned that "overbroad application of the conspiracy principle may drag innocent people into the prosecution's net." Taylor at 553. The United States Military Tribunals convened to try additional defendants also concluded that they "ha[d] no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." 15 UNITED NATIONS WAR CRIMES COMMISSION, LAW REPORTS OF TRIALS OF WAR CRIMINALS 90 (1949) ("LAW REPORTS OF TRIALS OF WAR CRIMINALS"). In addition, the Charter of the International Military Tribunal for the Far East did not confer jurisdiction over inchoate conspiracies to commit war crimes or crimes against humanity, only conspiracy to commit crimes against peace. *See* Charter of the International Military Tribunal for the Far East art. 5, Jan. 19, 1946, T.I.A.S. No. 1589, 4 Bevans 20.

Modern statutes defining international law-of-war offenses do not refer to conspiracy to commit such offenses (other than genocide). *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), *reprinted in* 32 I.L.M. 1159, 1192; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), *reprinted in* 33 I.L.M. 1598, 1602; Statute of the Special Court for Sierra Leone, Jan. 16, 2002, 2178 U.N.T.S. 138. Additionally, international tribunals recognizing "joint criminal

enterprise" as a theory of liability for completed law-of-war offenses have rejected a separate inchoate offense based on "mere membership" or "conspiring to commit crimes," and instead recognize liability only for "participation in the commission of the crime." *Prosecutor v. Milutinovic*, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction – Joint Criminal Enterprise, ¶ 26 (Int'l Crim. Trib. for the Former Yugoslavia, Appeals Chamber, May 21, 2003); *Rwamakuba v. Prosecutor*, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, ¶ 30 (Oct. 22, 2004); *see also* Br. of *Amici Curiae* Int'l Law Scholars 8–10.

**3.** Given this historical background, the government has a heavy burden to show that Congress's purpose in enacting the 2006 Act extended to inchoate conspiracy as an "offense[] that ha[s] traditionally been triable by military commissions," 10 U.S.C. § 950p(a). The government begins by suggesting that "a systemized body of international law establishing individual criminal responsibility for specific acts during warfare" commenced with the Hague Conventions of 1899 and 1907 and "is a relatively modern innovation." Resp't's Br. 28 (citing Timothy L.H. McCormack, *From Sun Tzu to the Sixth Committee: The Evolution of an International Criminal Law Regime*, *in* THE LAW OF WAR CRIMES: NATIONAL AND INTERNATIONAL APPROACHES 31, 43 (Timothy L.H. McCormack & Gerry J. Simpson eds., 1997)). It continues by citing Colonel William Winthrop, referred to by the Supreme Court as the "Blackstone of Military Law," *Hamdan*, 548 U.S. at 597 (plurality op.) (quoting *Reid*, 354 U.S. at 19 n.38 (plurality op.)), for the proposition that prior to the adoption of these and later treaties, the "offenses in violation of the laws and usages of war [consisted of] those principally, *in the experience of our wars*, made the subject of charges and trial." Resp't's Br. 29 (quoting

William Winthrop, MILITARY LAW AND PRECEDENTS 839 (1920)
("Winthrop PRECEDENTS")).  It also points to the reference in
*Hamdan* to "the American common law of war," 548 U.S. at
613.  Resp't's Br. 32.  Neither Winthrop nor *Hamdan* advance
the government's case for sustaining Bahlul's conspiracy
conviction.

First, in discussing the Civil War military commissions
relied upon by the government, Winthrop "excludes conspiracy
of any kind from his own list of offenses against the law of war."
*Hamdan*, 548 U.S. at 608 (plurality op.) (citing Winthrop
PRECEDENTS at 839–40).  Instead, Winthrop classifies the
relevant Civil War conspiracy cases either as "[c]rimes and
statutory offenses cognizable by State or U.S. courts, and which
would properly be tried by such courts if open and acting," or as
a "combin[ation]" of such civilian crimes and "violations of the
laws and usages of war cognizable by military tribunals."
Winthrop PRECEDENTS at 839 & n.5.  Winthrop rejected the idea
that inchoate conspiracy could be triable by law-of-war military
commission, emphasizing that "the jurisdiction of the military
commission should be restricted to cases of offence consisting in
*overt acts*, *i.e.* in unlawful commissions or actual attempts to
commit, and not in intentions merely."  *Id.* at 841.  In other
words, "'*overt acts*' constituting war crimes are the only proper
subject at least of those military tribunals not convened to stand
in for local courts," *Hamdan*, 548 U.S. at 608 (plurality op.)
(citing Winthrop PRECEDENTS at 841 & nn.22, 23).  The cases
cited by the government reveal that this is the manner in which
the Civil War military commissions proceeded.  *See infra* pt.
I.C.1.

Second, the Supreme Court's reference to "the American
common law of war" in *Hamdan*, 548 U.S. at 613, is to U.S.
military commission tradition and practice as an additional
constraint on, not an alternative basis for, military commission

jurisdiction under Section 821. The Court stated that the Uniform Code of Military Justice, which includes Section 821, "conditions the President's use of military commissions on compliance not only with the American common law of war, but also with the rest of the [Uniform Code of Military Justice] itself, insofar as applicable, and with the 'rules and precepts of the law of nations.'" *Id.* (quoting *Quirin*, 317 U.S. at 28). To come within the "law of war" under Section 821, an offense must constitute *both* a violation of the international law of war *and* a violation of the law of war as traditionally recognized in U.S. military commissions. This is necessary because, as the Court explained in *Quirin*, there may be

> acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.

317 U.S. at 29. Consequently, in *Quirin*, *Yamashita*, and *Hamdan* the Supreme Court sought to establish that the relevant offense was a violation of the law of war under international law and was recognized in U.S. military commissions. *See Quirin*, 317 U.S. at 35; *Yamashita*, 327 U.S. at 15–16; *Hamdan*, 548 U.S. at 603 (plurality op.). Under these precedents, the practice of U.S. domestic military commissions is irrelevant as long as inchoate conspiracy is not an international law-of-war offense, and the government conceded that it is not. Of course, to the extent the government relies on the Military Commissions Act of 2009, which refers to offenses that have "traditionally been triable under the law of war *or otherwise triable by military commission*" to support its argument that the statute embraces "a class of offenses — lawfully triable in U.S. military commission practice — that is broader than the group of offenses that are

currently prohibited by the international law of war," Resp't's Br. 28 (quoting 10 U.S.C. § 950p(d) (2009) (emphasis added)), this cannot advance its position since Bahlul was tried under the 2006 Act.

The legislative history of the 2006 Act also does not advance the government's position. The Report of the House Armed Services Committee on H.R. 6054 states "[f]or the reasons stated in Justice Thomas's opinion [in *Hamdan*], the Committee views conspiracy [to commit a war crime] as a separate offense punishable by military commissions." H.R. REP. NO. 109-664, pt. 1, at 25 (2006). But Justice Thomas expressly acknowledged that "conspiracy" was understood as a law-of-war offense only when it went "beyond 'intentions merely,'" and involved "unlawful" overt acts, 548 U.S. at 703 (Thomas, J., dissenting). There was no occasion in *Hamdan* for Justice Thomas to address the validity of a conspiracy charge where, as in Bahlul's case, "the overt act required . . . does not have to be a criminal act," Trial Tr. 849; Justice Thomas observed that Hamdan was "charged with the overt acts of providing protection, transportation, weapons, and other services to the enemy, acts which in and of themselves are violations of the laws of war," 548 U.S. at 704 (citation omitted).

## C.

Even assuming, contrary to Supreme Court precedent, that a U.S. common law of war tradition could serve as an independent basis for sustaining convictions by law-of-war military commissions for offenses that are not recognized under the international law of war or by then-existing statute, the government fails to establish a domestic tradition to sustain Bahlul's inchoate conspiracy conviction. It not only fails to point to evidence comparable to the abundance of evidence "both here and abroad" relied upon by the Supreme Court in *Quirin*, 317 U.S. at 31–35 & nn.10, 12, the government has not identified

a single case where military commission jurisdiction has been sustained on the basis of a charge of inchoate conspiracy, much less a charge of conspiracy with instructions defining the limits of the government's burden of proof that are comparable to those in Bahlul's case.

**1.** The Civil War cases to which the government points are, in fact, consistent with Winthrop's position. Further, as the Supreme Court cautioned, "[t]he Civil War precedents must . . . be considered with caution" because military commissions "operated as both martial law or military government tribunals and law-of-war commissions" and thus "often charged hybrid crimes mixing elements of crimes ordinarily triable in civilian courts (like treason) and violations of the law of war." *Hamdan*, 548 U.S. at 596 n.27, 609 n.37 (plurality op.); *see also* Winthrop PRECEDENTS at 839 & n.5. For example, William Murphy, who was tried by military commission in 1865, was charged with "[c]onspiracy to burn and destroy steamboats and other property" and also with "[v]iolati[ng] the laws and customs of war," by in fact burning and destroying a steamboat and by secretly crossing enemy lines and attempting to destroy a second boat. G.C.M.O. No. 107 (1866). These separate charges suggest that Murphy was tried by a tribunal serving as both a martial law court and a law-of-war military commission, and that the military commission classified the conspiracy charge as a civil crime, not as a "violation of the laws and customs of war." *Id*. Only this understanding is consistent with the fact that Murphy's conspiracy conviction was vacated because the civil courts were open and therefore the military commission "had no jurisdiction of his person or of his offence." *In re Murphy*, 17 F. Cas. 1030, 1031, 1032 (1867). And because Murphy did in fact destroy a steamboat during wartime, his case provides no support for the government's theory that a Civil War military tribunal had jurisdiction over conspiracy absent proof, much less absent any allegation, of a completed substantive law-of-war offense.

Similarly, the case of Henry Wirz, also cited by the government, does not provide evidence of a tradition on which to base affirmance of Bahlul's inchoate conspiracy conviction. Confederate Army Captain Wirz was charged with conspiring to injure the health and destroy the lives of soldiers in the military service of the United States and "alleged to have *personally committed* a number of atrocities against his victims, including torture, injection of prisoners with poison, and use of 'ferocious and bloodthirsty dogs' to 'seize, tear, mangle, and maim the bodies and limbs' of prisoners, many of whom died as a result." *Hamdan*, 548 U.S. at 609 (plurality op.) (citing H.R. Doc. No. 314, 55th Cong., 3d Sess., 785, 789–90 (1899)). Notably, as the *Hamdan* plurality explained, the Judge Advocate General determined that one of Wirz's alleged co-conspirators, R.B. Winder, should not be tried by military commission because "*while the evidence at the trial of Wirz was deemed by the court to implicate him in the conspiracy* against the lives of all Federal prisoners in rebel hands, *no such specific overt acts of violation of the laws of war* are as yet fixed upon [Winder]." *Id.* (quoting H.R. Doc. No. 314, 55th Cong., 3d Sess., 783 (1899)) (emphasis in original opinion). In other words, had Wirz not committed overt acts that were violations of the law of war, he could not have been tried by military commission for conspiracy.

The 1865 trial of the Lincoln assassins, "even if properly classified as a trial by law-of-war commission," *Hamdan*, 548 U.S. at 604 n.35 (plurality op.), likewise does not support the government's theory of a U.S. common law-of-war tradition. The defendants were charged with both "conspiring" to murder President Lincoln and the completed offense of "maliciously, unlawfully, and traitorously murdering the said Abraham Lincoln," G.C.M.O. No. 356 (1865); *see Hamdan*, 548 U.S. at 604 n.35 (plurality op.) (quoting H.R. Doc. 314, 55th Cong., 3d Sess., 696 (1899)); *see also* THE TRIAL: THE ASSASSINATION OF PRESIDENT LINCOLN AND THE TRIAL OF THE CONSPIRATORS

246–47 (Edward Steers, Jr. ed., 2003). Of utmost significance, surely, the then-Attorney General, in defending the use of a military tribunal, treated the charge as alleging the substantive, completed "offence of having assassinated the President." 11 Op. Atty. Gen. 297, 297 (1865). Furthermore, the district court, in rejecting petitions for a writ of habeas corpus filed by three of the assassins, described the charge of conviction as "a conspiracy to commit the military crime [of the assassination of the Commander in Chief] *which one of their number did commit.*" *Ex Parte Mudd*, 17 F. Cas. 954 (S.D. Fla. 1868) (emphasis added). Recall that in Bahlul's case the prosecution dismissed charges and theories of vicarious liability.

In sum, the Civil War conspiracy cases, including the trial of the Lincoln assassins, each, in fact, involved a completed law-of-war offense, not an inchoate conspiracy. These cases are consistent with Winthrop's description of such conspiracies as among the "[c]rimes and statutory offenses . . . which would properly be tried by [State or U.S.] courts if open and acting," or alternatively, as hybrid crimes combining elements of crimes ordinarily triable in civilian courts and law-of-war offenses. Winthrop PRECEDENTS at 839 & n.5. They offer no reason to depart from Winthrop's contemporary rejection of inchoate conspiracy as a law-of-war offense.

**2.** The World War II cases cited by the government also do not establish historical support for the jurisdiction of law-of-war military commissions over inchoate conspiracy. Although the Nazi saboteurs in *Quirin* were charged with conspiracy, the Supreme Court affirmed their convictions based on the independent charge that they had violated the law of war by crossing behind enemy lines having removed their uniforms, with the purpose of committing sabotage. *See Quirin*, 317 U.S. at 48. "The offense was complete when with [hostile] purpose they entered — or, having so entered, they remained upon — our

territory in time of war without uniform or other appropriate means of identification." *Id.* at 38. Like the case of the Lincoln conspirators, *Quirin* involved a completed law-of-war offense, not an inchoate conspiracy conviction like Bahlul's. "If anything, *Quirin* supports [the] argument that conspiracy is not a violation of the law of war," because "[t]he Court was careful in its decision to identify an overt, 'complete' act" and "took seriously the saboteurs' argument that there can be no violation of law of war — at least not one triable by military commission — without the actual commission or attempt to commit a 'hostile and warlike act.'" *Hamdan*, 548 U.S. at 606–07 (plurality op.) (quoting *Quirin*, 317 U.S. at 37–38). Brigadier General Mark Martins, the Chief Prosecutor of Military Commissions in the Department of Defense since June 2011, likewise characterized *Quirin* as an authority "supporting [the] rationale" that conspiracy may be tried under the law of war in conjunction with a completed offense that appears on the charge sheet, but not as an inchoate offense. Memorandum from Mark S. Martins, Chief Prosecutor of Military Commissions, Dep't of Defense, to the Convening Authority 4 (Jan. 6, 2013).

The government's reliance on *Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956), is misplaced. The Tenth Circuit followed *Quirin* in affirming the denial of a habeas petition filed by another World War II saboteur. Colepaugh had been convicted on three charges: (1) he "secretly passed through, in civilian dress, contrary to the law of war, the military and naval lines of the United States for the purpose of committing espionage, sabotage and other hostile acts;" (2) he "appeared and remained in civil dress, contrary to the law of war behind the military lines of the United States for the purpose of committing espionage, sabotage and other hostile acts;" and (3) "conspiracy to commit the above substantive offenses." *Id.* at 431. Like the Supreme Court in *Quirin*, the Tenth Circuit looked to the "body of international common law known as the law of war," *id.* at

431–32, and concluded that Colepaugh was not entitled to relief because he had committed the same substantive law-of-war offense as the saboteurs in *Quirin* when he entered this country and discarded his uniform for the purpose of committing hostile acts involving the destruction of life or property, *id.* at 432 (quoting *Quirin*, 317 U.S. at 35). The court also followed the Supreme Court in not confirming the validity of the separate conspiracy charge. Consequently, this case, like *Quirin*, provides no support for the government's theory that Bahlul could be tried by military commission for inchoate conspiracy absent any charge that he committed a substantive law-of-war offense.

**3.** In sum, "[f]ar from making the requisite substantial showing, the Government has failed even to offer a 'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission," *Hamdan*, 548 U.S. at 611 (plurality op.) (citation omitted). As the plurality in *Hamdan* explained:

> The crime of 'conspiracy' has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction, and does not appear in either the Geneva Conventions or the Hague Conventions — the major treaties on the law of war. Winthrop explains that under the common law governing military commissions, it is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.

*Id.* at 603–04 (citing Winthrop PRECEDENTS at 841).

Insofar as the government proposes, contrary to Supreme Court precedent, a U.S. common law of war basis for sustaining Bahlul's conspiracy conviction, the government's proposal is also "unmoored from any enumerated power and has no rational stopping place." Pet'r's Br. 32. Such a theory suggests that modern military commissions could try defendants for any offense that approximates a charge previously brought before any type of military tribunal, including Civil War era military commissions convened to try ordinary civilian crimes. *See id.*

The government's interpretation of Congress's intent in enacting the 2006 Act, additionally, leaves no room for consideration of the reasons the international community has rejected inchoate crimes as law-of-war offenses: for example, their dragnet effect could sweep in and condemn as war criminals the line soldier who merely pledged allegiance to the enemy as well as the errant but innocent delivery boy or shepherd who was on the wrong street at the wrong time. *See* Taylor at 553; Br. of *Amicus Curiae* Int'l Law Scholars 7, 15–18. The Supreme Court has long understood the role of military commissions to arise from the military necessity in the midst of war "to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war," *Quirin*, 317 U.S. at 28–29; *Hamdan*, 548 U.S. at 596 (plurality op.), not to try and convict (as distinct from holding as prisoners of war) anyone who is a member of the opposing forces. The law of war governing the use of military commissions is a product of the costly lessons learned in the last century from two World Wars, including the principle that, as a matter of international law, law-of-war offenses are about personal responsibility for war crimes, not collective guilt. *See* TRIAL OF MAJOR WAR CRIMINALS AT NUREMBERG at 500. It seems unlikely the Congress that enacted the 2006 Act intended to cast aside such costly learning without expressly indicating that it intended to do so; by using the phrase "offenses that have

*traditionally* been triable," 10 U.S.C. § 950p(a) (emphasis added), in stating its purpose, Congress signaled it was adhering to the established understanding of the role of military commissions, not breaking new ground.

And, even assuming *arguendo* that practices of U.S. military commissions could provide an independent basis upon which to support the jurisdiction of a law-of-war commission to try an offense not recognized in international law, nor codified in statute at the time, the government's failure to demonstrate that such a "tradition[]" existed at the time of the charged conduct requires vacatur of Bahlul's inchoate conspiracy conviction.

Were the implications for the separation of powers raised by trial by military commission not "of the highest order," *Hamdan*, 548 U.S. at 638 (Kennedy, J., concurring in part), the government's effort to establish its inchoate conspiracy theory on the basis of so meager and deficient an historical showing that it was among the "offenses that have *traditionally* been triable by military commissions," 10 U.S.C. 950p(a) (2006) (emphasis added), might be less problematic. After all, the war on terror is unlike recent wars waged among sovereign nations whose troops wore identifiable uniforms, and two Presidents have employed a modern "enemy combatant" military justice regime. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 733 (2008); *Hamdan*, 548 U.S. at 570 & n.1. But in codifying "offenses that have *traditionally* been triable by military commissions" in the 2006 Act, Congress did not encourage or permit any blurring of the jurisdictional lines between military commissions and Article III courts. The Article III courts were open for prosecuting September 11 perpetrators and other members of al Qaeda for inchoate conspiracy or other federal crimes. Only years later did Congress bar the President from using appropriated funds to bring Guantanamo detainees into the United States for any purpose. The President has opposed such restrictions on the

ground that they strip the Executive Branch of "the authority to determine when and where to prosecute Guantanamo detainees, based on the facts and circumstances of each case and our national security interests" — when the Administration wishes to employ federal prosecutions [in Article III courts] as "a legitimate, effective, and powerful tool in our efforts to protect the Nation." *See* Statement by the President on H.R. 3304 (Dec. 26, 2013). So far, Congress has not been persuaded to remove the restrictions. In the meantime, the court has a duty "in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty." *Quirin*, 317 U.S. at 19. Hewing to the jurisdictional limits for law-of-war military commissions, as Supreme Court precedent instructs, preserves the separation of powers under which law-of-war military commissions are confined to their historical role as necessities, not conveniences, of war. Congress's unequivocal statement of its purpose and effect in section 950p of the 2006 Act is consistent only with the understanding that it intended to maintain the traditional jurisdictional lines.

## II.

There is still another reason why Bahlul's conviction for inchoate conspiracy (and the other two convictions) must be reversed if the 2006 Act is applied retroactively. *See* Op. at 15. Even assuming, contrary to its express statement of the intended "effect" of the 2006 Act, 10 U.S.C. § 950p(b), that Congress intended the 2006 Act to apply retroactively to create new offenses triable by military commissions, Bahlul's convictions must be vacated under the *Ex Post Facto* Clause of the Constitution. U.S. CONST. art. I, § 9, cl. 3.

### A.

Bahlul's *Ex Post Facto* Clause challenge to his convictions is properly reviewed *de novo* for any one of three reasons. In

applying a plain error standard of review, the majority imposes a magic-words requirement nowhere to be found in the precedent of the Supreme Court or in the Uniform Code of Military Justice as interpreted by the Court of Appeals for the Armed Forces. *See, e.g.*, *Olano v. United States*, 507 U.S. 725 (1993).

Bahlul unambiguously objected to his trial on the grounds he was being charged with offenses that did not exist at the time of his alleged conduct. Although he did not refer specifically to the *Ex Post Facto* Clause, his pretrial colloquy with the presiding military judge invoked its principles and alerted the military commission to the substance of his objection, which is all that is required to preserve an objection. *See, e.g.*, *United States v. Breedlove*, 204 F.3d 267, 270 (D.C. Cir. 2000). The *Ex Post Facto* Clause is designed both "to assure that legislative Acts give fair warning of their effect" and to "restrain[] arbitrary and potentially vindictive legislation." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981). Bahlul objected to the judge that after the events of September 11, 2001, this country had "put on the side, the meaningless American laws, the United Nations, . . . the world codes, the international law and what branches out of it and the international war laws and the Geneva Conventions and the internal American law — military law, and the civil law — American civil law" and instead had "legislated new laws and this military commission." Trial Tr. 23. Bahlul repeated that the United States had "established a new law in the land, for me and for any person that stands in front of you or before you in the war in the entire world; but specifically, the Islamic world, and specifically also, the Mujahideen Regime." *Id.* at 24. He accused the United States of "getting confused between laws and going in an empty circle . . . [b]ecause today, you set a law that would impact you tomorrow, and then you will change it, or adjust it, or add to it." *Id.* at 25.

With these arguments, Bahlul expressly challenged the "new

laws and this military commission" that was to try him as divorced from both international and American law principles and as constructed after-the-fact for the purpose of trying members of al Qaeda. Bahlul's objections to "new laws" being applied to him and to "chang[ing]," "adjust[ing]," and "add[ing] to" existing laws are the considerations animating the *ex post facto* prohibition. The presiding military judge understood Bahlul's arguments and his decision to "boycott" the military commission proceedings to be a motion to dismiss for lack of jurisdiction, because the law that created the proceedings was unlawful or the charges did not state an offense. *Id.* at 98–99.

Even if Bahlul had forfeited his *ex post facto* challenge, *de novo* review of a forfeited issue is permitted where the lower court has "nevertheless addressed the merits of the issue." *Blackmon-Malloy v. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009) (citing *United States v. Williams*, 504 U.S. 36, 41 (1992)); *see United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th Cir. 2003); *cf. Milhouse v. Levi*, 548 F.2d 357, 363 (D.C. Cir. 1976); *United States v. Gorski*, 47 M.J. 370, 375 (C.A.A.F. 1997). This principle applies in both criminal and civil cases. *See Williams*, 504 U.S. at 41. The Court of Military Commission Review considered Bahlul's constitutional *Ex Post Facto* Clause objection on the merits, 820 F. Supp. 2d 1141, 1218 (C.M.C.R. 2011), and this court may as a matter of discretion consider Bahlul's challenge under a *de novo* standard of review. Given that Bahlul's objections go to the fundamental issue of the military commission's jurisdiction, this court should apply *de novo* review.

Furthermore, under the Rules of Military Commissions, Bahlul's challenge to the military tribunal's jurisdiction and the charges against him cannot be waived or forfeited and is reviewed *de novo*. Rule 905(e) provides, in relevant part, that failure to raise defenses or objections or to make motions or

requests "except lack of jurisdiction or failure of a charge to allege an offense" at the appropriate time "shall constitute waiver." *See* THE MANUAL FOR MILITARY COMMISSIONS, at II-83–84 (2007). The rule thus defines "waiver" to include forfeiture. Similarly, Rule 907(b)(1), "Nonwaivable grounds," states that "[a] charge or specification shall be dismissed at any stage of the proceedings if: (A) The military commission lacks jurisdiction to try the accused for the offense; or (B) The specification fails to state an offense." *Id.* at II-87. As the presiding military judge concluded, Bahlul's retroactivity objection is a claim that the charges against him fail to state an offense. *Cf.* MOORE'S FEDERAL PRACTICE § 612.04 (Lexis 2014) ("The defense of failure to charge an offense may be based on . . . the unconstitutionality of the statute relied upon."); *see also United States v. Haddock*, 956 F.2d 1534, 1542 (10th Cir. 1992), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997); *United States v. Gilbert*, 813 F.2d 1523, 1528–29 (9th Cir. 1987); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973).

**B.**

The government concedes that the *Ex Post Facto* Clause applies in military commission prosecutions under the 2006 Act of detainees at Guantanamo Bay. *See* Resp't's Br. 64. This conclusion follows from *Boumediene*, 553 U.S. at 766–71. Like the Suspension Clause at issue there, the *Ex Post Facto* Clause is "one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights," *id.* at 739, and serves both to protect individuals and to preserve the Constitution's separation-of-powers structure. *See id.* at 739–46; *Landgraf*, 511 U.S. at 267–68; *Weaver*, 450 U.S. at 29 n.10. "Because the Constitution's separation-of-powers structure . . . protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles." *Boumediene*, 553 U.S. at 743.

The Court's analysis of the extraterritorial reach of the Suspension Clause applies to the *Ex Post Facto* Clause because the detainees' status and location at Guantanamo Bay are the same, and the government has pointed to no distinguishing "practical obstacles" to its application. *See id.* at 766. The 2006 Act, in providing that it "does not establish new crimes that did not exist before its enactment," 10 U.S.C. § 950p(a), fairly demonstrates Congress's implied recognition of the reach of the fundamental protections embodied in the *Ex Post Facto* Clause.

*Ex post facto* laws are "contrary to the great first principles of the social compact," *Calder*, 3 Dall. at 388 (opinion of Chase, J.), and are "condemned by the universal sentence of civilized man" as "oppressive, unjust, and tyrannical," *Ogden v. Saunders*, 25 U.S. 213, 266 (1827). The *Ex Post Facto* Clause both "ensures that individuals have 'fair warning' about the effect of criminal statutes," *Landgraf*, 511 U.S. at 267–68 (citation omitted), and serves as a meaningful structural constraint imposed by Article I that goes "to the very root of the power of Congress to act all," *Downes v. Bidwell*, 182 U.S. 244, 277 (1901) (opinion of Brown, J.); *see also Weaver*, 450 U.S. at 29–30. It "safeguards 'a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'" *Peugh v. United States*, 133 S. Ct. 2072, 2085 (2012) (quoting *Carmell v. Texas*, 529 U.S. 513, 533 (2000)). And it "upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." *Weaver*, 450 U.S. at 29 n.10.

Tellingly, when ratified and now, the *Ex Post Facto* Clause addresses the risk that, in response to political pressures, the legislature "may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals."

*Landgraf*, 511 U.S. at 266; *see Weaver*, 450 U.S. at 29. By safeguarding the boundaries between the branches of government, the Clause promises that accusations that this country has, in Bahlul's words, "put [our laws] on the side" and "established a new law" for our enemies, Trial Tr. 23–24, will lack merit. Yet in an odd turn of phase for addressing "one of the most basic presumptions of our law," *Johnson*, 529 U.S. at 701, the government urges that the Clause "should apply flexibly" here "because of the common law nature of military proceedings" and "because Bahlul's conduct was criminal when done," albeit under statutes providing for prosecution in an Article III court. Resp't's Br. 62–63, 67. The government's "flexible" approach to the *Ex Post Facto* Clause, relying on the position that Bahlul's conduct may have been proscribed by laws other than those under which he was charged and convicted, "is a standardless exercise in crime by analogy," Pet'r's Reply Br. 21, that the Supreme Court has condemned, *see, e.g.*, *Papachristou v. Jacksonville*, 405 U.S. 156, 168–69 (1972), and the law of war forbids, *see, e.g.*, Rome Statute of the International Criminal Court art. 22, July 17, 1998, 2187 U.N.T.S. 90; 6 LAW REPORTS OF TRIALS OF WAR CRIMINALS at 95 (practices such as "application of principles of law condemned by the practice of civilised nations such as punishment by analogy . . . are all properly classed as war crimes").

### C.

Article I military commissions are an extraordinary tool designed to permit the military to infringe on the Article III power of the judiciary only to accomplish specific and discrete objectives. Through the use of military commissions, the government can provide a substitute for civilian courts in occupied territories and in places where martial law has been declared. *See Hamdan*, 548 U.S. at 595–96 (plurality op.); *see id.* at 683 (Thomas, J., dissenting). As relevant here, military

commissions may be convened as an "incident to the conduct of war," to prosecute law-of-war offenses. *Quirin*, 317 U.S. at 28–29; *see Hamdan*, 548 U.S. at 596–97 (plurality op.); 10 U.S.C. § 948b(a) (2006). The retroactive expansion of the jurisdiction of Article I law-of-war military commissions to include offenses that "have [not] traditionally been triable by military commissions," however, contravenes the structural limitations embodied in the *Ex Post Facto* Clause.

This appears to be a test case brought by the government to establish the jurisdiction of law-of-war military commissions over inchoate conspiracy where the government has evidence the defendant entered into an agreement to engage in terrorist acts against the United States, but no evidence the defendant committed an overt act that was a law-of-war offense in furtherance of the agreement. This approach may assist the Executive Branch in surmounting obstacles to prosecutions in Article III courts caused by Congress's recent restrictions on the use of appropriated funds to bring Guantanamo detainees into the United States. *See, e.g.*, Statement by the President on H.R. 3304 (Dec. 26, 2013). But it puts at risk the separation of powers and the *ex post facto* principle by ignoring Congress's plain statement of purpose and effect in the 2006 Act, the "traditional[]" jurisdiction of military commissions, and the international community's rejection of inchoate offenses as law-of-war offenses.

Accordingly, the inchoate conspiracy charge of which Bahlul was convicted under the 2006 Act does not support the jurisdiction of the military commission and this conviction must be vacated as well as the two convictions vacated by the court. All three convictions must be vacated as violations of the *Ex Post Facto* Clause. It remains for the Administration to decide whether to bring other charges against Bahlul before a military commission or whether to charge him in an Article III court. To

the extent that Congress has created an obstacle to bringing Bahlul to the United States, Congress can remove it. The question whether Congress has impermissibly intruded upon the President's Article II powers is not before the court. In the meantime, "[t]he laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene*, 553 U.S. at 798. I concur in the judgment vacating Bahlul's convictions for material support and solicitation, and I respectfully dissent with regard to affirmance of Bahlul's conviction for inchoate conspiracy.

BROWN, *Circuit Judge*, concurring in the judgment in part and dissenting in part:  Over five years ago, Ali Hamza Ahmad Suliman al Bahlul was convicted of conspiracy, solicitation, and providing material support for terrorism. Since that time, the government has been defending the conviction, first before the Court of Military Commission Review and now before this court.  In this appeal, the government seeks clarification of the prosecutorial tools it can employ in the war on terror.  While I concur in the court's judgment affirming Bahlul's conspiracy conviction and vacating the solicitation and material support convictions, I cannot agree with the way the court reaches that result.  By reviewing Bahlul's claims under a plain error standard, the court minimizes the value its opinion might provide to the government in future prosecutions.  And by remanding residual issues to a panel, the court delays resolution of Bahlul's case.

I would definitively answer the important questions raised by Bahlul's appeal, reviewing his ex post facto arguments under a de novo standard.  I would also affirm Congress's power under the Define and Punish Clause to make certain offenses, including conspiracy, triable by military commission.  This legal saga has endured long enough, and we should take this opportunity to resolve important legal questions that have arisen from the war on terror.

I

The opinion of the court provides insightful legal and historical background and, in certain areas, well-reasoned analysis.  The separate opinions of Judges Henderson and Kavanaugh afford additional insight.  There is much in those opinions with which I wholeheartedly agree.  But although I concur in the court's judgment, I would reach its conclusion through a slightly different path.  In this section, I draw on the

compelling analysis of my colleagues to explain briefly how I would dispose of Bahlul's challenges. In the following sections, which contain the analytical bulk of my concurrence, I address three issues that I feel are not adequately covered by the other opinions: the applicability of ex post facto principles to Bahlul's convictions, Bahlul's challenge to Congress's power under the Define and Punish Clause, and the court's decision to remand remaining issues to a panel of this court.

I begin by noting the areas where I agree with my colleagues. First, for the reasons expressed by Judge Kavanaugh, I would review Bahlul's Ex Post Facto Clause and retroactivity arguments under a de novo standard. *See* Opinion of Judge Kavanaugh (Kavanaugh Op.) 30–34; *see also* Opinion of Judge Rogers Part II.A. Bahlul asked the Military Judge presiding over his trial a "legal question" that, although not a model of clarity, was sufficient to preserve those arguments: "Does the law here start from before, during, or after?" Supp. App. 37. Furthermore, Rules 905 and 907 of the Rules of Military Commissions make jurisdictional challenges—including Bahlul's—not subject to forfeiture.

Second, I agree with the court that the Military Commissions Act (MCA) of 2006 unambiguously authorizes retroactive prosecution for all the crimes enumerated in that statute. *See* Op. Part III. Both the text of the Act—including in particular 10 U.S.C. § 948d(a) (2006) (granting military commissions jurisdiction over offenses "committed . . . before, on, or after September 11, 2001")— and the context of the judicial–legislative dialogue in which the Act was passed require this conclusion.

Third, like the court, I would accept, for the purposes of this case only, the government's concession that the Ex Post Facto Clause provides its protection to aliens detained at Guantanamo. *See* Op. 26–28. However, I doubt the correctness of the government's concession. If our review of the question were de novo, I would, like Judge Henderson, apply the longstanding precedents of the Supreme Court and this court and conclude that the Ex Post Facto Clause does not apply to Bahlul or other aliens at Guantanamo. *See* Opinion of Judge Henderson.

Fourth, I would reject Bahlul's Ex Post Facto Clause challenge as it concerns his conspiracy conviction. As Judge Kavanaugh explains, prior to 2006, the "law of war" provision of 10 U.S.C. § 821 (Article 21 of the Uniform Code of Military Justice) preserved the jurisdiction of military commissions to try offenses that (1) were codified in federal statutes and explicitly made triable by military commission, (2) were recognized by the international law of war, or (3) were, according to domestic tradition and practice, triable by military commission. *See* Kavanaugh Op. 7–11; *cf.* Op. 36–40 (holding such a conclusion is not plainly erroneous). Furthermore, as the Lincoln conspirators' cases, *Quirin*, *Colepaugh*, and the Korean War decisions demonstrate, domestic practice traditionally treated conspiracy as an offense triable by military commission. *See* Kavanaugh Op. 11–16; *cf.* Op. 40–44 (reaching similar conclusion under a plain error standard). Because conspiracy was an offense triable by military commission before the 2006 MCA, Bahlul's prosecution for that offense did not violate the Ex Post Facto Clause.[1]

---

[1] In upholding Bahlul's conspiracy conviction, I would not rely on 18 U.S.C. § 2332(b). Indeed, by relying on *Olano*'s fourth prong, the court practically concedes that the existence of the conspiracy

Fifth, I fully agree with the court's discussion of material support and solicitation and its conclusion that those offenses were not historically triable by military commission. *See* Op. Part IV.B–C. Thus, I join the court's decision to vacate Bahlul's convictions for those offenses.

II

As noted above, if not for the government's concession, I would hold that, as an alien detained outside the sovereign territory of the United States, Bahlul is not entitled to the protections otherwise afforded by the Ex Post Facto Clause. However, despite my doubts about the extraterritorial applicability of the Clause, I do not doubt that its underlying principles apply to detainees at Guantanamo. The legal principle *nullum crimen sine lege*, found in the common law and international law, constrains the power of the United States to prosecute wherever it may do so. But, even if there were not a long history of conspiracy charges being tried by military commission, invocation of the ex post facto principle alone could not help Bahlul or similarly situated detainees. As the International Military Tribunal convened at

provision in Title 18 would not save Bahlul's conviction if not for the court's application of a plain error standard. *See* Op. 32–35. I am also reluctant to rely on that provision, however, because of the significant procedural differences between criminal prosecutions in Article III civilian courts and prosecutions before military commissions. The parties have not fully briefed the issue, and I would be reluctant without such briefing to hold that a law retroactively transferring jurisdiction to try an offense from an Article III court to a military commission does not violate the Ex Post Facto Clause. Because the court utilizes a plain error standard, the court also does not fully embrace this novel and potentially far-reaching result.

Nuremberg in the aftermath of World War II thoughtfully observed, "the maxim *nullum crimen sine lege* is not a limitation of sovereignty, but is in general a principle of justice." Judgment of October 1, 1946, 1 INTERNATIONAL MILITARY TRIBUNAL, TRIAL OF THE MAJOR WAR CRIMINALS (IMT) 171, 219 (1947).

During the proceedings of the International Military Tribunal, the defendants, who were charged with conspiring to wage aggressive war, complained that ex post facto punishment was abhorrent to the law of all civilized nations and that no sovereign power had made aggressive war a crime, no statute defined aggressive war, no penalty had been fixed for its commission, and no court had been created to try and punish offenders at the time the acts were committed. Nevertheless, the Tribunal recognized that its expression of the international law was "itself a contribution to international law" and, in setting up the Tribunal, several nations had done together what any nation had a right to do singly. *Id.* at 218. The Tribunal stated that "[t]o assert that it is unjust to punish those who in defiance of treaties and assurances have attacked neighboring states without warning is obviously untrue, for in such circumstances the attacker must know that he is doing wrong, and so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished." *Id.* at 219.

In the case of the terrorist attacks of September 11, involving the murder of thousands of civilians, the attackers knew the civilized world would condemn their actions. Bahlul was fully aware of how the world would view his complicity in a moral evil, and "so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished." *See id.*

## III

Bahlul argues Congress does not have the power under the Define and Punish Clause to make triable by military commission those offenses not proscribed by the international law of war. The court remands this issue to the panel. But the issue was fully briefed and argued before the en banc court and, for the reasons explained below, *see infra* Part IV, I think we should take the opportunity to resolve Bahlul's challenge now.

Judge Kavanaugh would resolve this challenge by holding that Congress's authority to establish military commissions derives not only from the Define and Punish Clause, but from Congress's war powers more generally, including those originating in the Declare War and Necessary and Proper Clauses of Article I, Section 8. *See* Kavanaugh Op. Part II. Judge Kavanaugh notes that the war powers clauses do not refer to international law and are not defined or constrained by that law. While I agree with Judge Kavanaugh's broad characterization of Congress's war powers, I find his resolution of Bahlul's claim incomplete. By looking to Congress's authority under the war powers clauses, Judge Kavanaugh leaves unresolved the argument that Congress's power under the Define and Punish Clause is strictly constrained by international law. I would resolve Bahlul's challenge to Congress's Define and Punish Clause powers on Define and Punish Clause grounds alone, holding that the Clause gives Congress far greater powers than Bahlul acknowledges.[2]

---

[2] Judge Kavanaugh's reliance on the war powers clauses leaves unresolved questions such as whether the government may try before a military commission members of a terrorist organization with which the United States is not engaged in active hostilities.

Any discussion of the Define and Punish Clause must take proper account of two separate but related points. First, in drafting the Clause, the Framers were distinctly aware of the undefined and adaptable nature of international law. They also recognized the concomitant flexibility inherent in that law. And they understood that the United States could, and indeed should, make use of that flexibility to advance its own national security interests. That is, the Framers intended the United States—like other nations—to act in its own self-interest, albeit within the flexible constraints of international law. Second, the Framers deliberately placed the responsibility and prerogative to interpret and define international law with Congress—a political branch—rather than with the judiciary. This second point is related to the first and to some extent demonstrates its truth: If the Framers had intended the country to be strictly constrained by narrowly-interpreted international law, it would have made more sense to place the power to interpret that law with the judiciary—the legal branch expert in such tasks. But, instead, the Framers placed the power with Congress, intending that Congress would interpret and define international law in a more flexible way that serves the country's self-interest, but still remains compatible with international norms. The Framers recognized the discretion that must necessarily be exercised in defining international law, and entrusted that discretion to Congress. The judiciary was given only very limited power to review Congress's choices in defining and punishing violations of international law, and must exhibit tremendous deference to the legislature's choices in this area.

With respect to the two principles described above, Congress's decision to make conspiracy an offense triable by military commission provides an excellent example of the

flexibility inherent in international law and ably demonstrates congressional prerogatives.

A

1

The history behind the Define and Punish Clause supports an expansive reading of Congress's power under the Clause. Both the drafters of the Constitution and their eighteenth-century audience would have had more than a passing familiarity with Blackstone and Locke—and, perhaps, Vattel, Grotius, and other theorists—whose writings not only suggest the law of nations was the special domain of the executive and legislative branches, not the judiciary, but also tend to emphasize the protean quality of international law. *See* THE FEDERALIST NO. 42, at 260 (James Madison) (Clinton Rossiter ed., 1961) (referring to the Define and Punish Clause as one of the "class of powers, lodged in the general government . . . which regulate the intercourse with foreign nations"); BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 27–31 (1967); FORREST MCDONALD, NOVUS ORDO SECLORUM: THE INTELLECTUAL ORIGINS OF THE CONSTITUTION 7, 60, 80 (1985).

The Framers were committed to a national government agile enough to avoid foreign entanglements and strong enough to deter aggression. In part, it was the country's weakness in the face of decades of depredations by pirates in the pay of the despots of the Barbary States that added urgency to the constitutional convention. In 1785, when emissaries Thomas Jefferson and John Adams sought a diplomatic solution to America's piracy problems, Abd al-Rahman, the representative of Tripoli's pasha, coolly

reiterated his nearly one-million-dollar ransom demand, and replied to their peace overtures in terms that would be familiar to contemporary Americans. He told the emissaries: "all Nations who should not have acknowledged [the Muslims'] authority were sinners, that it was [Islam's] right and duty to make war upon whoever they could find and to make Slaves of all they could take as Prisoners, and that every Mussulman who should be slain in battle was sure to go to Paradise." MICHAEL B. OREN, POWER, FAITH, AND FANTASY: AMERICA IN THE MIDDLE EAST, 1776 TO THE PRESENT 26–27 (2007). And the fledgling U.S. Republic continued to be victimized, paying as much as a tenth of the national treasury to ransom its citizens and its ships until well into the nineteenth century when President Jefferson finally had a navy equal to the task of freeing some shipping lanes. It is inconceivable that the drafters, cognizant of this unhappy history and understandably wary of the agendas and motives of European powers, would have intended a reference to the law of nations to limit America's ability to defend its sovereignty and its citizens to only such actions as some international consortium sanctioned. *Cf.* NOTES OF DEBATES IN THE FEDERAL CONVENTION OF 1787, REPORTED BY JAMES MADISON 637, (W. W. Norton & Co. 1987) (debate on the Define and Punish Clause); THE FEDERALIST NOS. 16, 66, 68 (Alexander Hamilton).

More importantly, the Framers clearly understood that parity among sovereign states is an aspect of power. Customary international law is often just another name for enlightened self-interest. The philosophical and cultural environment in which the Constitution developed was permeated by the premise of natural law at the core of the Constitution. The drafters saw nothing odd in the idea that nation-states could commit wrongs or that wronged states could punish bad behavior, provided they were strong enough

to do so. America is not just the passive subject of the law of nations; it is a participant of and contributor to it. No one doubts the right of all nations "to resort to forcible means for the purpose of repressing any one particular nation who openly violates the laws of the society which Nature has established between them, or who directly attacks the welfare and safety of that society." EMMERICH DE VATTEL, THE LAW OF NATIONS, Preliminaries § 22, at 61 (photo. reprint 2005) (1854). Punishment contemplated a spectrum of coercive means up to and including war. Thus, Congress's power to punish offenses against the law of nations comprehended a power to invoke a range of coercive means to preserve and maintain the law of nations. These sentiments are also part of the organic law of nations. *See* J. Andrew Kent, *Congress's Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations*, 85 TEX. L. REV. 843, 927 (2007) ("The collective enforcement of the law of nations envisioned by Vattel, Grotius, and others included the power to punish through warfare pirates, terrorists, and other sub-state violent groups."); *see also* VATTEL, THE LAW OF NATIONS, *supra*, bk. III § 34, at 407 ("[P]rofessed assassins and incendiaries are guilty, not only towards the particular victims of their nefarious deeds, but also towards the state, which therefore proclaims them public enemies. All nations have a right to join in a confederacy for the purpose of punishing and even exterminating those savage nations.").

Moreover, the law of nations includes not only what is mandated, such as compliance with self-executing treaty obligations, but also what is permitted. *See, e.g.*, HUGO GROTIUS, THE LAW OF WAR AND PEACE, bk. 2, ch. 20, § 40, 226–27 (Walter J. Black 1949) (1625) (permitting nations to wage war not only for wrongs committed against themselves, but also for wrongs against nature). As one drafter explained: "The law of nature, when applied to states or political

societies, receives a new name, that of the law of nations." JAMES WILSON, OF THE LAW OF NATIONS, *in* 1 THE WORKS OF JAMES WILSON 148 (Robert Green McCloskey, ed., Harvard Univ. Press 1967) (1804).

Commentaries and treatises attempted to summarize how natural rights applied to relations between nations. In fact, the full title of Vattel's work is *The Law of Nations Or, Principles of the Law of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns*. Thus, such treatises acknowledged the undisputed right of each nation to preserve its national existence, to punish the violation of its laws, and to defend its polity and protect its property, and condemned unwarranted violence, conquest, and lawlessness. Vattel distinguishes the Positive law of nations (based on treaties, convention, and custom) from the Natural or Necessary law of nations. "As to the rights introduced by *Treaties* or by *Custom*, there is no room to apprehend that any one will confound them with the *Natural* law of nations." VATTEL, THE LAW OF NATIONS, *supra*, Preliminaries § 27, at 63. To the extent these laws originated as precepts of reason derived from the law of nature, it makes sense that the law can change in response to the exigencies of new species of violence.

The few early cases interpreting the Define and Punish Clause acknowledged the flexibility inherent in international norms and deference to the exclusive congressional prerogatives the clause prescribes. In *United States v. Smith*, 18 U.S. (5 Wheat.) 153 (1820), Justice Story noted offenses against the law of nations "cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations." *Id.* at 159. He acknowledged that Congress could provide its own enumeration of offenses or leave the definition, "without inconvenience to the law of nations." *Id.* at 158.

In *United States v. Arjona*, 120 U.S. 479, 487–88 (1887), Chief Justice Waite held that Congress may punish an individual who counterfeits another nation's money because the law of nations generally requires prevention of a wrong within one nation's dominion against a nation with whom it is at peace. Thus, Congress could define and punish counterfeiting as a violation of the law of nations even though counterfeiting was not a widely recognized offense like piracy. And there are other early indications from the Supreme Court that no mandate in the Constitution requires Congress to follow strictly the law of nations. *See, e.g.*, *Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 224 (1796) (Chase, J.) ("Suppose a general right to confiscate British property, is admitted to be in Congress, and Congress had confiscated all British property within the United States, including private debts: would it be permitted to contend in any court of the United States, that Congress had no power to confiscate such debts, by the modern law of nations? If the right is conceded to be in Congress, it necessarily follows, that she is the judge of the exercise of the right, as to the extent, mode, and manner."); *id.* at 266 (Iredell, J.) (noting "[t]he power . . . of the Legislature of the Union [is limited] by the Constitution of the Union" but acknowledging that when the legislature acts within a discretion expressly confided by the Constitution its enactments are "in all cases obligatory").

As Justice Story observed in *Smith*, the international law's resistance to facile formulas led the Framers to entrust Congress with the "power to define" the laws of nations. 18 U.S. at 159. The range and fluidity of international law, the distinctive needs of each nation-state, and dangers of faction to a system that relies on myriad sources establishing a consensus of nation-state opinion and practice increased the

necessity for carving out a zone of deference for Congress's authority.

The Framers labored to separate law from politics because they knew that without that boundary, everything would be politics. They (wisely) perceived that law is (mostly) clear and categorical while politics—statecraft, diplomacy, warfare—is murky, a realm Justice Jackson evocatively dubbed the "zone of twilight." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The structure of the Constitution echoes this rhetorical divide. On the political side, the Define and Punish Clause is included in Article I, Section 8, grouped with the other enumerated war powers such as declaring war, raising armies, maintaining a navy, and issuing letters of marque and reprisal. On the legal side, the Ex Post Facto Clause in Section 9 is part of a list of prohibitions limiting and defining the power of the national government over sovereign states and the polity newly subject to national power. The single exception to this categorization may be the prohibition on suspension of the Writ of Habeas Corpus, and that limitation can be overridden when it threatens the defense powers authorized by Section 8. *Cf.* Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 IOWA L. REV. 735, 744–47 (2001); Martin H. Redish, *Federal Common Law, Political Legitimacy, and the Interpretive Process: An "Institutionalist" Perspective*, 83 NW. U. L. REV. 761, 765 (1989).

Thus, both the history and the placement of the clause demonstrate the power to define and punish was intended to give Congress flexibility in protecting national security, not to constrain the country's ability to act by reference to international norms. They also suggest the power is a unique

legislative power separate from traditional federal court jurisdiction.

2

More modern authorities demonstrate that international law has remained as flexible a concept today as it was in 1789. Like all common law, the law of war is part of an evolving process. As the International Military Tribunal at Nuremberg explained:

> [I]nternational law is not the product of an international legislature, and . . . international agreements . . . have to deal with general principles of law . . . . The law of war is to be found not only in treaties, but in the customs and practices of states which gradually obtained universal recognition, and from the general principles of justice applied by jurists and practised by military courts. This law is not static, but a continual adaptation follows the needs of a changing world.

1 IMT 221.

The international law of war is an evolving effort to protect civilians from the horrors of total war. Weaponry and modes of warfare change; human nature does not. Customary understandings about the international law of war are revised to account for the impact of bigger armies, more lethal weapons, and the speed and scope of belligerents' response. Thus, the Lieber Code drafted during our Civil War gave way to the 1868 St. Petersburg Declaration, which stated that "the progress of civilization should have the effect of alleviating as much as possible the calamities of war." Declaration Renouncing the Use, in Time of War, of Certain Explosive Projectiles (St. Petersburg Nov. 29/Dec. 11, 1868). The

Hague Convention of 1899 included the so-called Martens Clause, still applicable today, which declared that except where otherwise provided within the specific regulations of the Convention, "populations and belligerents remain under the protection and empire of the principles of international law, as they result from the usages established between civilized nations, from the laws of humanity, and the requirements of the public conscience." Convention with Respect to the Laws and Customs of War on Land (Hague II), pmbl., July 29, 1899. Thus, the international community continues to recognize the protean nature of the law of war, and recognizes that the law may and should develop to address the demands of contemporary warfare.

What is perhaps an ironic example of the fluid development of the international law of war can be seen in *Hamdan v. Rumsfeld* (*Hamdan I*), 548 U.S. 557 (2006). The 1907 Hague Convention and the Geneva Conventions which followed it in 1929 and 1949 sought to provide a bright line of demarcation between combatants who could be harmed and noncombatants who could not be targeted. Reciprocity was the key to this protective regime. Combatants had to act under a fixed command structure, wear insignia that clearly identified them as combatants, and refrain from targeting or killing civilians. In 1977, the International Committee of the Red Cross, egged on by non-aligned nations and those within the sway of the former Soviet Union, introduced additional protocols that broke away from the reciprocity norms, allowing parties engaged in nonconventional warfare to refuse to wear distinguishing insignia or carry arms openly until immediately before an attack, and allowing non-state actors "fighting against colonial domination and alien occupation and against racist regimes" to assert lawful authority for their efforts. Protocol Additional to the Geneva Conventions of 12 August 1949, art. 1, 44, June 8, 1977. Leading states,

including the United States, declined to ratify these protocols, fearing they would protect terrorists at the expense of civilians and allow insurgents to claim status as prisoners of war.

However, in *Hamdan I*, Justice Stevens broke apart these carefully crafted understandings.  He concluded that Salim Hamdan was entitled to the protections of Article 3 of the Geneva Conventions (Common Article 3) without determining either the nature of the conflict or the status of the combatant, and without deciding whether extending the Conventions' protections to terrorists, anarchists, or brigands violated the expectation of the parties.  Even *Hamdan I*'s fans lament its "incomplete and at times cursory analysis of critical issues involving the Geneva Conventions' scope and the substantive protections the Conventions provide."  Michael W. Lewis, *International Myopia:  Hamdan's Shortcut to "Victory"*, 42 U. RICH. L. REV. 687, 689 (2008).  They note "a certain clumsiness of application and a dearth of analytical rigor."  Fionnuala Ní Aoláin, *Hamdan and Common Article 3: Did the Supreme Court Get It Right?*, 91 MINN. L. REV. 1523, 1524 (2007).

As Justice Stevens reconstructed Common Article 3, plucking bits and pieces out of other articles to suit his narrative, members of organizations that routinely target civilians and exploit perfidious circumstances were given the ability to argue for protections previously available only to combatants who followed the rules.  Detainees were quick to take advantage of these opportunities.  In *Al Warafi v. Obama*, 716 F.3d 627 (D.C. Cir. 2013), a member of the Taliban claimed protection as a medic under Article 24 of the Geneva Convention despite the fact that he did not have the mandatory insignia or identification the Convention requires.  Indeed, Al Warafi was captured carrying a weapon and had

previously served in a combat role. In *Al-Bihani v. Obama*, 590 F.3d 866, 871, 874 (D.C. Cir. 2010), a detained member of al Qaeda argued he must be considered a civilian and released because he did not belong to an official state military and had not had the opportunity to commit a direct hostile act such as firing a weapon in combat. Thus, belligerents who did not play by the rules of international law sought to claim the protections of that law. It is true that the purpose of the Geneva Conventions is to protect human rights during wartime—even the rights of combatants who flout the Conventions—but it is hard to "reconcile this purpose with the concept that a group which targets civilians may benefit from that very behavior, by being afforded all the rights of the civilians it targets." Lewis, *International Myopia*, *supra*, at 714–15.

In *Hamdan I*, the plurality seized upon the evolving nature of the international law of war to extend the protections of that law to nonconventional belligerents. But Bahlul argues this court should refuse to allow the government to leverage that evolving nature to deter those belligerents—an approach that would handcuff the United States to a one-way ratchet. Instead, we should recognize that the international law of war also adapts in a way that allows states to oppose nonconventional combatants and protect themselves from terrorists. Even more importantly, however, we must acknowledge that the development of international law is a task entrusted by the Framers to the legislative branch. The judiciary must give Congress extraordinary deference when it acts under its Define and Punish Clause powers.

## B

Under the approach to the Define and Punish Clause outlined above, which gives proper regard to the dual

principles of flexibility and deference, the conspiracy charge against Bahlul should stand.  Even if the offense of conspiracy was not recognized under international law in 2001 by the same labels used by Congress in the 2006 Military Commissions Act, the substance is similar.  Indeed, it is to be expected that international law, which was largely created by jurists trained in the civil law and which only more recently has begun to absorb common law ideas and institutions, differs formally from our own common law tradition.  *See* Colin B. Picker, *International Law's Mixed Heritage:  A Common/Civil Law Jurisdiction*, 41 VAND. J. TRANSNAT'L L. 1083, 1104–06 (2008).  But that does not mean that when Congress decides to implement international law domestically it cannot adapt that law to fit within our common law institutions.  Such adaptation is appropriate both because of the evolving nature of international law and the necessities of implementing international law in an established domestic legal system.  International law recognizes analogues to conspiracy and other inchoate offenses.

In civil law countries, conspiracy is generally treated as a mode of liability requiring a completed crime.  Peter Margulies, *Defining, Punishing, and Membership in the Community of Nations:  Material Support and Conspiracy Charges in Military Commissions*, 36 FORDHAM INT'L L.J. 1, 84 (2013).  In the United States and other common law countries, however, conspiracy is treated as a separate offense, requiring only an agreement and, in some instances, an overt act furthering the agreement.  *Id.*; *see, e.g.*, 18 U.S.C. § 371 (conspiracy to defraud the United States).  International law has adopted something of a hybrid approach, recognizing conspiracy as a stand-alone offense for some of the most serious war crimes—namely, genocide and waging aggressive

war—and using conspiracy as a mode of establishing liability for all other international law offenses.

With the exceptions of aggressive war and genocide, international law does not recognize inchoate acts as stand-alone offenses, but as modes of liability. For instance, the Rome Statute recognizes that a person will be criminally responsible for a crime if that person "[i]n any . . . way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose." Rome Statute of the International Criminal Court, art. 25, § 3(d) (2002); *see also id.* § 3(b) (a person shall be guilty of an offense if he "[o]rders, solicits or induces the commission of such a crime which in fact occurs or is attempted."); *id.* § 3(c) (a person shall be guilty of an offense if he "aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission."). The difference between inchoate offenses under domestic criminal law and the modes of liability under international law is that international law requires that for someone to be convicted of conspiracy, solicitation, or material support, the substantive offense must have been completed or attempted. But in defining the crime of conspiracy as an inchoate offense, Congress exercised precisely the kind of discretion and flexibility the Define and Punish Clause envisions. Congress adapted recognized international law to fit the country's particular needs and legal system.[3]

---

[3] Even under the international law standard requiring a completed offense, Bahlul was properly convicted. The conspiracy charge alleges Bahlul conspired to commit various substantive offenses, including murder of protected persons, attacking civilians and civilian objects, murder in violation of the law of war, destruction of property in violation of the law of war, terrorism, and providing material support for terrorism. App. 120. The charge alleges

It should be of no consequence that the form or name of the charges was different from what might be charged in the International Criminal Court or another international war tribunal. Whether the prosecutor demonstrates a conspiracy to obtain a conviction on a substantive offense, or establishes a conspiracy to commit a completed act as a stand-alone offense is a matter of form that springs from the differences between common law and civil law institutions. In matching military commission charges to international law offenses, we should adopt a functional approach, looking at the conduct involved rather than the label given to that conduct. It would be senseless to limit military commissions' ability to try terrorists because the government has not adopted the forms and names used by international tribunals. Under a functional approach, Bahlul's conviction for conspiracy is sufficiently grounded in international law.

Furthermore, recent international war crimes tribunals have recognized as independent offenses conspiracy to commit genocide and conspiracy to wage aggressive war. *See* 1 IMT 224–26 (recognizing the crime of conspiracy to wage aggressive war but not recognizing conspiracy to commit war crimes and crimes against humanity because the latter was not

---

Bahlul committed eleven overt acts in furtherance of that conspiracy. Among other overt acts, the military commission found Bahlul had prepared martyr wills "in preparation for the acts of terrorism perpetrated by . . . Muhammed Atta, Ziad al Jarrah and others at various locations in the United States on September 11, 2001" and "researched the economic effect of the September 11, 2001 attacks on the United States." App. 122–23. Thus, the military commission verdict incorporates the finding that Bahlul's co-conspirators completed international law offenses—namely, the terrorist attacks of September 11. *See* Findings Worksheet, App. 130, 133.

defined as a separate crime in the Tribunal's charter); Updated Statute of the International Criminal Tribunal for the Former Yugoslavia, art. 4 (2009) (making punishable "conspiracy to commit genocide" as well as incitement or attempt to commit genocide and complicity in genocide); Statute, International Criminal Tribunal for Rwanda, art. 2 (2010) (same); Convention on the Prevention and Punishment of the Crime of Genocide, art. 3 (1948) (same). These offenses are the progeny of particular conflicts, created to address new and previously unimaginable evils. Yet despite the innovative and post hoc nature of these particular conspiracy prosecutions, there was little if any protest that they violated ex post facto principles—the abhorrent nature of the offenses vitiated any such "justice" arguments. Similarly, it may be the time has come for international law to recognize the offense of conspiracy to commit acts of terrorism. Terrorism may be the global security challenge of the 21st Century, just like aggressive war was in the early 20th Century and genocide was in the half century following World War II. Perhaps the United States should be a leader in this area—a leader in international law commensurate with its status as a military leader in the war on terror—recognizing the offense of conspiracy to commit acts of terrorism. These are not questions for the judiciary, but rather for the legislature to answer. And Congress did so with the MCA, broadly construing international law to include the offense of conspiracy.

## C

The Framers and subsequent courts recognized that to define the law of nations, Congress required a zone of deference. Without a measure of deference, legislative fear of second-guessing would hobble Congress's power under the Define and Punish Clause, leaving the nation subject to the

fate Madison depicted for most previous democratic experiments: "short in their lives . . . [and] violent in their deaths." THE FEDERALIST NO. 10, *supra*, at 76 (James Madison). Contemporary international practice exhibits the same kind of practical deference to permit individual states to assess their own obligations. The principle of complementarity requires international tribunals to accord deference to state investigations and recognizes that what is mandated still leaves room for what is merely permissive.

*Hamdan I*'s plurality had no trouble extending Common Article 3 to members of organizations like al Qaeda. As noted, by stretching Common Article 3 to meet what it clearly perceived as a new exigency, the Court participated in the law's evolution. Thus, courts seem permitted to interpret international conventions to allow the humanitarian aspect of the law to evolve virtually instantaneously. We cannot, on the other side of the equation, deny the political branches the ability to respond to novel threats no matter how destructive, and leave the nation at the mercy of an international consensus and subject to the whims of hostile factions who could prevent agreement or promote harmful agendas. *See, e.g.*, Protocol Additional to the Geneva Conventions of 12 August 1949, June 8, 1977. This cannot be the logical import of arguing that the law of war is the law of nations. It would make the Constitution a suicide pact; and the Define and Punish Clause had just the opposite purpose. For international law to form a workable system, states need a zone of deference. "Exercising judgment within this zone, states could refine approaches that were broadly consistent with established norms and also fostered global compliance." Margulies, *Defining, Punishing, and Membership in the Community of Nations*, *supra*, at 16; *cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 386–87 (1932) (Brandeis, J.,

dissenting) (advocating deference to states, which serve as laboratories of democracy).

Of course, deference does not mean there are no limits. We are always subject to the limits which restrain any regime premised on natural law and dedicated to the protection of natural rights. This is likely what the international community meant with the Martens Clause's reference to the "principles of international law" resulting from "the laws of humanity[] and the requirements of the public conscience." Hague II, pmbl., July 29, 1899. But a one-sided rigidity imposed on an inherently evolutionary international law does not do justice, it thwarts it.

Congress's determination that conspiracy is an offense against the law of nations constitutes a reasonable interpretation of international law and is fully consistent with that law. Therefore, the judiciary is bound to uphold Congress's exercise of authority under the Define and Punish Clause.

IV

Finally, I dissent with regard to the court's remand of residual issues to a panel of this court. Bahlul's appeal has been before this court nearly three years, and the court's decision ensures it will remain here at least another term. Bahlul's jury trial, equal protection, and freedom of speech challenges are clearly meritless. I would deny them all because Bahlul, as an alien located outside the territorial United States, is not entitled to the protections of the constitutional provisions he invokes, and, alternatively, because his claims lack merit for the reasons stated by Judge Kavanaugh. *See* Kavanaugh Op. Parts III, IV, and V. However, to the extent the court was not ready to decide these

challenges, I would have asked the parties for supplemental briefing so we could do so.

More problematic, however, is that by reviewing Bahlul's retroactivity arguments under the plain error standard, the court disposes of this case without providing the government clear guidance for prosecuting the remaining detainees at Guantanamo. Thus, it may be many years before the government receives a definitive answer on whether it can charge the September 11 perpetrators with conspiracy, or whether Congress has the power to make such an offense triable by military commission even prospectively. The ability to charge conspiracy is an important prosecutorial tool in the war on terror, where it can often be difficult for the government to procure evidence directly connecting leaders of militant groups with specific terror attacks.

The United States is engaged in a war on terrorism. As the various iterations of *Hamdan* and this case demonstrate, the Executive Branch needs concrete guidance as to how it can proceed with its prosecution of the September 11 conspirators and other detainees. Bahlul was first charged before a military commission ten years ago. Today, this court again leaves the government without any definitive answers. The court does not express respect to the coordinate branches of government by further delaying the executive's prosecutorial efforts and thwarting the legislative's expressed preference that detainees be tried by military commission. I would resolve now the exceedingly important questions presented in this case.

* * *

For these reasons, I would affirm Bahlul's conspiracy conviction and vacate his material support for terrorism and

solicitation convictions. I would remand to the Court of Military Commission Review for it to address the consequences of our decision for Bahlul's life sentence.

KAVANAUGH, *Circuit Judge*, concurring in the judgment in part and dissenting in part: Of the seven judges on the en banc Court for this case, five judges (all but Judge Henderson and Judge Brown) agree in light of *Boumediene v. Bush* that the Ex Post Facto Clause applies at Guantanamo. Indeed, the Government concedes as much. Given the Government's concession, all seven judges on the en banc Court (including Judge Henderson and Judge Brown) therefore apply the Ex Post Facto Clause to analyze the offenses that were charged against Bahlul under the Military Commissions Act of 2006. In doing so, all seven judges reach the same bottom-line result that the Court reached in *Hamdan II* (here, by virtue of the Ex Post Facto Clause; there, by virtue of the 2006 Act as informed by the Ex Post Facto Clause): A military commission may not try the offense of material support for terrorism for conduct that occurred before enactment of the 2006 Act.[1] All seven judges likewise conclude that a military commission may not try the offense of solicitation for conduct that occurred before enactment of the 2006 Act. The Court is unanimous that those two offenses were not war crimes triable by military commission at the time of Bahlul's conduct in 2001. Therefore, all seven judges agree that we must vacate Bahlul's material support for terrorism and solicitation convictions as ex post facto violations.

---

[1] So that there is no confusion as an historical matter and to be clear about the legal implications of the majority opinion, it is important to emphasize that the majority opinion's analysis and vacatur of Bahlul's material support for terrorism conviction necessarily mean that Salim Hamdan's material support for terrorism conviction likewise had to be vacated, which is what the *Hamdan II* panel did. In other words, the majority opinion relies on a slightly different rationale than did *Hamdan II* (the Ex Post Facto Clause itself rather than the 2006 Act as informed by the Ex Post Facto Clause), but the majority opinion reaches the same result: The offense of material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act.

As to conspiracy, six of the seven judges (all but Judge Rogers) uphold Bahlul's conspiracy conviction against his ex post facto objection.  Two of us (Judge Brown and I) would do so by employing de novo review and concluding that conspiracy, unlike material support for terrorism and solicitation, has long been an offense triable by military commission, including at the time of Bahlul's conduct in 2001.  The majority opinion likewise upholds Bahlul's conspiracy conviction but does so by employing plain error review.  The majority opinion believes that Bahlul forfeited his ex post facto objection by not raising the objection at trial.

I write separately to explain my analysis of these difficult questions, in particular my analysis of the conspiracy issue.

On September 11, 2001, Osama bin Laden learned the results of al Qaeda's attack on the United States by listening to a radio. That radio was operated by bin Laden's trusted aide, Ali Hamza Ahmad Suliman al Bahlul.  A native of Yemen, Bahlul had moved to Afghanistan in the late 1990s to join al Qaeda.  Al Qaeda was and remains an international organization whose stated goals are to drive the United States from posts in the Middle East, to destroy the State of Israel, and to dislodge moderate Islamic regimes and establish radical Islamic control over the greater Middle East.  To advance its broad objectives, al Qaeda employs terrorist attacks on civilian and military targets.

After his arrival in Afghanistan in the late 1990s, Bahlul became deeply embedded in al Qaeda's operations.  He pledged allegiance to bin Laden.  He trained at an al Qaeda terrorist camp.  He was appointed by bin Laden to lead al Qaeda's media and propaganda operation. Bahlul produced a recruitment video glorifying al Qaeda's October 2000 bombing of the *U.S.S. Cole*, an attack that killed 17

Americans. Bahlul personally arranged the loyalty oath and transcribed the "martyr will" of Mohammed Atta, Bahlul's one-time roommate and the hijacker who flew American Airlines Flight 11 into the North Tower of the World Trade Center on September 11th. Bahlul performed the same services for Ziad Jarrah, another of Bahlul's former roommates, who hijacked and piloted United Airlines Flight 93, the flight that apparently was headed to destroy the U.S. Capitol Building or the White House until it was downed in a Pennsylvania field by American passengers who fought back. Bahlul later said that he himself would have participated on September 11th as hijacker number 20, but bin Laden deemed his "media man" too essential to lose.

By the time of the attacks on September 11, 2001, bin Laden, Bahlul, and other senior al Qaeda leaders had already evacuated from al Qaeda's headquarters in Kandahar and relocated to a remote mountainous region between Kabul and Khost. Soon thereafter, Bahlul fled from Afghanistan to Pakistan. In late 2001, while in Pakistan, he was captured. Since 2002, he has been detained by the U.S. Military at the U.S. Naval Base in Guantanamo pursuant to the 2001 Authorization for Use of Military Force. *See* Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224. The AUMF remains in effect and authorizes the Government to detain enemy combatants "for the duration of the relevant conflict" – in this instance, the ongoing global war that the United States and its allies are engaged in against al Qaeda and its associated forces. *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (controlling opinion of O'Connor, J.); *see Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011).[2]

---

[2] The ongoing global war against al Qaeda and its associated forces is overlapping but distinct, in law and in fact, from the war in Afghanistan against the former Taliban regime and Taliban forces.

In addition to detaining Bahlul, the U.S. Government also exercised its well-established authority to try him before a military commission for war crimes. *See* 10 U.S.C. § 948d (2006); 10 U.S.C. § 821 (2000); *Hamdan v. Rumsfeld*, 548 U.S. 557, 592-93 (2006); *In re Yamashita*, 327 U.S. 1, 7-8 (1946); *Ex parte Quirin*, 317 U.S. 1, 28 (1942). The Government ultimately charged Bahlul with three offenses specified in the Military Commissions Act of 2006: conspiracy to commit war crimes, material support for terrorism, and solicitation of war crimes. *See* Pub. L. No. 109-366, 120 Stat. 2600; 10 U.S.C. §§ 950u, 950v(b)(25), 950v(b)(28) (2006). Bahlul did not contest the relevant factual allegations, but he vehemently objected to the legitimacy of the military commission proceeding. The military commission convicted Bahlul of all three offenses and sentenced him to life in prison. The U.S. Court of Military Commission Review affirmed. *See United States v. Bahlul*, 820 F. Supp. 2d 1141 (C.M.C.R. 2011) (en banc). Bahlul appealed to this Court, and we granted en banc review.

Bahlul challenges his military commission convictions on five distinct constitutional grounds: (i) the Article I Ex Post Facto Clause, (ii) the Article I Define and Punish Clause, (iii) the jury trial protections of Article III and the Fifth and Sixth Amendments, (iv) the equal protection component of the Due Process Clause of the Fifth Amendment, and (v) the free speech protections of the First Amendment.

With respect to his material support for terrorism and solicitation convictions, Bahlul's Ex Post Facto Clause

---

The potential end of the U.S. combat mission against Taliban forces in Afghanistan obviously does not mean the end of the global war against al Qaeda and its associated forces.

argument is correct because those offenses were not war crimes triable by military commission at the time of Bahlul's conduct in 2001. With respect to his conspiracy conviction, however, Bahlul's Ex Post Facto Clause challenge lacks merit because conspiracy has long been proscribed under U.S. law as a war crime triable by military commission, including at the time of Bahlul's conduct. Bahlul's other arguments are all unavailing. Therefore, I would affirm Bahlul's conspiracy conviction, vacate his material support for terrorism and solicitation convictions as ex post facto violations, and remand to the U.S. Court of Military Commission Review for it to address the consequences, if any, for Bahlul's life sentence.

I

Bahlul's primary argument to this Court rests on the Ex Post Facto Clause of Article I, Section 9 of the Constitution. *See* U.S. CONST. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). Among other things, the Ex Post Facto Clause bars retroactive prosecution of new offenses. *See Peugh v. United States*, 133 S. Ct. 2072, 2081 (2013); *Collins v. Youngblood*, 497 U.S. 37, 42-43, 52 (1990). Bahlul contends that (i) the Ex Post Facto Clause applies to military commissions at Guantanamo and (ii) the three offenses in the 2006 Act that were charged against him – conspiracy to commit war crimes, material support for terrorism, and solicitation of war crimes – were new offenses that were not triable by military commission at the time of his conduct back in 2001.

In response, the Government concedes (correctly) that the Ex Post Facto Clause applies to military commissions at Guantanamo. *Cf. Boumediene v. Bush*, 553 U.S. 723, 766-71

(2008).[3]   And the Government all but concedes (again correctly) that material support for terrorism and solicitation

---

[3] As a general matter, the U.S. Constitution applies to U.S. citizens worldwide and to non-U.S. citizens within the 50 states and the District of Columbia, but not to non-U.S. citizens in foreign countries. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264-75 (1990); *id.* at 275-78 (Kennedy, J., concurring); *Reid v. Covert*, 354 U.S. 1, 5-14 (1957) (plurality opinion); *Johnson v. Eisentrager*, 339 U.S. 763, 768-85 (1950).

A more nuanced issue is the reach of the Constitution to non-U.S. citizens in an in-between category: in territories owned or controlled by the United States, such as Puerto Rico and Guam. Determining whether the Constitution applies to non-U.S. citizens in U.S. territories requires a "functional" rather than "formalistic" analysis of the particular constitutional provision and the particular territory at issue. *Boumediene v. Bush*, 553 U.S. 723, 762, 764 (2008). The Court focuses on whether it would be "impracticable and anomalous" to extend the constitutional guarantee in question to non-U.S. citizens in the territory at issue. *Id.* at 759 (quoting *Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring)); *see Balzac v. Porto Rico*, 258 U.S. 298 (1922) (Puerto Rico); *Dorr v. United States*, 195 U.S. 138 (1904) (U.S.-occupied Philippines); *Hawaii v. Mankichi*, 190 U.S. 197 (1903) (pre-statehood Hawaii).

In *Boumediene*, the Court determined that Guantanamo was de facto U.S. territory – akin to Puerto Rico, for example – and not foreign territory. *See* 553 U.S. at 769 ("In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States."); *compare Eisentrager*, 339 U.S. at 777-81 (habeas corpus right does not extend to U.S.-controlled military prison in post-World War II Germany); *Al Maqaleh v. Hagel*, 738 F.3d 312, 317 (D.C. Cir. 2013) (habeas corpus right does not extend to U.S. military base in wartime Afghanistan). The Court then determined that it would not be "impracticable or anomalous" to extend the habeas corpus right to non-U.S. citizen detainees at Guantanamo. *See Boumediene*, 553 U.S. at 769-71. As the Government concedes, the *Boumediene* analysis leads inexorably to

were new offenses that were not triable by military commission back in 2001. *See Hamdan v. United States*, 696 F.3d 1238, 1252 (D.C. Cir. 2012) (*Hamdan II*). But the Government forcefully argues that one of the three offenses charged against Bahlul, conspiracy, was not a new offense. According to the Government, conspiracy has long been triable by military commission under U.S. law, including at the time of Bahlul's conduct.

The relevant military commission law in effect at the time of Bahlul's conduct was 10 U.S.C. § 821. That statute was first enacted in 1916 and then re-enacted in 1950 as part of the Uniform Code of Military Justice. *See* Pub. L. No. 81-506, 64 Stat. 107, 115 (1950); Pub. L. No. 64-242, 39 Stat. 619, 653 (1916). As of 2001, at the time of Bahlul's conduct, Section 821 provided as follows:

> The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or *by the law of war* may be tried by military commissions, provost courts, or other military tribunals.

10 U.S.C. § 821 (2000) (emphasis added).

As the Deputy Solicitor General aptly stated at oral argument, the question at the heart of this case is whether, as of 2001, conspiracy to commit war crimes was an offense proscribed under the "law of war" prong of Section 821. *See*

---

the conclusion that the ex post facto right applies at Guantanamo. It would be no more impracticable or anomalous to apply the Article I, Section 9 ex post facto right at Guantanamo than it is to apply the Article I, Section 9 habeas corpus right at Guantanamo.

Tr. of Oral Arg. at 15-20. The Supreme Court faced that exact same question in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006). The Court as a whole did not decide the issue because it was not necessary to do so given the Court's conclusion that the military commissions then in place were unlawful on certain procedural grounds. As a result, there is no binding precedent from that case on the conspiracy issue. But seven Justices opined on the conspiracy question and split 4-3 in contrasting opinions written by Justice Stevens and Justice Thomas. (Justice Kennedy did not address the conspiracy charge. Chief Justice Roberts did not take part in the case.) Justice Stevens's opinion concluded that conspiracy was not a law of war offense under Section 821. *See* 548 U.S. at 600-12. Justice Thomas's opinion concluded that conspiracy was a law of war offense under Section 821. *See id.* at 697-706.

Importantly for our purposes as a lower court, all seven Justices who addressed the Section 821 "law of war" issue in *Hamdan* agreed that it turned on the content of the "common law of war" and required careful evaluation of historical U.S. military commission precedents involving conspiracy. *Id*. at 602 (Stevens, J.); *id.* at 689 (Thomas, J.). Although the two opinions reached different answers, they considered the same basic question: Did the U.S. military commission precedents suffice to show that conspiracy was a law of war offense triable by military commission under Section 821?

The detailed historical inquiry undertaken by the seven Justices in *Hamdan* was not idle background discussion. On the contrary, the historical inquiry followed from the text of Section 821. Enacted in 1916 when Congress amended the Articles of War and set forth new rules for courts-martial, and then re-enacted in 1950 as part of the Uniform Code of Military Justice, Section 821 provided that the new rules

governing courts-martial did not "deprive" military commissions of their pre-existing authority. 10 U.S.C. § 821 (2000).[4] Notwithstanding Section 821's somewhat unusual negative phrasing, the Supreme Court has repeatedly interpreted Section 821 as affirmative statutory authorization for the Executive Branch to convene military commissions to try war crimes. *See Hamdan*, 548 U.S. at 592; *In re Yamashita*, 327 U.S. 1, 7-8 (1946); *Ex parte Quirin*, 317 U.S. 1, 28 (1942). With its reference to statutory offenses, Section 821 authorizes military commissions to try offenses such as spying and aiding the enemy that are triable by military commission under federal statute. *See* 10 U.S.C. §§ 904, 906 (2000); *Quirin*, 317 U.S. at 41-42. With its reference to the "law of war," a term that encompasses the international law of war, Section 821 authorizes military commissions to try offenses that are war crimes under international law. *See Yamashita*, 327 U.S. at 7, 14-16. Moreover, as the seven Justices in *Hamdan* recognized with their extensive focus on U.S. military commission precedents – and as the Supreme Court stated in *Madsen v. Kinsella* in 1952 and *Yamashita* in 1946 – Section 821's "law of war" prong also expressly preserved the authority of military commissions to try offenses that had traditionally been tried by U.S. military commissions as of 1916 and 1950. *See Madsen v. Kinsella*, 343 U.S. 341, 352 (1952) (statute "states unequivocally that Congress has not deprived such commissions or tribunals of

---

[4] The precise text of Section 821 and its predecessor statutes has varied slightly over time, but the anti-deprivation language has been present in every iteration. *See* Pub. L. No. 64-242, 39 Stat. 619, 653 (1916) ("shall not be construed as depriving military commissions"); Pub. L. No. 66-242; 41 Stat. 759, 790 (1920) ("shall not be construed as depriving military commissions"); Pub. L. No. 81-506, 64 Stat. 107, 115 (1950) ("shall not be construed as depriving military commissions"); Pub. L. No. 84-1028, 70A Stat. 1, 44 (1956) ("do not deprive military commissions").

the existing jurisdiction which they had over such offenders and offenses as of August 29, 1916"); *Yamashita*, 327 U.S. at 20 (statute authorized military commissions "to preserve their traditional jurisdiction over enemy combatants"); *cf. Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) (when "a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it") (internal quotation mark omitted).

Bahlul nevertheless argues that the phrase "law of war" in Section 821 encompasses only international law offenses and not those offenses traditionally triable by U.S. military commissions. In other words, Bahlul says that Section 821, although expressly crafted not to "deprive" U.S. military commissions of their existing common-law authority over conspiracy and other offenses, did in fact deprive military commissions of that authority for offenses that were not also proscribed by the international law of war.

Bahlul's argument that Section 821's "law of war" prong consists *exclusively* of international law offenses is inconsistent with the text and textually stated purpose of Section 821, as well as with Supreme Court precedents such as *Madsen* and *Yamashita* interpreting Section 821. Perhaps most tellingly for present purposes, Bahlul's interpretation of Section 821 conflicts with what the Supreme Court actually did in *Hamdan*. Seven Justices in *Hamdan* analyzed the "law of war" embodied in Section 821 as the international law of war *supplemented by established U.S. military commission precedents*. Indeed, that is the only interpretation of Section 821 that squares with how the seven Justices analyzed the question in *Hamdan*.

In short, at the time of Bahlul's conduct, Section 821 authorized military commissions to try offenses drawn from

three bodies of law: federal statutes defining offenses triable by military commission, the international law of war, and historical U.S. military commission tradition and practice as preserved by Congress when it enacted Section 821 in 1916 and 1950.[5]

At the time of Bahlul's conduct, neither any federal statute nor the international law of war proscribed conspiracy as a war crime triable by military commission. So the question we must decide is whether U.S. military commission precedents treated conspiracy as an offense triable by military commission. In other words, we must decide the question that was addressed by seven Justices in *Hamdan* but not decided by the Court. The answer, in my view, is yes: U.S. military commission precedents have treated conspiracy as an offense triable by military commission.

I base that conclusion in substantial part on the 1865 military commission conviction of the conspirators who

---

[5] A passage in this Court's decision in *Hamdan II* – a passage beginning "*Third*," in the third-to-last paragraph of the opinion – suggested that the phrase "law of war" in Section 821 encompassed offenses under the international law of war but did not cover other offenses that were rooted only in U.S. military commission precedents. *See Hamdan v. United States*, 696 F.3d 1238, 1252 (D.C. Cir. 2012) (*Hamdan II*). That statement was not necessary to the result in *Hamdan II* because, as the opinion explained, material support for terrorism was not an offense under the international law of war *or* under U.S. military commission precedents. *See id.* In any event, as the Deputy Solicitor General persuasively explained at oral argument, *see* Tr. of Oral Arg. at 15-20, that statement in *Hamdan II* was underinclusive. Given the text and textually stated purpose of Section 821, and the relevant Supreme Court precedents, the "law of war" prong of Section 821 covers both offenses under the international law of war and offenses sufficiently rooted in U.S. military commission precedents.

plotted to assassinate President Lincoln. Put simply, the military commission trial of the Lincoln conspirators is the highest-profile and most important U.S. military commission precedent in American history. President Andrew Johnson, after seeking the advice of the Attorney General, decided to try the Lincoln conspirators by military commission for violating the law of war rather than by criminal trial in civilian court. *See* Military Commissions, 11 Op. Attorney Gen. 297 (1865); *see also Ex parte Mudd*, 17 F. Cas. 954 (S.D. Fla. 1868). The Lincoln conspirators were expressly charged with and convicted *of conspiracy* – in that case, conspiracy to violate the law of war by killing the President and Commander in Chief of the Union Army, Abraham Lincoln. Indeed, conspiracy was the *only* offense charged against them. After an extensive multi-week trial and vigorous argument about the facts and the commission's jurisdiction, numerous conspirators were convicted, and several of them were sentenced to death and executed.

In considering the history of U.S. military commissions, particularly at the time of Section 821's original enactment in 1916 and its re-enactment in 1950, the Lincoln conspirators case looms as an especially clear and significant precedent.

The Lincoln conspirators precedent does not stand alone. The second highest-profile and second most important U.S. military commission in American history was the military commission trial of the Nazi saboteurs who secretly crossed into the United States during World War II. Again, the defendants were expressly charged with and convicted *of conspiracy*, as well as of another law of war offense. The Attorney General of the United States personally prosecuted the case before the military commission. President Franklin Roosevelt, the Commander in Chief of the Army and Navy, reviewed and affirmed all of the convictions. Upon its

review, the Supreme Court affirmed the saboteurs' convictions based on the other law of war offense, making it unnecessary to address conspiracy. *See Quirin*, 317 U.S. at 46. Like the Lincoln conspiracy precedent, the trial of the Nazi saboteurs still stands as a major precedent in which a U.S. military commission charged and convicted the defendants of conspiracy.

To summarize so far: As of 1950 when Congress re-enacted Section 821 as part of the Uniform Code of Military Justice and expressly preserved the traditional authority of U.S. military commissions, the two most well-known and important U.S. military commissions in American history tried and convicted the defendants *of conspiracy*.

And there were other significant precedents as well. For example, later in World War II, the Government prosecuted another set of Nazi saboteurs by military commission for conspiracy. In that case, Assistant Attorney General Tom Clark produced a formal memorandum concluding – based in large part on the precedents involving the Lincoln conspirators and the earlier Nazi saboteurs – that conspiracy was a law of war offense triable by military commission. *See* Memorandum from Tom C. Clark, Assistant Attorney General, to Myron C. Kramer, Judge Advocate General (Mar. 12, 1945), *reprinted in* U.S. Supp. App. 133-139. The military commission subsequently convicted the defendants of conspiracy. President Truman reviewed and affirmed the convictions. And after one of those Nazi saboteurs later challenged his conviction in court, the Tenth Circuit upheld the conviction, including the conspiracy conviction, in an opinion by Judge Murrah. *See Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956).

To be sure, against those landmark *American* precedents, some *international* tribunals and conventions subsequent to the original enactment of Section 821 have chosen not to make conspiracy a war crime triable by military commission. Most notably, the International Military Tribunal at Nuremberg did not identify conspiracy to commit war crimes as an offense triable before that Tribunal. But the Tribunal reached that conclusion over the objections of the American prosecution team led by Justice Robert Jackson, and the Tribunal did so in part because conspiracy was not recognized by *European* law. *See Hamdan*, 548 U.S. at 611 (Stevens, J.); *id.* at 702 n.14 (Thomas, J.).

In any event, what matters for present purposes is that at the time of Bahlul's conduct, no authoritative source of U.S. law had ever negated the validity or authority of the U.S. military commission convictions of the Lincoln assassins for conspiracy or of the Nazi saboteurs for conspiracy. In 1916, when it enacted Section 821, as well as in 1950 when it re-enacted the statute, Congress was aware of those significant precedents. *See id.* at 592 & n.22 (majority opinion) (recounting legislative history of 1950 enactment and noting Congress's awareness of *Quirin* precedent); *Madsen*, 343 U.S. at 353 & n.20 (recounting legislative history of 1916 enactment, including discussion of Civil War, Mexican-American War, and Spanish-American War precedents); *A Bill to Unify, Consolidate, Revise, and Codify the Articles of War, Hearing on H.R. 2498: Before Subcommittee No. 1 of the House Committee on Armed Services*, 81st Cong. 962 (1949) ("A classical example of the military tribunal is the trial of the Lincoln conspirators.") (testimony of Colonel John P. Dinsmore); *see also Trials by Courts-Martial: Hearing on S. 5320 Before the Senate Committee on Military Affairs*, 65th Cong. 279 (1919) (Judge Advocate General Enoch H. Crowder discussing Lincoln conspirators trial). Moreover,

the leading authority on military commissions at the time of both enactments, Colonel William Winthrop's treatise on military law, repeatedly referenced the Lincoln conspirators precedent. *See* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 167, 169, 185 n.38, 334 n.40, 834 & n.77, 836 n.90, 839 n.5 (rev. 2d ed. 1920).

By stating that Section 821 did not "deprive" military commissions of their traditional authority, Congress necessarily incorporated the Lincoln assassins precedent for conspiracy when it enacted the original version of Section 821 in 1916, and it incorporated the Lincoln assassins and Nazi saboteur precedents for conspiracy when it re-enacted the statute in 1950 as part of the Uniform Code of Military Justice. After all, it would be rather bizarre to conclude that Congress, by enacting a statute that said it did not "deprive" military commissions of their traditional authority, in fact silently overruled the two most significant and well-known military commission precedents in American history. Since 1950, moreover, Congress has never backed away from its express preservation of traditional U.S. military commission authority over conspiracy. Indeed, in the 2006 Act, Congress reiterated its longstanding intent and belief that conspiracy has "traditionally been triable by military commissions." 10 U.S.C. § 950p(a) (2006).

At the time of Bahlul's conduct, the other two Branches likewise had never undermined the validity of the Lincoln conspirators and Nazi saboteur precedents. No U.S. court had ever cast any doubt on those landmark military commission convictions, or on trying conspiracy by military commission. And in the Executive Branch, there is a straight line from now to then: In deciding that conspiracy is an offense that may be tried by military commission, President Barack Obama is the same as President George W. Bush is the same as President

Harry Truman is the same as President Franklin Roosevelt is the same as President Andrew Johnson is the same as President Abraham Lincoln.

In light of the clear and consistent historical record in the United States as of the time of Bahlul's conduct in 2001 – in all three Branches of the U.S. Government – it is ultimately not persuasive to say, as Bahlul does, that conspiracy was a brand new U.S. military commission offense created by the 2006 Act. If we indulge the idea that Bahlul, holed up with bin Laden somewhere in the hills of Afghanistan, consulted U.S. military commission law on conspiracy back in 2001, he would have readily found the two most well-known U.S. military commission precedents, the landmark Lincoln assassin and Nazi saboteur cases in which the defendants had been convicted *of conspiracy*.

In sum, conspiracy was triable by military commission under the law of war prong of Section 821 at the time of Bahlul's conduct in 2001. The Ex Post Facto Clause therefore does not bar the Government's prosecution of Bahlul under the 2006 Act for conspiracy. And for that same reason, to the extent that Bahlul argues that the 2006 Act itself incorporates ex post facto principles and bars retroactive prosecution of new offenses, the 2006 Act likewise does not bar the Government's prosecution of Bahlul for conspiracy.[6]

---

[6] It would be unconstitutional to apply any *new* offenses in the 2006 Act to pre-2006 conduct. In light of the canon of constitutional avoidance and Congress's express statement in the text of the 2006 Act that the law did "not establish new crimes," but rather merely codified "offenses that have traditionally been triable by military commissions," I read the 2006 Act consistently with the Ex Post Facto Clause to authorize retroactive prosecution only of offenses that were already prohibited as war crimes triable by military commission under U.S. law at the time of the defendant's

17

By contrast, as the Government all but concedes, there is no historical U.S. military commission precedent for trying the offenses of material support for terrorism and solicitation before U.S. military commissions. And those two offenses are not international law of war offenses, nor were they triable by military commission under any other federal statute at the time of Bahlul's conduct. The Government's actions between the attacks of September 11, 2001, and the enactment of the 2006 Act underscore that material support for terrorism and solicitation have not been thought to be Section 821 "law of war" offenses. During that time, the United States charged 10 al Qaeda defendants before military commissions. The United States did not charge any of them with material support for terrorism or solicitation, presumably because it was widely understood that those two offenses were not covered under Section 821. By contrast, the United States charged all 10 al Qaeda defendants with conspiracy, presumably because the Government believed, based on the

---

conduct. 10 U.S.C. § 950p(a) (2006); *see Hamdan v. United States*, 696 F.3d 1238, 1247 (D.C. Cir. 2012) (*Hamdan II*); *cf. Bond v. United States*, 134 S. Ct. 2077, 2087-90 (2014); *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193, 205 (2009); *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring) ("as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act."). The majority opinion disagrees that the 2006 Act can be read to incorporate ex post facto principles, even in light of the constitutional avoidance canon. I do not think the majority opinion is correct about that. But that does not matter in this case. Whether it is because of the Act as construed in light of the Ex Post Facto Clause or because of the Ex Post Facto Clause itself (or both), military commissions at Guantanamo may not prosecute any new offenses in the 2006 Act for pre-2006 conduct. The key question is which offenses in the 2006 Act are new.

historical precedents, that conspiracy was covered under Section 821.

In short, unlike conspiracy, material support for terrorism and solicitation were not covered under Section 821 at the time of Bahlul's conduct in 2001. *See Hamdan II*, 696 F.3d at 1252 (concluding that material support for terrorism was not covered under Section 821). Bahlul's convictions for material support for terrorism and solicitation therefore must be vacated as ex post facto violations.

## II

In challenging his convictions, Bahlul also advances a far more sweeping constitutional argument. He contends that Congress lacks constitutional authority to make conspiracy, material support for terrorism, or solicitation war crimes triable by military commissions, *even prospectively*, because those offenses are not proscribed under the international law of war. Bahlul's argument, in essence, is that the U.S. Constitution (as relevant here) incorporates international law and thereby interposes international law as a constitutional constraint on what crimes Congress may make triable by military commission. On its face, that is an extraordinary argument that would, *as a matter of U.S. constitutional law*, subordinate the U.S. Congress and the U.S. President to the dictates of the international community – a community that at any given time could be unsupportive of or even hostile to U.S. national security interests as defined by Congress and the President. And because conspiracy is not and has not been an offense under the international law of war, the argument would render the Lincoln conspirators and Nazi saboteur convictions for conspiracy illegitimate and unconstitutional. I would reject the argument.

Bahlul spins out the argument in two different ways. First, he contends that Congress's authority to create offenses triable by military commission stems exclusively from the Article I Define and Punish Clause, which allegedly confines military commissions to trying only international law of war offenses. I will consider that argument in this Part II of the opinion. Second, Bahlul contends that the jury trial protections of Article III and the Fifth and Sixth Amendments generally require jury trials, and that the exception to those jury trial protections for military commissions applies only to international law of war offenses. I will consider that argument in Part III below.[7]

Bahlul says that Congress may enact offenses triable by U.S. military commissions only under Congress's Article I, Section 8 power to "define and punish . . . Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10. Because conspiracy is not an offense under international law, Bahlul argues that Congress lacked power under Article I, Section 8 to make the offense triable by military commission.

The premise of this argument is incorrect. As the Supreme Court has repeatedly stated, Congress's authority to establish military commissions to try war crimes does not arise exclusively from the Define and Punish Clause. On the contrary, as the Supreme Court has explained, Congress also has authority to establish military commissions to try war

---

[7] For purposes of Bahlul's jury trial, equal protection, and First Amendment arguments, I will assume for the sake of argument that those constitutional protections apply to non-U.S.-citizens at Guantanamo. *See supra* note 3; *Kiyemba v. Obama*, 561 F.3d 509, 518 n.4 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (similarly assuming for sake of argument that Due Process Clause applies to Guantanamo). Even so, as I will explain, Bahlul's arguments are unavailing.

crimes under the Declare War and Necessary and Proper Clauses of Article I, Section 8. *See* U.S. CONST. art. I, § 8, cls. 11, 18; *Hamdan v. Rumsfeld*, 548 U.S. 557, 591-92 & n.21 (2006); *Madsen v. Kinsella*, 343 U.S. 341, 346 n.9 (1952); *Ex parte Quirin*, 317 U.S. 1, 26-31 (1942); *see also* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 831 (rev. 2d ed. 1920) (military commission "is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war"). And unlike the Define and Punish Clause, the Declare War Clause and the other Article I war powers clauses do not refer to international law and are not defined or constrained by international law. In other words, at least as a matter of U.S. constitutional law (as distinct from international law), the United States is not subject to the whims or dictates of the international community when the United States exercises its war powers. Therefore, under the text of Article I, international law is not a constitutional constraint when Congress proscribes war crimes triable by military commission.

That interpretation also follows from historical practice. In accordance with the constitutional text, Congress since the earliest days of the Republic has gone beyond international law in proscribing war crimes triable by military commission. *See* 10 U.S.C. §§ 950t(26), 950t(27) (2012) (aiding the enemy and spying); 10 U.S.C. §§ 904, 906 (2000) (same); Articles of War of 1806, 2 Stat. 359, 366, 371 (1806) (same). That historical practice strongly supports the conclusion that international law is not a constitutional constraint when Congress proscribes war crimes triable by military commission. *Cf. NLRB v. Noel Canning*, No. 12-1281 (U.S. June 26, 2014) (relying on longstanding historical practice to interpret Constitution).

And perhaps most important for us as a lower court is the Supreme Court's decision in *Quirin*. There, the Court rejected various constitutional challenges to military commissions. In so doing, the Court emphasized among other things that U.S. military commissions have long possessed statutory authority to try the offense of spying, which was not and has never been an offense under the international law of war. *See Quirin*, 317 U.S. at 41-42; *see also* U.S. Br. 71 (spying not an international law of war offense); National Institute of Military Justice Amicus Br. 18 n.8 (same); *Hamdan v. United States*, 696 F.3d 1238, 1246 n.6 (D.C. Cir. 2012) (*Hamdan II*) (Kavanaugh, J., concurring) (same). *Quirin*'s approval of spying, a non-international-law-of-war offense, as an offense triable by military commission confirms that Congress has authority under the Constitution to make non-international-law-of-war crimes triable by military commission.

In short, the constitutional text, longstanding statutes, and Supreme Court precedent all demonstrate that Article I does not limit Congress to international law of war offenses when it proscribes war crimes triable by military commission.

III

Citing the jury trial protections of Article III and the Fifth and Sixth Amendments, Bahlul reprises the same basic argument that U.S. military commissions may try only international law of war offenses. This version of Bahlul's argument begins with the premise that the Constitution requires all crimes to be tried by jury. Bahlul recognizes, as he must, that the Supreme Court in *Quirin* nonetheless permitted trial by military commission for war crimes. *See Ex parte Quirin*, 317 U.S. 1, 38-45 (1942); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 592-93 (2006). But Bahlul says that

this exception to the jury trial right extends only to international law of war offenses.

To begin with, there is no textual support for Bahlul's theory. There is no textual reason to think that the exception to the jury trial protections for military commissions is somehow confined to international law of war offenses. That exception, as the Supreme Court has explained, stems from the various war powers clauses in Article I and Article II. And those war powers clauses are not defined or constrained by international law. *See Hamdan*, 548 U.S. at 591-92; *Quirin*, 317 U.S. at 25-27.

Moreover, Bahlul's novel theory contravenes precedent: It is inconsistent with the Lincoln conspirators and Nazi saboteurs conspiracy convictions, and it cannot be squared with *Quirin*.

In *Quirin*, the defendants argued that they had a constitutional right to trial by jury and thus could not be tried by military commission. At some length, the Court in *Quirin* specifically rejected the defendants' Article III and Fifth and Sixth Amendment jury trial objections to trial by military commission. *See Quirin*, 317 U.S. at 38-45. The Court explained that the Constitution's jury trial provisions "did not enlarge the right to jury trial" beyond the right as it existed at common law. *Id.* at 39. Because the common law did not preclude military commission trials, "Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission." *Id.* at 40.

For present purposes, two things are notable about *Quirin*. First, in reaching its conclusion on the jury trial issue, the Court relied on the fact that Congress had made spying an

offense triable by military commission since the earliest days of the Republic. The Court said that the early Congress's enactment of the spying statute "must be regarded as a contemporary construction" of both Article III and the Fifth and Sixth Amendments "as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id.* at 41. "Such a construction," the Court said, "is entitled to the greatest respect." *Id.* at 41-42. To reiterate, the offense of spying on which the Court relied was not and has never been an offense under the international law of war. It thus makes little sense to read *Quirin* as barring military commission trial of non-international-law-of-war offenses when *Quirin*, in rejecting a jury trial objection to military commissions, relied expressly on a longstanding statute making a *non*-international-law-of-war offense triable by military commission. Second, nothing about the Court's reasoning in *Quirin* on this point depended on whether the offense tried before a military commission was an international law of war offense or, by contrast, was a military commission offense recognized only by U.S. law. In other words, the Court never stated that military commissions are constitutionally permitted only for international law of war offenses, which one would have expected the Court to say if the Court believed that military commissions are constitutionally permitted only for international law of war offenses.

In short, neither Article I nor the jury trial protections of Article III and the Fifth and Sixth Amendments limit Congress to the international law of war when Congress proscribes war crimes triable by military commission. Put another way, the United States may be a leader in the international community, not just a follower, when Congress authorizes war against a terrorist organization or makes

crimes such as conspiracy war crimes triable by military commission. To be sure, it can be quite prudent (and in some circumstances required as a matter of international law) for Congress and the President to coordinate closely with the international community and to pay careful attention to international law when authorizing war and enacting war crimes triable by military commission. But those policy factors, political realities, and international law considerations are not *constitutional* constraints incorporated into the Article I war powers clauses or the jury trial guarantees of Article III and the Fifth and Sixth Amendments.

IV

Bahlul also raises an equal protection challenge under the Due Process Clause of the Fifth Amendment. Bahlul argues that the Military Commissions Act of 2006 violated equal protection principles because it was underinclusive in authorizing military commission trials of alien enemy combatants but not of U.S. citizen enemy combatants. *See* 10 U.S.C. §§ 948b(a), 948c, 948d(a) (2006); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (Fifth Amendment includes equal protection component). That argument is meritless.

The Government correctly points out that many federal laws draw distinctions between U.S. citizens and aliens, and that the Supreme Court has upheld many such laws. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 522 (2003); *Mathews v. Diaz*, 426 U.S. 67, 78-80 (1976); *see also Bluman v. FEC*, 800 F. Supp. 2d 281, 287 (D.D.C. 2011), *affirmed*, 132 S. Ct. 1087 (2012). The Supreme Court has explained that any federal "policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government" and that such "matters are so

exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Mathews*, 426 U.S. at 81 n.17 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)). As a result, federal laws drawing distinctions between U.S. citizens and aliens – particularly in the context of war and national security – are generally permissible so long as they are rationally related to a legitimate governmental interest. *See Demore*, 538 U.S. at 527-28; *Mathews*, 426 U.S. at 83; *United States v. Ferreira*, 275 F.3d 1020, 1025-26 (11th Cir. 2001); *United States v. Lue*, 134 F.3d 79, 87 (2d Cir. 1998); *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). Here, Congress chose to create a distinct system of military commissions to try non-U.S. citizens who commit war crimes. The Government reasonably explains that "Congress had a vital national security interest in establishing a military forum in which to bring to justice foreign unlawful belligerents whose purpose it is to terrorize innocent U.S. citizens and to murder U.S. military personnel." U.S. Panel Br. 86. Such a wartime distinction between alien enemy combatants and U.S. citizens easily satisfies rational basis review. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 768-77 (1950). Bahlul's equal protection challenge has no merit.

V

Bahlul also raises a First Amendment argument, claiming that he was unconstitutionally prosecuted for his political speech, including his production of the al Qaeda recruitment video celebrating the terrorist attack on the *U.S.S. Cole*. That argument, too, lacks any merit.

As an initial matter, Bahlul was convicted of conspiracy based on his conduct. The military commission found that Bahlul, among other acts, "traveled to Afghanistan with the

purpose and intent of joining al Qaeda," "underwent military-type training at an al Qaeda sponsored training camp," "acted as personal secretary and media secretary of Usama bin Laden in support of al Qaeda," arranged for two September 11th hijackers to pledge loyalty oaths to bin Laden, and "operated and maintained data processing equipment" "for the benefit of Usama bin Laden." App. 122-23.

Moreover, although non-U.S. citizens arguably may have some First Amendment rights at Guantanamo or in other U.S. territories for any speech they engage in *there*, non-U.S. citizens have no First Amendment rights abroad in foreign countries. The Supreme Court has applied the Constitution to aliens in the United States and in U.S. territories, but has not extended constitutional rights to aliens in foreign countries. *See Boumediene v. Bush*, 553 U.S. 723, 768-71 (2008) (applying Article I, Section 9 to U.S. Naval base at Guantanamo, which was "[i]n every practical sense . . . not abroad"); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (declining to apply Fourth Amendment to search and seizure of alien's property in Mexico); *Johnson v. Eisentrager*, 339 U.S. 763 (1950) (declining to apply habeas corpus right to U.S.-controlled military prison in Germany); *see also Al Maqaleh v. Hagel*, 738 F.3d 312 (D.C. Cir. 2013) (declining to apply habeas corpus right to U.S. military base in Afghanistan); *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010) (same). Therefore, Bahlul had no First Amendment rights as a non-U.S. citizen in Afghanistan when he led bin Laden's media operation.

In addition, even if the First Amendment did apply to Bahlul's speech in Afghanistan, the Supreme Court has made clear that the First Amendment does not protect speech such as Bahlul's that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

*Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)); *see also United States v. Stevens*, 559 U.S. 460, 471 (2010) (First Amendment not understood to protect "speech or writing used as an integral part of conduct in violation of a valid criminal statute"). That is particularly true when the Government seeks "to prevent imminent harms in the context of international affairs and national security." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010); *see United States v. Rahman*, 189 F.3d 88, 116-18 (2d Cir. 1999). Under that traditional test, the speech encompassed within the charges against Bahlul – including a terrorist recruitment video produced on foreign soil that "was aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction" – was not protected speech under the First Amendment. *United States v. Bahlul*, 820 F. Supp. 2d 1141, 1249 (C.M.C.R. 2011) (en banc). The Constitution is not a suicide pact. *Cf. Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

## VI

A few words in response to the majority opinion: I find the majority opinion surprising both in what it decides and in what it declines to decide.

*First*, I am surprised by what the majority opinion decides. After all, the majority opinion reaches the same bottom-line conclusion that this Court reached in *Hamdan II*: The offense of material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act. But the majority opinion does so based on the Ex Post Facto Clause alone and "overrules" *Hamdan II*'s statement that the 2006 Act itself incorporates ex post facto principles. That seems to be a meaningless exercise by the

majority opinion. Applying the canon of constitutional avoidance, *Hamdan II* reasoned that the 2006 Act could not be applied to new offenses that were not previously triable by military commission. *Hamdan II* was based on its understanding of the limits of the Ex Post Facto Clause. *Hamdan II* indicated that the 2006 Act allowed prosecutions of the listed offenses for pre-2006 conduct to the extent that the Ex Post Facto Clause allowed such prosecutions. As the Court said, "Congress incorporated ex post facto principles into the terms of" the Act. *Hamdan II*, 696 F.3d at 1248 (internal quotation mark omitted). So whether we apply the Constitution to inform interpretation of the statute or we apply the Constitution to limit the statute, the question in this case is the same: What are the constraints imposed by the Ex Post Facto Clause?[8]

On that question, my view is that the Ex Post Facto Clause bars retroactive prosecution at Guantanamo of new offenses that were not previously triable by military commission. But the majority opinion suggests (although it does not definitively conclude) that the Ex Post Facto Clause is less of a constraint on the Government and may allow

---

[8] Judge Henderson's concurrence, which speaks only for her, notes quite correctly that the majority opinion today overrules *Hamdan II*'s reliance on the 2006 Act (as opposed to the Ex Post Facto Clause) as a basis for concluding that material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act. What Judge Henderson does not say in her concurrence is this indisputable fact: Based on the Ex Post Facto Clause, the majority opinion today reaches the same result as *Hamdan II* by concluding that material support for terrorism may not be tried by military commission for conduct that occurred before the 2006 Act, which in turn means that Salim Hamdan's material support for terrorism conviction was properly overturned by this Court in *Hamdan II*.

military commissions at Guantanamo to retroactively prosecute offenses that were previously triable as federal crimes in Article III federal courts, *even if* those offenses were not previously triable by military commission.

I am surprised by this rather aggressive suggestion about the meaning of the Ex Post Facto Clause. After all, that position was not forcefully advocated by the Government in its submission to the en banc Court, as the argument appeared only in a short discussion late in its brief. In the hour-long oral argument, moreover, the Government did not advance that argument, and no Judge asked any question along those lines or suggested this as a possible approach.

Moreover, like Judge Brown (as well as Judge Rogers), I too respectfully have serious doubts about the majority opinion's suggestion that the Ex Post Facto Clause may allow military commissions to *retroactively* prosecute crimes that were previously triable as federal crimes in federal court even when they were not previously triable by military commission. Can Congress, consistent with the Ex Post Facto Clause, really just pull out the federal criminal code and make offenses *retroactively* triable before military commissions? I am aware of no commentator who has taken that position or even analyzed the question. I have found no precedent taking that position or analyzing the question. And even Congress, hardly in a passive mode when it enacted the 2006 Act, did not go so far as the majority opinion about the meaning of the Ex Post Facto Clause. The text of the 2006 Act reveals that Congress thought there was no ex post facto problem because the listed offenses were previously triable *by military commission*. *See* 10 U.S.C. § 950p(a) (2006). If Congress had thought it enough that there were some prior federal criminal statutes on the books, Congress no doubt would have relied on that point to respond to the ex post facto concerns.

But as best as I can tell, no Member said as much. On the contrary, the text of the Act itself demonstrates that Congress thought it necessary, in order to overcome ex post facto objections, to show that the offenses had been previously triable *by military commission*.

It is especially surprising for the majority opinion to take its doubly aggressive approach – overruling one aspect of a precedent of this Court and advancing a heretofore unheard-of view of the Ex Post Facto Clause's application to military commissions – when it is unnecessary to do so here. After all, in what it terms an "independent and alternative" holding, the majority opinion says that plain error review applies and concludes that the conspiracy conviction was not plain error because conspiracy at least arguably was triable by military commission under Section 821 at the time of Bahlul's conduct. The majority opinion notes, correctly, that it is impossible to describe the Government's position on conspiracy and Section 821 as plain error when the issue remains open in the Supreme Court and three Justices in *Hamdan* agreed with the Government's position. The majority opinion could have said no more than what it says about Section 821 to resolve the conspiracy ex post facto issue for purposes of Bahlul's appeal.

*Second*, from the other direction, I am also surprised by what the majority opinion does *not* decide. We took this case en banc specifically to decide whether, consistent with the Ex Post Facto Clause, a military commission could try conspiracy for conduct that occurred before the 2006 Act. Yet the majority opinion does not actually decide that question.

That is because the majority opinion applies the plain error standard of review. The majority opinion thus does not

decide whether there was error in the conspiracy conviction; instead, it decides only whether any alleged error was plain.

Like Judge Brown (as well as Judge Rogers), I too disagree with the majority opinion's use of a plain error standard of review. To begin with, Bahlul did not forfeit his ex post facto objection, so he is legally entitled to de novo review of that issue and does not have to meet the high bar of showing plain error. Bahlul raised an ex post facto issue when he pled not guilty and, among other things, posed to the Military Judge a "legal question": "Does the law here start from before, during, or after?" Supp. App. 37; *see id.* (Bahlul asking whether "the law here" "stems from the action, before action, or post action?").

But put that aside. Even if Bahlul did not expressly raise an ex post facto objection at trial, the issue is not forfeitable under Rules 905 and 907 of the Rules of Military Commissions. Those Rules contain two exceptions to the usual forfeiture rules for objections based on a "lack of jurisdiction" or "failure of a charge to allege an offense." MANUAL FOR MILITARY COMMISSIONS pt. II, at II-83-84 (2007); *see id.* at II-87; *see also* MANUAL FOR MILITARY COMMISSIONS pt. II, at II-89-91, II-95 (2012). In this case, each of those two exceptions applies. As the relevant statutes say on their face, the question of whether conspiracy may be charged is jurisdictional – whether the military commission had "jurisdiction" over the offense. 10 U.S.C. § 948d(a) (2006) (military commissions have "*jurisdiction* to try any offense made punishable by this chapter or the law of war") (emphasis added); 10 U.S.C. § 821 (2000) ("provisions of this chapter conferring *jurisdiction* upon courts-martial do not deprive military commissions . . . of concurrent *jurisdiction* with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions") (emphases

added). Indeed, the Military Judge construed Bahlul's sometimes rambling comments as an objection to the military commission's jurisdiction. *See* Supp. App. at 31-32.

And in any event, the question raised by Bahlul in this Court is surely whether the conspiracy charge fails to "allege an offense," which is the other kind of non-forfeitable objection under Rules 905 and 907.[9] Although there is obviously scarce precedent interpreting the recently promulgated Rules of Military Commissions with respect to a charge that fails to state an offense, the same basic language is found in Federal Rule of Criminal Procedure 12(b)(3)(B). That Criminal Rule provides an exception to waiver or forfeiture in criminal cases for, among other things, a claim that the indictment or information "fails to state an offense." Interpreting that language, courts have determined that constitutional objections such as Ex Post Facto Clause claims challenging the validity of the charge are objections that the charge failed to state an offense – and thus may be raised for the first time on appeal and reviewed de novo even if those objections were not timely raised in the district court proceedings. *See United States v. Haddock*, 956 F.2d 1534, 1542 (10th Cir. 1992) (reviewing de novo Ex Post Facto Clause challenge that was not raised prior to trial); *United States v. Gilbert*, 813 F.2d 1523, 1528-29 (9th Cir. 1987) (constitutional challenges attacking "the sufficiency of the information to charge an offense . . . may be raised for the

---

[9] Rules 905 and 907 are entitled "waiver" but those Rules, like the other Rules of Military Commissions, use that term (imprecisely) to cover both waived arguments and forfeited arguments. *See* MANUAL FOR MILITARY COMMISSIONS pt. II, at II-83-84, II-87 (2007); MANUAL FOR MILITARY COMMISSIONS pt. II, at II-89-91, II-95 (2012); *see also* Rules 920(f), 1005(f), 1106(e)(6), MANUAL FOR MILITARY COMMISSIONS pt. II, at II-115, II-125, II-145 (2007).

first time on appeal"); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973) ("The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional. That objection may be raised for the first time on appeal."); *see also United States v. Al Hedaithy*, 392 F.3d 580, 586 (3d Cir. 2004) (reviewing de novo Rule 12(b)(3)(B) objection that was not raised at trial); *United States v. Panarella*, 277 F.3d 678, 682-86 (3d Cir. 2002) (same); *United States v. Maybee*, No. 11-30006, 2011 WL 2784446, at *3 (W.D. Ark. July 15, 2011) ("Courts have held that a claim that the indictment fails to 'charge an offense' includes a claim that the statute creating the offense is unconstitutional."), *aff'd*, 687 F.3d 1026 (8th Cir. 2012); *United States v. Thomas*, 534 F. Supp. 2d 912, 915 (N.D. Iowa 2008) ("It is settled that a claim that the indictment fails to state an offense under Rule 12(b)(3)(B) includes a claim that the statute creating the offense is unconstitutional.") (internal quotation marks and ellipses omitted), *aff'd sub nom. United States v. Howell*, 552 F.3d 709 (8th Cir. 2009); MOORE'S FEDERAL PRACTICE § 612.04 (Lexis 2014) ("The defense of failure to charge an offense may be based on the absence of an essential element in the indictment, indefiniteness of allegations, the lack of a statute creating the crime, or the unconstitutionality of the statute relied upon.").[10]

---

[10] Notably, the Advisory Committee on the Federal Rules of Criminal Procedure has recently recommended changing this aspect of Rule 12(b)(3)(B), apparently because it is somewhat too lenient. Under the proposed change, the argument that a charge failed to state an offense would no longer be an exception to the usual rules governing waiver and forfeiture. In other words, a defendant would no longer be able to raise an argument that the charge failed to state an offense for the first time on appeal and still receive de novo review of that claim. *See* SUMMARY OF THE REPORT OF THE JUDICIAL CONFERENCE COMMITTEE ON RULES OF PRACTICE AND

Finally, even if the issue had been forfeited and plain error review applied, the majority opinion still would possess discretion to decide the ex post facto issue under the first prong of the plain error test as defined by the Supreme Court and conclude that there was no "error" in the conspiracy conviction. *See United States v. Olano*, 507 U.S. 725, 732 (1993). The majority opinion should do so. Courts have an appropriate role in times of war to decide certain justiciable disputes – but we should do so "with as much clarity and expedition as possible." *Kiyemba v. Obama*, 561 F.3d 509, 522 (D.C. Cir. 2009) (Kavanaugh, J., concurring). The majority opinion's failure to decide the ex post facto question with respect to conspiracy does not comport with that principle, in my respectful view. Given the various pending cases raising the same question and the need for guidance in those wartime tribunals, I believe that the majority opinion should decide the issue.

On top of not deciding how the ex post facto principle applies to conspiracy trials before military commissions, the majority opinion also does not decide Bahlul's Article I, jury trial, equal protection, or First Amendment challenges, but rather sends those four issues back to a three-judge panel for resolution. I also respectfully disagree with that approach. The remaining issues are not that complicated; we have the

---

PROCEDURE, Rules Appendix C-15-C-26 (Sept. 2013). But that proposed rule change, which has not yet taken effect, just highlights what the "fails to state an offense" language means now in the Criminal Rules. And that is the same language that the Rules of Military Commissions uses. Unless and until the Rules of Military Commissions are likewise changed, therefore, an argument that a military commission charge failed to state an offense – such as the Ex Post Facto Clause argument here – may be raised for the first time on appeal and receive de novo review.

requisite briefing; and we could request supplemental briefing if need be. Moreover, those issues are especially easy to decide on plain error review, which after all is the standard of review that the majority opinion indicates must be applied to those issues. Sending the case back to a three-judge panel will delay final resolution of this case, likely until some point in 2015, given the time it will take for a decision by the three-judge panel and then resolution of any future petitions for panel rehearing or rehearing en banc. Like Judge Brown, I believe that we should resolve the case now, not send it back to the three-judge panel.

In short, I respectfully disagree with the majority opinion's addressing the ex post facto issue in a way that does not actually decide the legal issue with respect to conspiracy and provides little clarity or guidance on that issue going forward, and also with its sending the other four issues back to a three-judge panel. There is a time to avoid and a time to decide. Now is the time to decide.

\* \* \*

In sum, I would affirm Bahlul's conspiracy conviction, vacate the material support for terrorism and solicitation convictions as ex post facto violations, and remand to the U.S. Court of Military Commission Review for it to address the consequences, if any, for Bahlul's life sentence.[11]

---

[11] The Supreme Court in *Quirin* affirmed the Nazi saboteurs' convictions and sentences on one charge and declined to review their convictions on the remaining charges. *See Ex parte Quirin*, 317 U.S. 1, 46 (1942). That approach reflected the practice at the time for American appellate review of criminal convictions. The modern American appellate practice, however, is to address each conviction separately in these circumstances. *See Rutledge v. United States*, 517 U.S. 292, 301-03 (1996); *Ray v. United States*,

36

---

481 U.S. 736, 736-37 (1987).  Absent contrary indication, I assume that Congress intended appellate review under the Military Commissions Acts of 2006 and 2009 to proceed in the same manner as modern appellate review of multiple criminal convictions.  For that reason and because a sentence was not specified for each individual offense in this case, I have addressed the material support for terrorism and solicitation offenses as well as the conspiracy offense.